**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | |
| | **:** | **CRIMINAL NO. 21-CR-145 (JDB)** |
| **LUIS MIGUEL TEIXEIRA-SPENCER,** | **:** | |
| **and OLATUNJI DAWODU,** | **:** | |
| | **:** | |
| **Defendants.** | **:** | |

**GOVERNMENT'S MEMORANDUM FOR PRETRIAL DETENTION**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in support of its motion for pretrial detention of Defendants Luis Spencer and Olatunji Dawodu. In support of this motion, the United States relies on the following points and authorities and such other points and authorities as may be cited at any hearing on this matter.[1]

**BACKGROUND AND STATEMENT OF FACTS**

Investigation of Johncarter7

The FBI, in partnership with other law enforcement agencies, conducted a criminal investigation of a Darknet market vendor that operates the moniker "johncarter7."[2] Beginning in approximately February of 2017, and continuing through May of 2020, johncarter7 sold pills pressed with fentanyl on a number of Darknet markets, including AlphaBay, Wall Street, Dream, and Empire.   As one darknet market would get shut down, the vendor would migrate to new

---

[1] As noted in the Motion for Emergency Review, a Detention Hearing was held in the Southern District of Florida on March 31, 2021.  The transcript has been requested, but is not yet available.  The government is providing a written proffer and arguments in writing here to supplement the transcript that will be provided.

[2] A related investigation was simultaneously conducted with another darknet site, "PolarSprings."  The sale of fentanyl pills from PolarSprings is the subject of the second indictment charging Defendant Dawodu and Defendant Ogando (21-CR-163).

markets.   The vendor listed the pills as "oxycodone M30 best in the market," but included descriptions on its site that noted that the pills contained fentanyl and claimed that the "pills are pressed with just the right amount of fentanyl no hot spots."   This language sought to convey to customers that the pills would pose less of a risk of overdose ("no hot spots").

Records from the markets and from servers seized when certain markets were shut down by law enforcement indicate the following volumes of pill sales from the vendor Johncarter7:

- more than 40,000 pills were sold on AlphaBay;
- approximately 8,000 pills on Dream;
- approximately 1,700 pills on Wall Street; and
- more than 18,000 on Empire.

Johncarter7 also began communicating with customers directly without using the darknet markets, through an encrypted messaging application called Jabber.   In those transactions, johncarter7 would provide a bitcoin address for the customer to provide payment and would then send the requested pills to the customer directly.

<u>Identification of Spencer</u>

During the course of the investigation into the vendor, law enforcement identified that the sites on Dream, Wall Street, and Empire all had the same Pretty Good Privacy (PGP)[3] public key—and embedded within each key was the same email address.   Law enforcement obtained records related to the embedded email address that link the email address to Luis Spencer.

---

[3] PGP encryption, while having various legitimate uses, is also used by dark web vendors to encrypt their communication with customers. When a user creates a PGP encryption key, the user is provided a public and private key. Both the public and private keys are unique and would never generate duplicates. Dark web vendors advertise their public keys on marketplaces as a way for customers to encrypt messages to them, while keeping their private keys secret to be used to decrypt the messages. As dark web markets have been disrupted over the past few years and vendors are forced to create new accounts on new markets, use of the same public PGP key across markets is considered the best way for a vendor to prove that the vendor is who the vendor purports to be, since only the true vendor would have access to the private key.

Specifically, the email address embedded in the PGP key was the recovery address for an account on Localbitcoins.com, a cryptocurrency exchange.   The Localbitcoins.com account name was "johncarter777."   Law enforcement contacted a bitcoin trader who engaged in numerous transactions with johncarter777 and that bitcoin trader identified Spencer's photograph as the individual with whom he had traded cash for bitcoin (the trader met with Spencer in person on a number of occasions, but knew him to go by a nickname and did not know his first and last name).   The same bitcoin trader also conducted trades with Spencer under another handle and records for that handle include Spencer's name, as well as a phone number and email used by Spencer.   The bitcoin trader's phone had a saved contact in the Telegram application with the name "LBC johncarter777."   The bitcoin trader advised that the contact was for the individual who he had identified in the photograph (Defendant Spencer).   Individuals attempting to conceal proceeds from illegal narcotics trafficking on the darknet will often seek to "cash out" the bitcoin (proceeds from the transactions) with individuals who are willing to trade cash for bitcoin off of bitcoin exchanges, in order to avoid reporting requirements that an exchange might have to comply with.

Additionally, law enforcement has traced funds from johncarter7 to Spencer. Specifically, records from Coinbase, another virtual currency exchange, reveal proceeds from johncarter7 were used to process a payment to Expedia to reserve a hotel room in Ft. Lauderdale from May 27-May 29, 2017.   Records from Expedia indicate the reservation was paid for in Bitcoin and was made in Luis Spencer's name and included his phone number and email address. Additionally, in June and December of 2019, an undercover officer conducted direct buys of pills from johncarter7 using Jabber.   The undercover made payments to bitcoin addresses provided by

johncarter7; law enforcement was able to trace those payments from the undercover to an account at Binance connected to Spencer (and the Binance account was accessed numerous times from an IP address in Spencer's name, at Spencer's residence).

<u>Identification of Dawodu</u>

One of Spencer's top contacts is Olatunji Dawodu. During the course of the conspiracy, toll records reflect approximately 1,496 calls between Spencer and Dawodu from June 17, 2019, until November 15, 2020. Law enforcement also observed the two meet on numerous occasions. Law enforcement installed a pole camera that captured Dawodu and Spencer coming and going from a storage unit in Davie, Florida (where they were frequently seen bringing in and taking out boxes). Defendants Spencer and Dawodu were also observed on multiple occasions at Spencer's residence. In a review of messages from Dawodu's iCloud account that were obtained during the course of this investigation, law enforcement has identified Defendant Spencer sending what appear to be bitcoin wallet addresses to Spencer on more than one occasion.

During surveillance of Dawodu, law enforcement observed Dawodu drop packages containing pills at USPS boxes on two separate occasions. Specifically, on July 17, 2019, law enforcement observed Dawodu drop packages at a blue USPS mailbox. Law enforcement subsequently made contact with two of the intended recipients. Both packages contained pills that were consistent with the pills purchased by the undercover from johncarter7. In interviewing the intended recipients and reviewing their accounts, law enforcement was able to confirm that the two seized packages had been ordered from johncarter7 (on Empire Market). Similarly, in August of 2019, law enforcement again observed him drop packages. Law enforcement followed up with the intended recipient of one of the packages and that individual

provided consent to open the package (which again contained pills packaged similarly to the pressed fentanyl pills seized throughout the investigation).  In addition to the pills connected to johncarter7, a confidential human source also purchased pills directly from Dawodu on multiple occasions, including in May of 2020, October of 2020, and twice in January 2021.  The pressed pills purchased by the confidential human source were consistent with the pills that were in the packages dropped by Dawodu that had been purchased on johncarter7.

<u>Search Warrants at Residences</u>

On February 23, 2021, search warrants were conducted at both defendants' residences. Evidence of the drug conspiracy were recovered from the residences, including:

- **Dawodu's Residence** (Ft. Lauderdale, FL)

  o Approximately 1,400 grams of pills containing suspected fentanyl (consistent with pills ordered through the darknet markets);

  o Numerous electronic devices; and

  o Approximately 30 USPS mailing envelopes, consistent with those used to ship drugs during the course of the conspiracy.

Photographs of items recovered from Dawodu's residence include:









The pills and packaging located in Dawodu's residence were consistent with the packaging from the johncarter7 undercover purchases, as well as from the packages purchased form Johncarter7 that law enforcement observed Dawodu drop at U.S. Postal Boxes in July and August of 2019.

- **Spencer's Residence** (Ft. Lauderdale, FL)

  o More than $12,000 in U.S. Currency;

  o Numerous digital devices; and

  o Ledgers.

<u>Dawodu and Spencer's Connections to Alex Ogando</u>

Defendant Dawodu is separately charged based on his involvement in a related drug conspiracy involving Alex Ogando.  That conspiracy involves the operation of another darknet site that used the moniker "PolarSprings."  That conspiracy is detailed in the indictment in Case No. 21-CR-163 (<u>United States v. Dawodu & Ogando</u>).  Alex Ogando is a known associate of both Spencer and Dawodu.

On or about January 14, 2021, video footage captured Ogando and Dawodu arriving together in a black Jeep at and entering Ogando's residence in Providence, Rhode Island.[4]   A search warrant was conducted at Ogando's residence and during the search, the following items were recovered:

  o Approximately $370,000 in U.S. currency;

  o A money counter;

  o Numerous electronic devices;

---

[4] The black Jeep is registered in Ogando's name, but is registered at Dawodu's address in Ft. Lauderdale (the address where the search warrant described below was executed).  Additionally, paperwork related to Dawodu's GMC Yukon (a vehicle used during drug transactions) was recovered inside of Ogando's residence.

    o  More than 1,770 grams of pills that field tested positive for fentanyl;

    o  Approximately 30 USPS Priority Mail envelopes with filled pill orders (pills had been packed in the envelopes, but no labels had yet been affixed) containing an additional approximately 363 grams of suspected fentanyl pills.

Additionally, messages exchanged between Dawodu and Individual #1 discuss what appear to be package drops (including images of USPS blue boxes) and Individual #1's fingerprint was identified on a PolarSprings package that was purchased during an undercover transaction in the course of the investigation. Additionally, in a saved not on Dawodu's iCloud, there were references to what appears to be financial transactions with Ogando and Individual #1.

Evidence of Spencer's Obstruction

In a recorded jail call between Spencer and his girlfriend, Claudia Schilling, (who resides with him at the location where the search warrant was executed) shortly after his arrest, Spencer directed the girlfriend to get rid of laptops that had been inadvertently missed by the FBI during their search of the residence. Specifically, on the call Spencer asks Schilling about a backpack on the floor "with garbage and shit" in it and inquires if they [law enforcement] took it. Spencer then further clarified which backpack he was referring to. Schilling then appears to locate the backpack Spencer described to her and states "it's right here…there's laptops in here." Schilling appears to express surprise upon locating the contents of the backpack. Spencer immediately responds "get rid of it!" Later on during the call, he again directs his girlfriend at least two more times to get rid of the backpack. Spencer also inquired about other specific items were seized during the search warrant, including the ledgers. Because law enforcement is still in the process of reviewing the digital devices seized from Spencer's residence, it is possible that Defendant

8

Spencer would be able to move or hide bitcoin if he were released and able to access his wallets.

## APPLICABLE LAW

Here, the Government has requested a pretrial detention hearing under a provision of the Bail Reform Act, 18 U.S.C. § 3142(f)(1)(C), which provides that a judicial officer "shall hold a hearing to determine whether any condition or combination of conditions set forth in subsection (c) of this section will reasonably assure the appearance of such person as required and the safety of any other person and the community" upon motion for a case that involves "an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act." 18 U.S.C. § 3142(f)(1)(C). The Controlled Substance offense charged here meets these criteria.

Under the statute, pretrial detention must be supported by clear and convincing evidence when the justification involves the safety of the community, and a preponderance of the evidence when the justification involves the risk of flight. *U.S. v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987). In considering either justification, the charged offense here (given that it is a Controlled Substances offense punishable by a maximum term of imprisonment of more than ten years and therefore meets the criterial of 18 U.S.C. § 3142(f)(1)(C)) and carries with it a rebuttable presumption that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community" where a judicial officer determines that there is probable cause to believe that the person committed the charged offense. 18 U.S.C. § 3142(e)(3) and (e)(3)(A). By itself, an indictment establishes that probable cause and triggers the presumption. *See*, *e.g., United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996) ("the indictment alone would have been enough to raise the rebuttable presumption that no

condition would reasonably assure the safety of the community"). Furthermore, under the Bail Reform Act the Government may proceed by way of proffer. *Smith*, 79 F.3d at 1210.

When considering the interplay of the statutory presumption and the "safety of any other person and the community" and "flight risk" justifications for pretrial detention, the common sense reasons for both the Bail Reform Act and the statutory presumption's treatment of serious drug trafficking offenses should be kept in mind. Under the Bail Reform Act, 18 U.S.C. §§ 3142 et seq., "[t]he statutory language, as well as the legislative history, unequivocally establishes that Congress intended to equate traffic in drugs with a danger to the community." *United States v. Strong*, 775 F.2d 504, 506 (3d Cir. 1985). Its legislative history also "fully supports the conclusion that Congress intended to equate drug trafficking with danger to the community." *Strong*, 775 F.2d at 507. As noted by the D.C. Circuit:

The legislative history indicates that the rebuttable presumption covering serious drug trafficking offenses was included because:

> 'Persons charged with major drug felonies are often in the business of importing or distributing dangerous drugs, and thus, because of the nature of the criminal activity with which they are charged, they pose a significant risk of pretrial recidivism. Furthermore, the Committee received testimony that flight to avoid prosecution is particularly high among persons charged with major drug offenses. Because of the extremely lucrative nature of drug trafficking, and the fact that drug traffickers often have established substantial ties outside the United States from whence most dangerous drugs are imported into the country, these persons have both the resources and the foreign contacts to escape to other countries with relative ease in order to avoid prosecution for offenses punishable by lengthy prison sentences.'

*United States v. Alatishe*, 768 F.2d 364, 370 n.13 (D.C. Cir. 1985) (quoting S. Rep. No. 225, 98th Cong., 1st Sess. 20 (1983), U.S. Code Cong. & Admin. News 1984, p. 3203). Thus, in creating a presumption of pretrial detention for serious drug trafficking offense, both the legislative history and the statutory language make clear that very "real-world" concerns lie

behind the recognition of the inherent, pretrial dangers and flight risks posed by those who commit serious drug trafficking offenses.

To be sure, that presumption is rebuttable and does not shift the ultimate burden of proof from the Government's shoulders. But it does create a burden of *production* on the defense to submit at least some credible evidence that might purport to overcome it. And even if the defense does submit such evidence, the presumption remains as a factor that may be considered by the Court amongst others in determining whether the defendant should be detained, and the presumption retains "evidentiary weight." *United States v. Dillon*, 938 F.2d 1412, 1416 (1st Cir. 1991) ("When a defendant produces such evidence, however, the presumption does not disappear. The burden of persuasion remains on the government and the rebutted presumption retains evidentiary weight") (citations omitted); *United States v. Rueben*, 974 F.2d 580, 586 (5th Cir. 1992) (the mere production of evidence [regarding flight risk for a drug offense] does not completely rebut the presumption . . . . In making its ultimate determination, the court may still consider the finding by Congress that drug offenders pose a special risk of flight and dangerousness to society" (citation omitted); *United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir. 1991) ("Although the government retains the burden of persuasion, a defendant must introduce some evidence contrary to the presumed fact in order to rebut the presumption . . . . Once a defendant introduces rebuttal evidence, the presumption, rather than disappearing altogether, continues to be weighed along with other factors to be considered when deciding whether to release a defendant. . . . *see also United States v. Jessup*, 757 F.2d 378, 382-83 (1st Cir.1985) (rejecting "bursting bubble" approach)" (internal citation omitted)); *see also United States v. Ali*, 793 F. Supp. 2d 386, 388 and 388 n.2 (D.D.C. 2011) ("Even if such contrary evidence or

credible proffers are offered, the presumption remains as a factor to be considered by the Court amongst others in determining whether the defendant should be detained").

In making a pretrial detention decision, by statute a judicial officer must consider four factors:  1) the nature and circumstances of the offense charged, including whether the offense involves such things as a controlled substance or a firearm; 2) the weight of the evidence against the person; 3) the history and characteristics of the person; and 4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. § 3142(g).

Here, the first factor, the nature and circumstances of the offense charged, clearly weighs in favor of detention. Here, a grand jury found probable cause to believe that the Defendants were involved in a sophisticated conspiracy to distribute more than 400 grams of a mixture and substance containing fentanyl.  Notably, over the course of johncarter7 operating across a number of darknet markets, the quantity of fentanyl distributed greatly exceeded the 10-year mandatory minimum quantity. Moreover, the quantity of pills recovered in Dawodu's residence alone is more than three times the amount that would support the 10-year mandatory minimum.

The distribution of these narcotics poses a very significant danger to our community. The nature of this offense and the statutory presumption therefore weigh heavily in favor of detention. Furthermore, the seriousness of the offense also poses a significant risk of substantial incarceration for the Defendants; if convicted, both defendants are subject to mandatory periods of incarceration (10 year mandatory minimum given the quantity of fentanyl). That exposure, in turn, only increases the incentive of the Defendants to flee.  This is especially true where both defendants have substantial ties to other countries and access to large amounts of U.S. Currency

and access to virtual currency.  Defendant Spencer is a citizen of Cape Verde and has a detainer in place based on his immigration status.  *See* Exh. 1.  As a result of that detainer, Defendant Spencer could be deported before he ever appears before this Court. Although Defendant Spencer contends that he intends to fight any deportation proceedings, that provides no assurance that he will not be deported or that he might not change his mind at a later date and avoid prosecution for these very serious offenses.  Additionally, Defendant Dawodu has significant ties to Nigeria (where his mother resides) and states that he is involved in exporting vehicles from this country, providing evidence of further connections that could assist him were he to try to flee the country to avoid the substantial penalties he faces. Finally, these defendants are familiar with darknet markets that, in addition to narcotics, often sell false or stolen forms of identification—which would further facilitate their ability to flee.

The second factor, the weight of the evidence, also clearly weighs in favor of detention. As set forth above, this case involves a long-standing, sophisticated drug trafficking operation that used the darknet and encrypted messaging applications to evade detection by law enforcement.   Additionally, the evidence recovered from the defendants' residences further corroborates their roles in the conspiracy and establish that the defendants have engaged in a conspiracy to traffic pills pressed with fentanyl.

The third factor, the history and characteristics of the person, also weigh in favor of detention. Although both defendants have limited criminal history, as Judge Strauss noted, the indictment charges the defendants with a drug-trafficking conspiracy that was able to avoid detection by law enforcement and spanned a number of years based on the use of electronic means that are designed specifically to conceal illegal activity.  As one darknet market would be

shut down, the vendor would migrate to new markets.  Additionally, the defendants' use of cryptocurrency, the darknet, and encrypted applications further evidences a level of sophistication that allowed them to operate this drug conspiracy without detection out of their own homes.  Using technology in this way, there would be no conditions that the Court could impose to prevent them from resuming such conduct while on home detention in this case.

Defendant Spencer's efforts to obstruct justice by directing his girlfriend to get rid of laptops in this case provides further evidence that he would not comply with release conditions if this Court were to release him pending trial.  Similarly, although Defendant Dawodu has not been charged with possessing a firearm in furtherance of drug trafficking, a firearm was located his bedroom where the large quantity of pills were stored.  The quantity of pills would make Defendant Dawodu a prime target for a robbery, so it is not surprising he would possess a firearm in order to protect the drugs in the residence.  In total, the Defendants are subject mandatory periods of incarceration on drug charges. These offenses, in concert with the way in which the drugs were trafficked in this case (using sophisticated technology to avoid detection), warrant detention in this case.  Additionally, both defendants have substantial ties to foreign countries (and Defendant Spencer has an immigration detainer that is currently in place that could result in his deportation) and present a risk of flight, especially given the very significant periods of incarceration they both face based on the charges in the indictment.

The fourth factor, the nature and seriousness of the danger to any person or the community posed by the Defendants' release, also weighs in favor of detention. As discussed above, the Defendants' activities pose a substantial danger to the community. The members of this conspiracy are involved in the large-scale distribution of pills pressed with fentanyl. In

creating the statutory presumption for pretrial detention, as noted above, Congress recognized the high risk of pretrial recidivism of those involved in serious drug trafficking offenses. Here, the continuing danger to the community that is posed by these defendants is quite evident. Additionally, Defendant Dawodu was not only selling fentanyl pills through the darknet, but was also doing direct deals (as evidenced by the transactions with the Confidential Human Source, referenced above).   Fentanyl is responsible for large numbers of overdose deaths and the defendants acted with complete disregard for the safety of the individuals who were purchasing the pills during the course of the conspiracy.[5]

In the end, given all of these facts and circumstances, the Defendants simply cannot present evidence sufficient to overcome the statutory presumption that the Defendants should be held without bond. Furthermore, even apart from that presumption, the weight of the evidence and the gravity of the alleged offenses provide compelling justification for the detention of the Defendants until this case is resolved.

---

[5]   *See, e.g.* 2019 National Drug Threat Assessment Report, available at https://www.dea.gov/sites/default/files/2020-01/2019-NDTA-final-01-14-2020_Low_Web-DIR-007-20_2019_1.pdf.   As the Report notes, a potential lethal dose of fentanyl is any dose greater than two milligrams (that is 2/1000th, or 1/500th, of a gram of fentanyl).  The quantities of pills trafficked in this conspiracy – and the quantity of narcotics recovered from the residences – thus presents grave dangers.   Additionally, although the listings attempted to reassure customers that there were no "hot spots" (a reference meant to reassure consumers that they would not risk an overdose), the defendants had no basis to make such assurances and the language in fact evidences that the defendants were aware of the dangers that these pills present.

WHEREFORE, the Government requests that the Court order the defendants to be detained without bond pending resolution of this case.

Respectfully submitted,

CHANNING D. PHILLIPS
United States Attorney
D.C. Bar No. 415793

By: _____/s/_____
LAURA CRANE
DC Bar No. 992454
RACHEL FLETCHER
Texas Bar No. 24078505
Assistant United States Attorneys
555 4th Street, N.W.
Washington, D.C. 20001
(202) 252-7667 (Crane)
(202)252-7093 (Fletcher)
Laura.crane@usdoj.gov
Rachel.Fletcher@usdoj.gov

16