Exh. A

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2
            Case No. 21-6099-MJ-JMS and 21-6100-MJ-JMS
 3
    UNITED STATES OF AMERICA,      )
 4                                 )
         GOVERNMENT,               )
 5                                 )
         -v-                       )
 6                                 )
    LUIS MIGUEL TEIXEIRA-SPENCER,  )
 7  AND OLATUNJI DAWODU,           )
                                   )
 8       DEFENDANTS.               )    Fort Lauderdale, Florida
                                   )    March 31, 2021
 9  _____ )
```

```
10


11       TRANSCRIPT OF VIDEO DETENTION AND REMOVAL HEARING

12           BEFORE THE HONORABLE JARED M. STRAUSS

13               UNITED STATES MAGISTRATE JUDGE


14
    Appearances:
15
    FOR THE GOVERNMENT          Trevor C. Jones, ESQ., AUSA
16                              U.S. Attorney's Office
                                500 East Broward Boulevard
17                              Suite 7th Floor
                                Fort Lauderdale, FL 33394
18  -and-
                                Laura Crane, ESQ., AUSA, and
19                              Rachel Fletcher, ESQ., AUSA
                                555 4th Street Northwest
20                              Washington, DC 20530

21  (Continued on Page 2.)

22  Reporter                    Stephen W. Franklin, RMR, CRR, CPE
    (561)313-8439               Official Court Reporter
23                              500 West Capitol Avenue
                                Little Rock, AR 72201
24                              E-mail:  SFranklinUSDC@aol.com

25       Proceedings recorded by DIGITAL AUDIO RECORDING, and
    transcript prepared utilizing computer-aided transcription.
```

```
 1   Appearances (Cont.'d)

 2   FOR DEFENDANT SPENCER        Jack A. Fleischman, ESQ.
                                  Fleischman & Fleischman, P.A.
 3                                2161 Palm Beach Lakes Blvd
                                  Suite 403
 4                                West Palm Beach, FL 33409

 5   FOR DEFENDANT DAWODU         Landon W. Ray, ESQ.
                                  Chukwuma, Hildebrandt & Ray, PLLC
 6                                1135 Kane Concourse
                                  5th Floor
 7                                Bay Harbor Islands, FL 33154

 8                                *  *  *  *  *

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          (Call to the order of the Court.)

 2          THE COURT:  Okay.  May I please have appearances

 3   from all the parties starting with the government.

 4          MR. JONES:  Good morning, Your Honor.  Assistant

 5   United States Attorney Trevor Jones on behalf of the

 6   government.

 7          THE COURT:  Good morning, Mr. Jones.

 8          Who do we have here --

 9          Mr. Jones, is anyone appearing from the District of

10   Columbia for the government, as well?

11          MR. JONES:  Yes, Your Honor.  We have AUSA Laura

12   Crane and Rachel Fletcher, who are the attorneys on the -- on

13   the indictments.

14          THE COURT:  Good morning, Ms. Crane.

15          MS. CRANE:  Good morning.

16          THE COURT:  And Ms. Fletcher I don't see you, but

17   good morning to you.

18          Who do we have appearing on behalf of

19   Mr. Teixeira-Spencer?

20          MR. FLEISCHMAN:  Good morning, Your Honor.  Jack

21   Fleischman for Spencer; he's if custody.

22          THE COURT:  Good morning, Mr. Fleischman.

23          Mr. Fleischman, I'm having a hard time hearing you.

24          MR. FLEISCHMAN:  Let me take out my -- can you hear

25   me better?
```

1              THE COURT:  Yes, that's much better.  Thank you,

2    Mr. Fleischman.

3              Mr. Teixeira is appearing from the cellblock?

4              MR. FLEISCHMAN:  He is, Your Honor.

5              THE COURT:  Mr. Teixeira, can you see and hear me

6    okay?

7              THE DEFENDANT:  Yes, Your Honor.

8              THE COURT:  Okay.  Who do we have on behalf of

9    Mr. Dawodu?

10             MR. FLEISCHMAN:  Judge, I'm sorry, I need to

11   interrupt (inaudible) Teixeira.  I don't see my client.  I

12   want to make sure he was on.

13             THE COURT:  Hold on a second.

14             So Mr. Wacia (phonetic) Teixeira, I assume you're

15   a -- you're related to the defendant?

16             UNIDENTIFIED SPEAKER:  Yes, Your Honor.

17             THE COURT:  Okay.  If you're going to -- if I could

18   ask you to please turn off your camera and your microphone

19   unless and until you're asked to testify.  We're trying to

20   minimize the number of people that are appearing on the

21   screen.

22             Mr. Luis Teixeira-Spencer, you're appearing from the

23   cellblock, correct?

24             THE DEFENDANT:  Yes, Your Honor.

25             THE COURT:  Mr. Fleischman, can you see him from the

```
 1    cellblock there?
 2              MR. FLEISCHMAN:  I do.  I see him now, thank you.
 3              THE COURT:  Okay.  Who do we have on behalf of
 4    Mr. Dawodu?
 5              MR. RAY:  Good morning, Your Honor.  Can you hear
 6    me?
 7              THE COURT:  Yes.
 8              MR. RAY:  This is Landon Ray on behalf of
 9    Mr. Olatunji Dawodu.  And I am in the courtroom, and
10    Mr. Dawodu is present here in the courtroom with me.
11              THE COURT:  Mr. Dawodu is there in the courtroom?
12              MR. RAY:  Yes, Your Honor.
13              THE COURT:  Okay.  We are here for a detention
14    hearing as to Mr. Dawodu and a detention and removal hearing
15    as to Mr. Teixeira-Spencer.  First let me -- let me confirm
16    with counsel for each of the defendants with respect to your
17    clients' right to have these hearings in person, and are they
18    consenting to do it by video conference?
19              First Mr. Fleischman on behalf of Mr. Teixeira-
20    Spencer.
21              MR. FLEISCHMAN:  Yes, Your Honor, he consents.
22              THE COURT:  Thank you.
23              And Mr. Ray on behalf of Mr. Dawodu?
24              MR. RAY:  Yes, he consents, Your Honor.
25              THE COURT:  Let me also just confirm,
```

1  Mr. Fleischman, are we still going ahead with the removal

2  hearing today?

3          MR. FLEISCHMAN:  We are not contesting removal, we

4  just want to go ahead with the detention hearing.

5          THE COURT:  Okay.  I'll address (inaudible) towards

6  the end, then.

7          MR. FLEISCHMAN:  Thank you.

8          THE COURT:  Are we prepared to proceed regarding the

9  pretrial detention?

10          MR. FLEISCHMAN:  Yes, Your Honor.

11          MR. JONES:  Yes, Your Honor.

12          THE COURT:  One moment, please.

13          Okay.  Mr. Jones, are you going to be presenting for

14  the government, or is one of the AUSAs from D.C. going to be

15  leading your presentation?

16          MR. JONES:  I will be presenting, Your Honor.

17          THE COURT:  Okay.  Please tell me what the basis for

18  detention is for each defendant.

19          MR. JONES:  We're proceeding under 3142(f)(1)(C).

20  The defendants are a danger to the community and a risk of

21  flight.  We believe there should be a presumption in this case

22  after the presentation and the factual proffer.

23          THE COURT:  Okay.  What is the maximum penalty that

24  each of the defendants faces?

25          MR. JONES:  They're placing life imprisonment with a

1    10-year minimum mandatory.

2              THE COURT:  Okay.  And what is the estimated

3    guideline range?

4              MR. JONES:  Guidelines are estimated roughly 121 to

5    151 months.

6              THE COURT:  And is the government going to proceed

7    by proffer this morning?

8              MR. JONES:  Yes, Your Honor.  And we have agent Sean

9    Hamblet from the FBI with us today.

10             THE COURT:  Okay.  Please proceed with your proffer,

11   Mr. Jones.

12             MR. JONES:  Thank you, Your Honor.

13             The FBI, in partnership with other law enforcement

14   agencies, have investigated a dark net market vendor that

15   operates the moniker, quote, John Carter 7; that's a

16   numeral 7.  Beginning in approximately February of 2017 and

17   continuing through May of 2020, John Carter 7 sold pills

18   pressed with Fentanyl on a number of dark net markets,

19   including AlphaBay, Wall Street, Dream and Empire.  As one

20   dark net market would get shut down, the vendor would migrate

21   to new markets.  The vendor listed the pills as Oxycodone M30,

22   best in the market, but also included descriptions on its site

23   that noted that the pills contained Fentanyl and claimed that

24   the pills are pre -- quote, the pills are pressed with just

25   the right amount of Fentanyl, no hotspots, end quote.

No hotspots is an attempt to convey to customers
that the pills would pose less of a risk of overdose.  In
context, according to the DEA's 2019 National Drug Threat
Assessment, Fentanyl remains the primary driver behind the
ongoing opioid crisis and continues to be the most lethal
category of illicit substances that's used in the United
States.  A potential lethal dose of Fentanyl is any dose
greater than 2 milligrams; that is 2-1000ths or 1-500th of a
gram.

The mean consistent amount of Fentanyl present in
Fentanyl-containing pills is another major contributor to the
pills' lethality.  In 2018, DEA's Fentanyl Signature Profiling
Program examined 148 tablet exhibits representing 180
kilograms in which the average tablet contained 1.5 milligrams
of Fentanyl, with a range of .02 to 4.84 milligrams per
tablet.  (Inaudible) 19 tablets, about 13 percent that
contained a lethal dose of Fentanyl; that is, a dose greater
than 2 milligrams.

Back to the instant investigation, records from the
dark net markets and from servers seized when certain markets
were shut down by law enforcement indicate the following
volume of pill sales by John Carter 7:  More than 40,000 pills
were sold on AlphaBay, approximately 8000 pills on Dream,
approximately 1700 pills on Wall Street, and more than 18,000
on Empire.

1           John Carter 7 also began communicating --

2           THE COURT:  Hold on, Mr. Jones.  Hold on.  You said

3   1700 on~--

4           MR. JONES:  Wall Street.

5           THE COURT:  -- on Wall Street and 18,000 on~--

6           MR. JONES:  Empire.

7   May I continue?

8           THE COURT:  Yes, please.

9           MR. JONES:  John Carter 7 also began communicating

10  with customers directly without using the dark net markets

11  through an encrypted messaging application called Jabber.  In

12  those transactions, John Carter 7 would provide a Bitcoin

13  address for the customer to provide payment and would then

14  send the requested pills to the customer directly.

15          During the course of the investigation, law

16  enforcement identified that Dream, Wall Street and Empire all

17  had the same PGP public key, and embedded within each key was

18  the same e-mail address.  Law enforcement obtained records

19  related to that e-mail address that linked to the defendant,

20  Luis Spencer.  Physically, the e-mail address was the recovery

21  address for an account on LocalBitcoins.com, the

22  cryptocurrency exchange.  The LocalBitcoins.com account name

23  was, quote, John Carter 777, all one word, and those are

24  numerals.

25          Law enforcement contacted a Bitcoin trader who made

numerous transactions with John Carter 777, and that Bitcoin

trader identified Spencer's photograph as the individual with

whom he had traded under the moniker John Carter 777.  The

trader could identify Spencer because he met him on multiple

occasions but only knew him by a nickname.

The same Bitcoin trader also traded with Spencer

under another moniker, quote, LBC John Carter 777, all one

word and using numerals, and records for that moniker include

Spencer's name, as well as phone number and e-mail used by

Spencer.  The Bitcoin trader's phone had a saved contact in

the Telegram application with the name LBC John Carter 777

that the Bitcoin trader said was the same individual he

(inaudible) identified as using the moniker John Carter 777;

that is, defendant Spencer.

Additionally, law enforcement traced funds from John

Carter 7 to Spencer.  Specifically, records from Coinbase

revealed proceeds from John Carter 7 were used to process a

payment to Expedia to reserve a hotel room in Fort Lauderdale

from May 27th to May 29th, in 2017.  Records from Expedia

indicate that the reservation was paid for in Bitcoin, was

made in Spencer's name, and include Spencer's phone number and

e-mail address.

Additionally, in June and December 2019, an

undercover officer conducted direct buys of Fentanyl-pressed

pills from John Carter 7 using Jabber.  The undercover made

1   payments to Bitcoin addresses provided by John Carter 7, and

2   law enforcement was able to trace those payments from the

3   undercover to an account at Finance connected to defendant

4   Spencer, which account was accessed numerous times from an IP

5   address in Spencer's name and from Spencer's residence.

6          One of Spencer's close contacts is defendant

7   Olatunji Dawodu.  During the course of the investigation, law

8   enforcement observed the two men meet on numerous occasions.

9   Law enforcement installed a pole camera that captured Dawodu

10  and Spencer coming and going from a storage unit in Davie,

11  Florida, where they were frequently seen bringing in and

12  taking out boxes.

13          During surveillance of Dawodu, law enforcement

14  observed Dawodu drop packages on separate occasions.

15  Specifically, on June -- July 17th, 2019, law enforcement

16  observed Dawodu drop packages at a blue USPS mailbox.  Law

17  enforcement contacted two of the intended recipients of those

18  packages that contained pills which were consistent with the

19  pills purchased by the undercover from John Carter 7.  In

20  interviews with the intended recipients and reviewing their

21  accounts, law enforcement confirmed that the two seized

22  packages had been ordered from John Carter 7 on Empire Market.

23          Similarly, in August of 2019, law enforcement again

24  observed Dawodu drop packages.  They observe -- law

25  enforcement followed up with the intended recipients of one of

1   those packages, and an individual provided consent to open the

2   package, which again contained pills packaged similarly to the

3   pressed Fentanyl pills seized throughout the investigation.

4            In addition to the pills connected to John Carter 7,

5   a confidential human source also purchased pills from Dawodu

6   on multiple occasions, including in May of 2020, October of

7   2020, January 7th, 2021, and January 25th, 2021.  The pressed

8   pills purchased by the confidential source were consistent

9   with the pills that were packaged in packages dropped by

10  Dawodu that had been purchased on John Carter 7.

11           On February 23rd, 2021, law enforcement executed

12  search warrants at both of the defendants' residences.  In

13  Dawodu's residence, law enforcement found approximately

14  1400 grams of pills consistent with pills ordered from John

15  Carter 7, numerous electronic devices and approximately 30

16  USPS mailing envelopes consistent with those used by John

17  Carter 7.  Law enforcement also recovered a handgun in a

18  drawer in the residence.  At defendant Spencer's residence,

19  law enforcement found $12,000 in cash and numerous electronic

20  devices.

21           That same day, law enforcement executed a search

22  warrant at a residence of an associate of Dawodu and Spencer

23  in Providence, Rhode Island, Alex Ogando.  Inside that

24  residence, law enforcement recovered approximately $370,000 in

25  cash, more than 1770 grams of light blue pills that field

1    tested positive for the presence of Fentanyl, and

2    approximately 30 USPS Priority Mail envelopes containing

3    363 grams of pills packed for mailing.

4        Dawodu has also been indicted in the District of

5    Columbia on another conspiracy to distribute over 400 grams of

6    Fentanyl for a similar distribution scheme with Mr. Ogando.

7        THE COURT:  Hold on a second, Mr. Jones.  My

8    computer crashed and I was out of the meeting there for a

9    little while.  So the last I heard was regarding the local

10   Bitcoin -- you were discussing the tie between the Expedia

11   purchase and the John Carter -- the John Carter Bitcoin

12   account.

13       MR. JONES:  Okay.  I'll apologize for everyone else

14   for having to hear my voice for that long again, but I'll go

15   back.

16       Okay.  Back to the Expedia.  Records from Expedia

17   indicated the reservation in Fort Lauderdale was paid for in

18   Bitcoin, was made in Spencer's name and included Spencer's

19   phone number and e-mail address.

20       Additionally, in June and December 2019, an

21   undercover officer conducted direct buys of Fentanyl-pressed

22   pills from John Carter 7 using Jabber.  The undercover made

23   payments to Bitcoin addresses provided by John Carter 7.  Law

24   enforcement was able to trace those payments through the

25   undercover to an account at Finance connected to Spencer,

1   which account was accessed numerous times from an IP address

2   in Spencer's name and from Spencer's residence.

3          One of Spencer's close contacts is defendant

4   Olatunji Dawodu.  During the course of the investigation, law

5   enforcement observed two men -- the two men meet on numerous

6   occasions.  Law enforcement installed a pole camera that

7   captured Dawodu and Spencer coming and going from a storage

8   unit in Davie, Florida, where they were frequently seen

9   bringing in and taking out boxes.

10          During surveillance of Dawodu, law enforcement

11   observed Dawodu drop packages on two separate occasions.

12   Specifically, on July 17th, 2019, law enforcement observed

13   Dawodu drop packages at a blue USPS mailbox.  Law enforcement

14   contacted two of the intended recipients, and both packages

15   contained pills that were consistent with pills purchased by

16   the undercover from John Carter 7.  In interviewing the

17   intended recipients and reviewing their accounts, law

18   enforcement confirmed that the two seized packages had been

19   ordered from John Carter 7 on Empire Market.

20          Similarly, in August of 2019, law enforcement again

21   observed Dawodu drop packages.  Law enforcement observed --

22   followed up with the intended recipients of one of the

23   packages, and that individual provided consent to open the

24   package, which also contained pills packaged similarly to the

25   pressed Fentanyl pills seized throughout this investigation.

1          In addition to the pills connected to John Carter 7,

2     a confidential human source also purchased pills from Dawodu

3     on multiple occasions, including in May of 2020, October of

4     2020, January 7th, 2021, and January 25th, 2021.

5          THE COURT:  Mr. Jones, did you say were those --

6     those were in-person purchases from --

7          MR. JONES:  Yes.

8          THE COURT:  -- Dawodu?

9          MR. JONES:  Yes, by a confidential human source.

10         THE COURT:  Okay.

11         MR. JONES:  The pressed pills were purchased by the

12    confidential source and were consistent with the pills that

13    were packages dropped by Dawodu that had been purchased on

14    John Carter 7.

15         On February 23rd, 2021, law enforcement executed

16    search warrants at both defendants' residences.  At Dawodu's

17    residence, law enforcement found and seized approximately

18    1400 grams of pills consistent with the pills ordered through

19    John Carter 7, numerous electronic devices, and approximately

20    30 USPS mailing envelopes consistent with those used by John

21    Carter 7.  Law enforcement also recovered a handgun at the

22    residence.  At Spencer's residence law enforcement found

23    $12,000 in cash, as well as additional electronic devices.

24         The same day, law enforcement executed a search

25    warrant at a residence of an associate of Dawodu and Spencer

1    in Providence, Rhode Island, Alex Ogando.  Inside of that

2    residence law enforcement recovered approximately $370,000 in

3    cash and more than 1770 grams of light blue pills that field

4    tested positive for the presence of Fentanyl, and

5    approximately 30 USPS Priority Mail envelopes containing

6    363 grams of pills packed for mailing.

7            Dawodu has also been indicted in the District of

8    Columbia on another conspiracy to distribute over 400 grams of

9    Fentanyl for a similar distribution scheme with Mr. Ogando.

10           Following his arrest and while in jail, Spencer

11   called his girlfriend, Ms. Schilling, from jail, and the two

12   were recorded, the following exchange.

13           Mr. Spencer stated:  "I had a backpack on the floor

14   with garage and shit.  They took that?"

15           Ms. Schilling:  "Your black backpack?  No, they took

16   your cameras.

17           "Mr. Spencer:  I mean my black backpack, the other

18   one, the NPN.

19           "Ms. Schilling:  It's right here.  There's laptops

20   here.

21           "Mr. Spencer:  Get rid of it."

22           This concludes the factual proffer.  FBI agent Sean

23   Hamblet's available for cross-examination.

24           THE COURT:  Special agent Spencer (sic), can you

25   turn on your -- can you turn on your video, please?  Actually,

1    if you'll just hold on a second.

2            Everyone who's joining us now for the 11:00 o'clock

3    calendar, we are still in the middle of a detention hearing

4    from prior to that calendar.  If you'd all make sure that your

5    video and microphone is off if you're not participating in the

6    10:00 o'clock hearing.  We will proceed with the 11:00 o'clock

7    calendar as soon as we're done with this hearing.

8            Special agent Hamblet, can you please turn on your

9    microphone.

10           Special agent Hamblet, please raise your right hand.

11           Sean Hamblet, Government's witness, sworn.

12           THE COURT:  You can put your hand down.

13           Did you hear the factual proffer read by AUSA Jones?

14           THE WITNESS:  I did.

15           THE COURT:  Okay.  And do you have any corrections

16   to that proffer?

17           THE WITNESS:  Your Honor, there was a question I

18   believe about whether or not the deals that were executed with

19   the confidential human source were conducted in person, and

20   I'd like to clarify something on that if I may.

21           THE COURT:  Please do.

22           THE WITNESS:  Your Honor, may I refer to any notes?

23           THE COURT:  Yes, go ahead.

24           While he's doing that, again, if any of the

25   attorneys or parties or witnesses who are here for the

 1   11:00 o'clock hearing who are not participating in the

 2   10:00 o'clock hearing, please turn off your videos and

 3   microphones so that we can have as clear a stream as possible

 4   for this 10:00 o'clock hearing.  Thank you.

 5            THE WITNESS:  Your Honor, the only clarifying point

 6   I'd like to make is that the communicaions with -- between

 7   Mr. Dawodu and the CHS, some of those communications happened

 8   electronically and resulted in in-person -- in in-person

 9   meetings.

10            That's the only clarifying point that I'd like to

11   make, Your Honor.

12            THE COURT:  Thank you very much, special agent.

13   Other than that correction, do you adopt the factual proffer

14   as your direct testimony?

15            THE WITNESS:  I do.

16            THE COURT:  Okay.  Can you -- Mr. Fleischman on

17   behalf of Mr. Spencer, why don't you start with

18   cross-examination, please.  Yes, thank you, Your Honor.

19                       Cross-Examination

20   BY MR. FLEISCHMAN:

21   Q    And special agent Hamblet, you'll let me know if you

22   cannot hear me, and I'll repeat the question.

23   A    Will do.

24   Q    Can you hear me okay, or . . .

25   A    I can.

```
 1   Q     Okay.  Thank you.  I'll begin.
 2              I want to ask you first about the search of homes
 3   and other places that took place here.  It's correct that no
 4   drugs were found in Mr. Spencer's home; is that correct?
 5   A     That's correct.
 6   Q     And is it correct that no firearms were found in
 7   Mr. Spencer's home?
 8   A     It is correct.
 9   Q     And is it correct that Mr. Spencer, I'm assuming, was
10   surveilled during the course of this (inaudible).
11   A     I'm sorry, sir, you broke up on me.
12   Q     Sure.  Was Mr. Spencer part of your surveillance during
13   the course of the investigation prior to his arrest?
14   A     Mr. Spencer was the subject of physical surveillance.
15   Q     And at any time was he seen possessing or moving any form
16   of weapon?
17   A     Did you say moving any form of weapon, sir?
18   Q     Yes; or possessing a weapon.
19   A     No.
20   Q     And was Mr. Spencer ever seen holding, physically
21   holding, what you believed to be any form of drugs?
22   A     He was seen holding envelopes we believe contained drugs,
23   but not actual -- I didn't see actual drugs in his hand.
24   Q     Okay.  And the envelopes that he was seen holding were
25   never seized; is that correct?
```

1   A    I believe that's correct, yes.

2   Q    Okay.  You could not say that anything illegal is

3   contained within those envelopes; is that correct?

4   A    That's correct.

5   Q    Now, the co-defendant, Mr. Dawodu, you used the term the

6   packages were dropped.  I'm assuming you mean that they were

7   mailed at a postal center?

8   A    I'm sorry, sir.  You broke up on me a little bit there.

9   Q    I'll move the mic a little.

10          The -- now, you had testified that Mr. Dawodu -- it

11  was part of the proffer -- Dawodu was seen dropping packages.

12  Does that refer to dropping packages at a postal center?

13  A    Or USPS mailbox.

14  Q    Okay.  At no time was Mr. Spencer with him (inaudible)?

15  A    I'm sorry, I'm hearing either background noise or I've

16  had a hard time hearing you.  Can you please repeat?

17  Q    Yes.  At no time was Mr. Spencer seen with Mr. Dawodu

18  when he was at a postal center or United States Post Office;

19  is that correct?

20  A    Not that I'm aware of, sir.

21  Q    And the packages that were intercepted, those came from,

22  you believe, Mr. Dawodu; is that correct?

23  A    The packages that we intercepted and later determined to

24  contain pills?

25  Q    Yes; you believe those were dropped by Dawodu?

1    A    That's correct.

2    Q    Is it correct that there's no physical evidence in this

3    case that links Mr. Spencer to any of the drugs that were

4    actually collected and placed into evidence in this case; is

5    that correct?

6    A    Meaning physical evidence that we collected during the

7    course of the search warrant and --

8    Q    Yes.  There's no physical evidence that links him to any

9    of the drugs that you physically collected, whether it be

10   search warrant or packages that were -- were intercepted; is

11   that correct?

12   A    Correct.

13   Q    Okay.  And none of the -- none of the -- I'm using the

14   term "suspects," but none of the purchasers of these drugs

15   that you interviewed have identified Spencer as the person

16   that they purchased drugs from; is that correct?

17   A    Not directly, that's correct.

18   Q    Okay.  And the confidential informant, the human source

19   that was used to target and make contact with Mr. Dawodu, that

20   informant had no contact with Mr. Spencer; is that correct?

21   A    Not that I'm aware of, sir.

22   Q    And was the confidential informant being paid, or working

23   off a charge when he was working this case?

24   A    I don't know the answer to that, sir.

25   Q    Was it a confidential informant that was used by the FBI

1  or a local agency?

2  A    I can say that it was used by the FBI.  The extent of

3  that person's work with other agencies I'm not aware of.

4  Q    Okay.  Did you vet the CI to have some confidence that

5  the CI was reliable?

6  A    I didn't -- so this confidential human source was not my

7  human source, so I'm not sure of the extent of the vetting

8  that was done on this source.

9  Q    Do you know if the human source ever brought up the name

10  of Mr. Spencer?

11  A    I don't believe so, but I'm not sure.

12  Q    Okay.  As of today, have you recovered any narcotics that

13  came from Mr. Spencer directly?  And let me correct that; that

14  you can say came from Mr. Spencer directly.  Have you

15  recovered any physical narcotics that you can say came from or

16  were delivered by Mr. Spencer directly?

17  A    Not that we can say with certainty.

18  Q    Was a search warrant executed or maybe a consensual

19  search done on the storage unit that you -- was referred in

20  the proffer?

21  A    Not that I'm aware of.

22  Q    And I'm correct that there was nothing in Mr. Dawodu's

23  home that connected Spencer to Mr. Dawodu, is that correct,

24  that you located during the search?

25  A    The review of electronics that we've collected at the

1  home is ongoing, so nothing that I'm aware of right now that

2  directly connects the two.  But as I said, the search of

3  electronics is ongoing.

4  Q    Okay.  Now, Mr. Spencer's home was searched; is that

5  correct?

6  A    Yes.

7  Q    Okay.  And there was reference made in the proffer to a

8  phonecall while he was in custody to his girlfriend, where he

9  speaks of, quote, getting rid of or removing sounds like maybe

10 computers or some form of electronics.

11          Were you present for the search of the home?  Let me

12 ask you that first.

13 A    I was not, not the search of -- when the search warrants

14 were executed, I was at Mr. Dawodu's home.

15 Q    And am I correct that what Mr. Spencer was referencing on

16 the phone was actually left at the house by the agents after

17 the search?

18 A    I can make that assumption.  All I know is from the call

19 it sounded like there was a bag found by Ms. Schilling that

20 contained electronics.  So I don't know what was left behind

21 by the agents, but I can make that assumption based on what

22 was found by Ms. Schilling.

23 Q    So it's not like the agents didn't know about those

24 electronic devices when they left; is that correct?

25 A    I'm not sure if they knew of them.  Again, it's

1   speculation on my part, but I believe they may have overlooked

2   them.

3   Q    Do you know how long they searched the home?

4   A    I do not.

5   Q    Okay.  Have you heard the call?

6   A    I have.

7   Q    Okay.  And there's no indication that these were hidden

8   somehow in the house; is that correct?  In other words, before

9   they were sitting wherever they were sitting, there's no

10  indication they had been hidden by anyone prior to or during

11  the search; is that correct?

12  A    I didn't hear anything like that in the call.

13  Q    Okay.  And this is a search where the subjects weren't

14  called ahead of time and said, hey, we're coming to your house

15  to search, and I'm assuming that this was a executed search

16  warrant, is that correct, without prior notice?

17  A    That is correct.

18  Q    Okay.  Now, agent, do you have -- well, am I correct that

19  there is no direct evidence that Spencer is John Carter?

20  Would you agree with me on that or not?

21  A    Help me understand what you mean by "direct".  I think we

22  have several things pointing to that.

23  Q    Okay.  Let me start off with:  Did you find in any

24  searches that you have done up to now, or through informants

25  or other collection of evidence, that Spencer is the person

1    that set up the John Carter name and/or accounts?  Do you have

2    any evidence of that?

3    A    Not that he set them up.

4    Q    Are multiple people able to access and use the John

5    Carter account?

6    A    Yes, I would assume that anybody who has the password to

7    access the vendor account would be able to access it.

8    Q    And do you know where this vendor account was originally

9    set up?

10   A    You mean where the person was physically sitting when

11   they set the account up, or whether the --

12   Q    Yes.  Can you --

13   A    -- where the server was sitting?

14   Q    Well, let me start with that.  Well, have you been able

15   to ascertain or have you been able to figure out where the

16   person was sitting, let's start with that, when that John

17   Carter vendor account was set up?

18   A    No, no.

19   Q    Okay.  And what about the server?  Where is the server,

20   the same for the server?

21   A    Well, we don't know, but -- well, I suppose we need to

22   specify.  The John Carter -- the John Carter vendor accounts

23   operated on multiple markets, so there may -- we're likely

24   talking about multiple servers.  So in I believe two

25   instances, the markets were taken down by law enforcement, and

1   in -- I believe, and I can confirm if I can refer to my

2   affidavit, that the other two markets just went down.

3           But to answer your question where those servers may

4   have been physically located would likely be known to us from

5   the vendor accounts that were taken down by law enforcement.

6   The other two we would not know.

7   Q    Okay.  But you cannot rule out, though, that multiple

8   people, if they had the code to enter, could have accessed and

9   used John Carter; is that correct?

10  A    That's correct.

11  Q    And you would agree that the fact that curren -- that

12  Bitcoin went into what you're alleging are wallets or accounts

13  that were kept by Spencer does not mean that he was involved

14  in the distribution or selling of drugs; is that correct?

15  A    Could you ask the question again, please, sir?

16  Q    Would you agree that the fact that Bitcoin, or portions

17  of coin, were directed and actually went into wallets or

18  accounts that you believe belong to Spencer, that that doesn't

19  mean that he was selling or distributing drugs; is that

20  correct?

21  A    I believe if you look at the totality of the

22  circumstances, it does indicate that he was involved in the

23  distribution of narcotics using the dark web.

24  Q    Well, you do not have evidence that the monies that went

25  into his wallet -- or I'm using a generic term, account -- but

1    came directly from the sale of drugs; is that correct?

2    A     One more time, sir?

3    Q     Sure.  You don't have any actual direct evidence that

4    monies that went into his wallet or accounts came from the

5    sale of drugs.

6    A     May I refer to my affidavit?

7    Q     Yes, definitely.

8    A     (Perusing document.)

9          So in the case of AlphaBay as an example, we can say

10   that a portion of the proceeds of the sale of illicit

11   narcotics went to virtual currency accounts that were

12   associated with Spencer.

13   Q     Okay.  You don't know how many other people had access to

14   those accounts; is that correct?

15   A     That is correct.

16   Q     And do you know if Spencer traded currencies, Bitcoin or

17   other digital currency?

18   A     I know that he traded using LocalBitcoins, for example,

19   yes.

20   Q     And you didn't -- were you able to subpoena any of the

21   records from any of the accounts that pulled his wallet to see

22   the number of transactions he engaged in and when?

23   A     Are you referring specifically to -- I -- can you restate

24   the question, please?

25   Q     Sure.  Let me, just as an example, was there an account

1  at Coinbase?

2  A    Yes.

3  Q    Okay.  So let me, just as an example, in Coinbase were

4  you able to subpoena those records and determine the volume of

5  turnover or trades that he did in digital currency?

6  A    I personally did not review those records.  We had

7  another person on my team review those records.

8  Q    Okay.  Are you familiar with those records?

9  A    Not to the extent of the volume that you're asking about.

10  Q    Were you able to locate dates that match up with what

11  you're alleging were drug transactions in any of those, you

12  know, digital records?

13  A    I'm not familiar enough with the records, sir, to be able

14  to answer the question.

15  Q    Do you know how many people had access to that Coinbase

16  account, for example, other than Spencer?

17  A    I do not.

18  Q    Okay.  I want to move on now to Spencer's arrest.  Were

19  you present for Spencer's arrest?

20  A    I was present -- I was not the present -- excuse me.  I

21  was not present at his home when he was arrested, which was

22  the day the search warrant was executed.  I was present when

23  we transferred him from the jail to the U.S. Marshals.

24  Q    Did you speak with Mr. Spencer?

25  A    No.  And, uh --

```
1    Q    (Inaudible.)
2    A    May I clarify?
3    Q    Sure.
4    A    I don't recall speaking with him.  If I said anything, it
5    might have just been maybe a greeting or something of that
6    nature.
7    Q    Mr. Spencer has made no admissions that he was involved
8    in any form of illicit drug trade; is that correct?
9    A    Not that I'm aware of.
10   Q    And his passport and other documents were seized from him
11   at the time of his arrest; is that correct?
12   A    I'm aware that his passport was seized.  I'm not sure
13   what other documents may have been taken with -- relating to
14   that.
15   Q    And Mr. Spencer didn't resist arrest or provide any type
16   of threats of force or violence at the time of his arrest; is
17   that correct?
18   A    That's correct, not that I'm aware of.
19   Q    And you're aware that Mr. Spencer does have a business,
20   is that correct?  A music business?  Are you aware of that, or
21   . . .
22   A    I understand he might be involved in music.  I'm not sure
23   what extent -- to what extent he runs a business associated
24   with that.
25              MR. FLEISCHMAN:  Okay.  Thank you, special agent
```

1   Hamblet.

2          Your Honor, I have nothing further at this time.

3          THE COURT:  Okay.  Mr. Ray, your cross-examination.

4          MR. RAY:  Thank you, Your Honor.

5                    Cross-Examination

6   BY MR. RAY:

7   Q    Good morning, special agent Hamblet.  Can you hear me?

8   A    Good morning.  Yes, sir.

9   Q    Sir, during this investigation, Mr. Dawodu was the

10  subject of your investigation; is that correct?

11  A    That's correct.

12  Q    During your entire investigation, did you ever see

13  Mr. Dawodu complete a Bitcoin transaction?

14  A    Not that I can recall.

15  Q    So during --

16  A    I should clarify -- go ahead, I'm sorry.

17  Q    During your investigation, did you observe, was there any

18  evidence that Mr. Dawodu made payments using any type of

19  cryptocurrency?

20  A    May I have a moment to refer to my affidavit?

21  Q    Yes.

22  A    (Perusing document.)

23          Could you please restate the question?

24  Q    Yeah.  During your investigation, did you ever observe,

25  or is there any evidence that Mr. Dawodu made any type of

1    payment using any type of cryptocurrency?

2    A    Not that I'm aware of.

3    Q    And during your investigation, was there -- did you

4    observe or was there any evidence that Mr. Dawodu accepted any

5    type of cryptocurrency payment?

6    A    Not that I'm aware of.  I should clarify.  I just want to

7    state for the record that there may be some instance of that,

8    but not that I can recall at the moment.

9    Q    And at no point in your investigation did you observe or

10   see evidence that Mr. Dawodu accessed the dark web?

11   A    Again, may I refer to my affidavit?

12   Q    Yes.

13   A    (Perusing document.)

14        So regarding evidence that Mr. Dawodu accessed the

15   dark web, I'm not aware of any indications with certainty that

16   he accessed the dark web, but we do see through the Internet

17   service provider at his residence at least in some cases his

18   resident -- the residential IP address associated with his

19   residence did access IP addresses that are associated with Tor

20   relays.  So while I can't say with certainty that he accessed

21   the dark web, I couldn't rule it out either.

22   Q    And so at any time during your investigation, did you

23   have -- discover any evidence that Mr. Dawodu accessed the

24   online markets through the dark net?

25   A    Not direct evidence at this time; however, I should point

```
 1   out that the review of electronics that were seized from his
 2   residence is ongoing.
 3   Q    So did the name John Carter or any other of the online
 4   monikers that were revealed during your investigation that
 5   were on the dark net markets, were any of those linked
 6   directly to Mr. Dawodu?
 7   A    May I refer to my affidavit once more?
 8   Q    Yes.
 9   A    (Perusing document.)
10         Not directly.
11   Q    Now, you stated that there were proceeds from -- for the
12   narcotic transactions, some of the proceeds were withdrawn to
13   a Bitcoin address ending in 4MW9; is that correct?
14   A    One moment, please.
15         Did you say 4MW9?
16   Q    Correct.
17   A    Yes, that's correct.
18   Q    And, now, that address, 4MW9, that was linked to the
19   Coinbase account that was used to pay for a hotel in Fort
20   Lauderdale; is that correct?
21   A    That's correct.
22   Q    And that hotel room that was booked using that Coinbase
23   account, that was booked under the -- under Spencer's name; is
24   that correct?
25   A    Yes, that was booked under Mr. Luis Spencer's name.
```

1    Q    And the phone number that was on that reservation was

2    also connected to Spencer, correct?

3    A    That's correct.

4    Q    And the e-mail address that was under that reservation

5    was also connected to Spencer; is that correct?

6    A    That's correct.

7    Q    You stated that you observed meetings between Mr. Dawodu

8    and Mr. Spencer at a storage unit; is that correct?

9    A    That's correct.

10   Q    And you observed them taking in and out boxes?

11   A    That's correct.

12        I should clarify, I wasn't physical present during

13   that.  We had a camera installed, and so multiple people saw

14   that video, which was recorded.

15   Q    But you're not certain as to what was inside of the

16   boxes?

17   A    That's correct.

18   Q    So you can't say that there was anything illegal inside

19   of the boxes?

20   A    That's correct.

21   Q    Now, you stated that you observed Mr. Dawodu make two

22   drops, which you're saying that you observed him make two

23   drops, and drops meaning dropping packages off at the U.S.

24   Postal Service?

25   A    He was observed by people that are involved in law

```
 1   enforcement, not by me personally.
 2   Q    But there was two times that he was observed?
 3   A    Give me just one moment, please.
 4   Q    No problem.
 5   A    That's correct.   There were at least two times that he
 6   was observed.
 7   Q    One was on July 17th?
 8   A    That's correct.
 9   Q    And one was on August -- or July of 2017, I'm sorry.
10   A    I'm sorry, one more time.   I show a date of July 17th,
11   2019.
12   Q    Yeah, I apologize.   July 17, 2019.
13        And then there was also another time in August of
14   2019; is that correct?
15   A    That's correct.
16   Q    You also stated that Mr. Dawodu has another pending case;
17   is that correct?
18   A    There are separate charges; for us it's the same case.
19   Q    But it stems from the same alleged operation; is that
20   correct?
21   A    We believe two separate vendor accounts are related, so
22   it's relating to a different vendor account.
23   Q    But part of the investigation is connected, both
24   co-defendants of Mr. Dawodu, they've connected them together?
25   A    Say that one more time, please.
```

1   Q    So it's Alex Ogadu (phonetic) is the other co-defendant

2   in his --

3   A    That's correct.

4   Q    -- other case?  And you have evidence connecting

5   Mr. Ogadu (phonetic) and Mr. Spencer; is that correct?

6   A    Yeah, I can't speak directly to the evidence we have, but

7   we believe this is operating all as part of the same

8   conspiracy.

9   Q    And earlier you stated that you were not the one who

10  personally vetted the confidential informant; that's correct?

11  A    That's correct.

12  Q    So you're not sure of the relationship between the

13  confidential informant and Mr. Dawodu?

14  A    The extent of my knowledge of their relationship is from

15  reviewing records memorializing drug transactions.

16  Q    Okay.  So you're not aware if the confidential informant

17  had a personal grudge against Mr. Dawodu?

18  A    I'm not aware of that, that's correct.

19  Q    And you're not aware if they had any type of falling out

20  as prior friends?

21  A    That's correct, I'm not aware of that.

22  Q    So Mr. Dawodu, he was not the main subject of your

23  investigation; is that correct?

24  A    I'm not sure how to answer that.  You know, the -- our

25  investigation focuses on two, uh, separate monikers operating

1   on multiple dark net marketplaces, and we believe Mr. Dawodu

2   is involved in that business.

3   Q    And you said you believe, but is there any evidence that

4   directly ties Mr. Dawodu to one of those online monikers?

5   A    I suppose that's correct not directly, but indirectly.

6   Q    Okay.  You were present on the day the search warrant was

7   executed on Mr. Dawodu's apartment; is that correct?

8   A    I was present the day that -- I was present.  I wasn't in

9   his home during the entire process of searching his home, and

10  I can expand on that a little bit if you'd like me to.

11  Q    Well, my question is:  At any point in time, did

12  Mr. Dawodu resist being taken into custody?

13  A    He did not.

14  Q    And at any time did he display and signs of violence?

15  A    He did not.

16  Q    And during that search, there was a .9 millimeter firearm

17  recovered; is that correct?

18  A    That is correct.

19  Q    And are you aware that that .9 millimeter was registered

20  to Mr. Dawodu?

21  A    I believe that is correct.

22  Q    And so as far as you know, that he lawfully owned that

23  firearm; is that correct?

24  A    As far as I know.

25  Q    So during your investigation, you were not able to

1  ascertain if other people occupied the residence at

2  Mr. Dawodu's place; is that correct?

3  A    Well, we -- that's not correct, and I can expand on that

4  if you'd like.

5  Q    Yes, please.

6  A    So when we executed the search warrant, we discovered

7  that the home was subdivided into three efficiency units, and

8  we were not aware of that leading up to the warrant.  And when

9  we were -- so the main building of the residence was divided

10 into, like I said, three units.  Mr. Dawodu occupied the

11 center unit, and we encountered other people within his

12 efficiency unit when we arrived.

13 Q    And you don't know who those other people are; is that

14 correct?

15 A    We -- we did gather there identities when the search

16 warrant was being executed.

17 Q    But you were not aware of any relationship, if any at

18 all, between Mr. Dawodu and the other residents of that

19 efficiency apartment?

20 A    As I said, when we executed the warrant we thought it was

21 one residence.  It wasn't until we arrived at the residence we

22 realized it was divided into three.  So, and we were also

23 aware of some of the other individuals present at the

24 residence when the search warrant was executed; however, we

25 didn't know the extent of their -- the relationship of those

1  other people to Mr. Dawodu.

2  Q    Now, during your investigation, so the investigation had

3  started back in 2017; is that correct?

4  A    I believe so, yes.

5  Q    But Mr. Dawodu is not mentioned in your report until

6  2019; that's correct?

7  A    You know, if we can . . . may I step back to your

8  previous question?

9          When the -- the date that our case opened, I'm not

10 sure of the date that the case opened.  What I -- what I was

11 recalling when I answered the last question was the date of

12 the AlphaBay server.  So I'm not sure the exact date that our

13 case was initiated.

14 Q    But in your report, you date back to transactions and

15 incidents that go back to 2017; is that correct?

16 A    In the affidavit, sir?

17 Q    Yes.

18 A    So we make reference in the affidavit, or I make

19 reference, rather, in the affidavit, of John Carter 7

20 operating as a vendor on AlphaBay since 2017, but then our

21 undercover purchases that are referenced in the affidavit

22 don't begin until 2019.

23 Q    And again, Mr. Dawodu was not mentioned in your affidavit

24 or in the indictment until 2019; is that correct?

25 A    I believe that's correct, yes.

```
 1              THE COURT:  Mr. Ray, I don't want to cut you short,
 2    but we are going to need to move along with the hearing --
 3              MR. RAY:  Yeah.
 4              THE COURT:  -- rapidly.  If there are specific
 5    points you want to make, I'd suggest you direct yourself
 6    towards them.
 7              MR. RAY:  Yes, Your Honor.  I only have a couple
 8    more questions.
 9    BY MR. RAY:
10    Q    So there were multiple purchases made by undercovers in
11    this investigation, correct?
12    A    That's correct.
13    Q    And it looks like in 2000' -- from March to June of 2019,
14    there were five undercover purchases?
15    A    There were at least five, that's correct.
16    Q    And then from April to December 2019, there was at least
17    six?
18    A    That's correct.
19              MR. RAY:  Nothing further, Your Honor.
20              THE COURT:  Okay.  Thank you.
21              Any redirect, Mr. Jones?
22              MR. JONES:  Yes, Your Honor.
23                        Redirect Examination
24    BY MR. JONES:
25    Q    Agent Hamblet, (inaudible) conceding to the relationship
```

1   between defendant Dawodu and defendant Spencer, are you

2   familiar with any -- the connections or the amount of times

3   that they had met during your investigations?

4   A    I can't tell you the exact number, but we are aware that

5   they -- they were observed during physical surveillance

6   meeting on numerous occasions.

7   Q    Have they ever -- has Mr. Dawodu ever gone to

8   Mr. Spencer's residence?

9   A    I can't tell you with certainty.  I believe we have seen

10  Mr. Spencer go to Mr. Dawodu's residence.

11  Q    Okay.  Would it help you refresh your recollection if you

12  took a look at your affidavit?

13  A    Yes.

14  Q    If I can direct you to paragraph 26.

15  A    (Perusing document.)

16       Yes, that's correct.  Mr. Dawodu was observed on

17  multiple instance at Mr. Spencer's residence.

18       THE COURT:  Mr. Jones, when you refer to the

19  affidavit, are you referring to the complaint affidavit?

20       THE WITNESS:  The search warrant affidavit, sir.

21       THE COURT:  Okay.  Thank you.

22  BY MR. JONES:

23  Q    And are there phone records between Dawodu and Spencer

24  communicating?

25  A    Yes.

1  Q    And how many times approximately had they communicated

2  between June 2019 and November 2020?

3  A    May I refer to the affidavit?

4  Q    Of course.

5  A    (Perusing document.)

6       Could you say the dates one more time, please?

7  Q    Between June 2019 and November 2020, approximately how

8  many times have they communicated based on toll records?

9  A    I apologize.  I'm trying to find that spot in my

10  affidavit.

11  Q    Twenty -- it's paragraph 26, I can direct your attention.

12  A    That's correct.

13  Q    I asked you approximately how many times.

14  A    Oh, I'm sorry.  Law enforcement observed approximately

15  1496 calls between Spencer and Dawodu between June 17th of

16  2019 and November 15th of 2020.

17  Q    Does that overlap with the investigation regarding these

18  Fentanyl-pressed pills?

19  A    It does.

20  Q    Do you recall obtaining iCloud data from Mr. -- defendant

21  Dawodu's iCloud account?

22  A    Yes.

23  Q    Do you recall whether they ever exchanged Bitcoin wallet

24  addresses between defendant Spencer and defendant Dawodu?

25  A    Let me -- just one moment, please.

1    Q    Would it help your recollection if I referred you to a --

2    or showed you a Cellebrite?

3    A    Yes.

4    Q    (Inaudible.)

5         MR. JONES:  Your Honor, if I may share my screen

6    real quick?

7         THE COURT:  Sure.

8    BY MR. JONES:

9    Q    Can you see my screen, the extraction report?

10   A    Yes, sir.

11   Q    Do you recognize what this is?

12   A    I do.

13   Q    What is it?

14   A    It's an extraction report from an iCloud backup.

15   Q    Do you recognize the phone numbers associated with this

16   backup?

17   A    I do.

18        THE COURT:  Let me just interrupt.

19        Mr. Jones, the rules -- the typical rules of

20   evidence don't apply here.  Do you want to proffer what you're

21   trying to get from the extraction report and we can see if

22   special agent Hamblet agrees with that or not?

23        MR. JONES:  Yes, Your Honor.

24        I could just proffer that on or around August 26,

25   2019, defendant Spencer and defendant Dawodu exchanged a

1    Bitcoin wallet address that I'm showing on the screen right

2    now.

3              THE COURT:  Special agent, is that your recollection

4    from the iCloud data?

5              THE WITNESS:  Are you asking me, Your Honor?

6              THE COURT:  Yes.

7              THE WITNESS:  Yes, yes, Your Honor.

8    BY MR. JONES:

9    Q    Thank you.

10             And referencing the original cross-examination from

11   Mr. Fleischman, during -- are you familiar with the undercover

12   purchases on June 28th, 2019 and December 9th, 2019, as

13   reflected in paragraphs 21 and 22 of the affidavit?

14   A    I am.

15   Q    And those -- weren't those -- weren't those transactions

16   directly tied back to a Bitcoin address associated with

17   defendant Spencer, and specifically his e-mail account

18   associated with the address, Mr. Spencer's address?

19   A    That's correct.

20             MR. JONES:  No further questions, Your Honor.

21             THE COURT:  Thank you, special agent Hamblet.

22             Is there any further -- oh, actually, wait, before

23   you step down, I don't know if this is something the special

24   agent can address and maybe the defendant will be able to

25   address.  Is there any -- is there an immigration detainer

1   against -- formally lodged against Mr. Spencer?

2           THE WITNESS:  Is that for me, Your Honor?

3           THE COURT:  If you know.

4           THE WITNESS:  I believe there -- as of a couple of

5   weeks ago, there was an immigration detainer for Mr. Spencer,

6   which we provided to the U.S. Attorney's Office, and I believe

7   that was forwarded to his attorney.

8           THE COURT:  Okay.  Thank you.

9           Okay.  You may step down, special agent Hamblet.

10          Mr. Jones, any further evidence that the government

11  wants to present?

12          MR. JONES:  No further evidence, Your Honor.  Just

13  argument.

14          THE COURT:  Okay.  Mr. Fleischman, is there any

15  evidence to present from Mr. Teixeira-Spencer, or -- I'll hear

16  argument from you --

17          MR. FLEISCHMAN:  I do have --

18          THE COURT:  Is there any evidence to present?

19          MR. FLEISCHMAN:  I wanted to proffer first our --

20  and I have the witness available regarding our bond proposal.

21          THE COURT:  Please, yes.

22          MR. FLEISCHMAN:  So, and we've met him initially.

23  He was on Zoom.  He's still on.  I'm not sure if I'm

24  pronouncing this right, Laucio (phonetic) Teixeira is the

25  defendant's cousin.  They reside in Rhode Island.  He owns a

1   home together with his mom, the address of which is 55

2   Edgeworth Avenue, Providence, Rhode Island, 02904.  The

3   defendant's aunt, this witness' mother, is Laurinda Teixeira.

4   Laucio is a sales rep for Kitu Super Coffee.  He's lived in

5   Rhode Island for 29 years.  The mom, the defendant's aunt, is

6   currently temporarily unemployed, working for a banquette

7   company because of COVID, but she intends to go back as soon

8   as that's completed.  The home they own is worth approximately

9   350,000.  The mortgage is down to 125,000.

10          Our proposal is that the defendant would live with

11  them in Rhode Island.  We would -- and Laucio would --

12  Teixeira would sign on a personal surety or, you know, the --

13  what's left as far as the equity in the home.  And we would

14  also propose either house arrest or electronic monitor,

15  depending on what's available in Rhode Island.  And the family

16  also has savings of between 13 and 15,000 that they would be

17  willing to post as a personal surety, as a corporate surety

18  bond on behalf of the defendant in this case.

19          So, again, just to summarize, Your Honor, we would

20  be requesting a personal surety secured by the residence in

21  Rhode Island, signed by both Laucio Teixeira and his mother,

22  Laurinda Teixeira, the aunt, and first cousin of Mr. Spencer.

23  Additionally, they would be willing to post a corporate

24  surety.  The maximum funds they have to do that is 15,000,

25  which come from both of them having worked full-time.

1           THE COURT:  Mr. Fleischman, what was your

2    understanding of Mr. Teixeira-Spencer's immigration status and

3    whether there's an immigration detainer lodged that would put

4    him in immigration custody if he were released?

5           MR. FLEISCHMAN:  There is an immigration detainer,

6    but he has hired an immigration attorney, but it's something

7    that even if you awarded bail at this point or some form of

8    pretrial release, they cannot just rush out and take care of

9    that.  The immigration issue would have to be addressed first.

10   But, so that's the status.  And as of now, there is an

11   immigration detainer.  They hired an immigration attorney.

12           And I don't know if you're ready for me to argue or

13   not, if you want the government to go first, but I did want to

14   address his background, the Pretrial Services report, and the

15   documents I filed from Rhode Island as defense exhibits would

16   show that he pled to a misdemeanor there.

17           THE COURT:  Okay.

18           MR. FLEISCHMAN:  If you want me to go, I can do that

19   now, or if you want the government to go.

20           THE COURT:  Well, what I'm going to do, what I'm

21   going to do, Mr. Ray, what I'm going to do is hear argument

22   from the government and Mr. Fleischman regarding

23   Mr. Teixeira-Spencer, and then we will -- I'll hear from you

24   as to any evidence you want to present as to Mr. Dawodu and

25   move to argument for him.  Okay?

 1              MR. RAY:  Thank you, Your Honor.

 2              MR. FLEISCHMAN:  And also if the government wanted

 3    to question Laucio Teixeira, he is present on Zoom.

 4              THE COURT:  Mr. Jones, would you like to

 5    cross-examine Mr. Teixeira?

 6              MR. JONES:  No, Your Honor.

 7              THE COURT:  Okay.  So let me hear argument from

 8    Mr. Jones.

 9              MR. JONES:  Thank you, Your Honor.

10              As previously referenced, we believe there's

11    probable cause at this point to determine that Mr. Spencer and

12    Mr. Dawodu both committed the offense as charged in the

13    indictment, at which point the -- there's a rebuttable

14    presumption that there's no reasonable conditions that can

15    assure their appearances and maintain the safety of the

16    community.

17              In this instance, we are dealing with a extreme

18    amount of Fentanyl, which, as referenced previously in the

19    factual proffer, is a very dangerous drug that causes a lot of

20    death in our country with the opioid crisis, and these --

21    Mr. Spencer and Mr. Dawodu have been distributing these

22    Fentanyl-laced pills that can cause this danger.

23              In addition to the underlying problems with the --

24    their ability to distribute this from home or from anywhere,

25    this is two gentlemen, or I can reference Mr. Spencer now, but

1   obviously very capable of hiding his ability to sell drugs,

2   work on the dark net and use Bitcoin to fund his life.  So we

3   are in a situation where if any -- even if they were released

4   at home, we cannot monitor their ability to continue to

5   function and sell drugs, as they seem very good at doing.

6          The charge that he's facing is obviously

7   substantial.  There's a 10-year minimum sentence, and his

8   guidelines are upwards of 15, or 150 months.  But we also have

9   to take into account that he has no legal status in the United

10  States, has ties to Cape Verde and could flee and fund his

11  flight with his illicit proceeds that we may not have our

12  hands on at this point.  He had $12,000 in cash in his home

13  when the residence was searched, and this is consistent with

14  behavior of someone that can hide, stash money and be able to

15  flee at the drop of a hat.

16         In addition, we have evidence from his jail calls

17  that he's not afraid to obstruct justice.  He directed his

18  live-in girlfriend to destroy evidence, and I think that's

19  indicative of Mr. Spencer's character, which is something this

20  Court should consider in the factors.

21         In addition, we know that he's used marijuana

22  consistently, which is another factor for this Court to

23  consider, his substance abuse.

24         And that is all I have to present for Mr. Spencer.

25         THE COURT:  Mr. Fleischman, your argument.

1          MR. FLEISCHMAN:  Judge, let me start off with, if I

2  could, before I get to our view of the facts, the Pretrial

3  Services report.  I want to note, Your Honor, that he

4  literally, other than the misdemeanor in Rhode Island, he has

5  no criminal history whatsoever.  But although he does have a

6  detainer currently, he is -- there's no evidence -- and he

7  denied this to, as well, to Pretrial Services, that he's left

8  the United States.  I mean, he's literally grown up here.

9  He's totally assimilated into the U.S.  He has no connection

10  nor does he want to go back to Cape Verde.  There's no

11  evidence he's ever left the U.S., period.  They have his

12  passport; it would be impossible for him to leave this

13  country.  All his ties are here.  His family lives in Rhode

14  Island and South Florida.

15          There's no evidence that he's a risk of danger to

16  the community.  There's no prior acts of violence.  No

17  firearms were found on him or in his home.  He was never seen

18  with any form of weapon during surveillance that took place in

19  this case.  So I would say that danger to the community, zero.

20  And risk of flight I would say, you know, obviously in any

21  criminal case there's a risk of flight, but I would say that

22  that is almost zero on the part of Mr. Spencer.

23          Addressing the -- addressing the facts of this case,

24  it's our position that for Mr. Spencer there's barely probable

25  cause, barely.  And I want to emphasize the fact that one of

the strongest points that the government has is that it
appears that currency, digital currency from the sale of
drugs -- and this in the light most favorable to the
government -- may have gone into wallets, or I'm using that
term broadly, that the defendant had access to.  This is the
problem with their theory of the case and claiming to have
probable cause for this is that multiple people have access to
those accounts, and they cannot say who accessed the accounts,
they can't say who the money was to be sent into the account
for, if, in the light most favorable to the government, you
know, it was actually drug money that was sent to those
accounts, and there's no evidence that Spencer knew that money
for drugs were going into those wallets, period.

        So the fact that he later rented a hotel room with
Bitcoin, so what?  That doesn't prove that he was using drug
proceeds.  And they know that he trades Bitcoin and other
digital currency, which could account for a large amount of
transactions.

        They did surveillance.  They never saw him with
drugs, they never saw him with weapons, they never saw him
mail at a postal center or a United States Post Office any
form of drugs.  No CI had contact with him.  They did a search
of his home, found no drugs.  They never searched the storage
unit.  There's no evidence that that was used for anything
illicit.

1              There's pole -- apparently their surveillance of him

2    with the co-defendant.  So what?  I mean, there's no evidence

3    that at that time they're engaged in any type of illegal

4    activity, period.

5              So it's complete conjecture on the government's

6    part.  There's barely probable cause in this case to even

7    charge and arrest him for this.  And the fact that he told the

8    girlfriend, again, in the light most favorable to the State

9    (sic), to get rid of the computers, the computers were there

10   during the search and the police left them.  That was their

11   decision to leave them.  Also, they're not even evidence at

12   this point.

13             And they did a search of the home, found only U.S.

14   currency.  There's no evidence the currency is linked to

15   drugs.  He has a music business which the agent is somewhat

16   aware of.

17             So I would say at this point, Your Honor, first of

18   all, we shouldn't have to rebut the presumption, but if you

19   find that the government's evidence rises to that --

20             THE COURT:  Mr. Fleischman, the grand jury's

21   returned an indictment here finding probable cause.  Why

22   shouldn't you have to rebut the presumption?

23             MR. FLEISCHMAN:  Okay.  Well, let's -- I agree,

24   there is an indictment in this case.  I would say

25   overwhelmingly we have rebutted the presumption.

1          So we're asking the Court to at this point -- he

2     can't -- obviously at this point he can't get out, but I'm

3     asking the Court to, you know, put together a bond package

4     where a personal surety with the home in Rhode Island where he

5     would reside would be, you know, posted as collateral, and

6     then if the Court felt it necessary, although I don't see why

7     it would be necessary on top of that, an additional corporate

8     surety bond or even some form of 10 percent bond with the

9     clerk, with electronic monitor of him in Rhode Island and the

10    ability to travel to South Florida and, you know, Rhode Island

11    and obviously Washington, D.C., if he's out of custody.

12          But that's our position, Your Honor.

13          THE COURT:  A couple questions.

14          First of all, as to your bond conditions, why would

15    he need to travel to South Florida --

16          MR. FLEISCHMAN:  Because he still has --

17          THE COURT:  -- (inaudible) Rhode Island, is going to

18    be living in Rhode Island, and the court proceedings are in

19    D.C., for what reason would he have to travel back to South

20    Florida?

21          MR. FLEISCHMAN:  Because he still has family here.

22    And although obviously he's not going to live with his

23    girlfriend, I mean, there's no indication that they're on bad

24    terms.  It's our -- just because of everything that went on

25    with the phonecall and the, you know, that situation, we felt

1    it better to propose that he live with, you know, the family

2    in Rhode Island, so . . .

3              THE COURT:  Who is the family in South Florida?

4              MR. FLEISCHMAN:  Well, he has Claudia Schilling, who

5    is his, you know, live-in partner.  And then he has other

6    family members in the South Florida area.  But he -- if you

7    restricted him only to Rhode Island, so, you know, he could

8    certainly live with that.

9              THE COURT:  Let me ask this:  With the immigration

10   detainer, you said that he has no intent to go back to Cape

11   Verde or otherwise leave the United States.  How am I supposed

12   to deal with that?  Immigration may not actually give him that

13   choice.

14             MR. FLEISCHMAN:  Well, he intends to fight, you

15   know, deportation.  He's hired an immigration attorney.  He

16   has zero interest in going back to a country in that area, in

17   Cape Verde.  But he's been in the United States since he's 11

18   years old.  So, I mean, absent this case, I'm not even sure

19   that DACA could be ruled out.  I don't know, I don't do

20   immigration work, but he's been here since he's 11 years old.

21   He's completely assimilated to this country.  So he does not

22   intend to just say, okay, deport me, because he does not want

23   to -- for all intents and purposes, other than not having U.S.

24   citizenship, he's here, so . . .

25             THE COURT:  Let me -- Mr. Jones, is there anything

1    you want to respond to?

2          MR. JONES:  Just that he has family in Cape Verde.

3    His mother is there.  There's somewhere for him to go and make

4    a start, and when you're facing a minimum of 10 years in

5    prison, anyone can change their plans to have their

6    immigration attorney to stop fighting also.

7          THE COURT:  As to Mr. Spencer, the Court must

8    determine whether the government's met is burden of proving

9    that no condition or combination of conditions reasonably

10   assure the defendant's appearance as required, and the safety

11   of the community.

12         As to appearance in court, the government's burden

13   is by a preponderance of evidence, that's more likely than

14   not.  As to danger, it's by clear and convincing evidence.

15   That means evidence sufficient to create an abiding conviction

16   that future danger is highly probable.  The Court has to first

17   assess the extent of any risk, whether any condition, or

18   combination of conditions, would mitigate that risk.

19         There is an indictment in this case establishing

20   probable cause that the defendant committed the charged

21   offenses, and that does create a rebuttable statutory

22   presumption that no condition or combination of conditions

23   could reasonably assure the defendant's appearance as

24   required, and the safety of the community.

25         Regardless of the presumption, the government

1  retains its burden of proving that there's no condition or

2  combination of conditions I can set.

3          There are a number of factors I must consider,

4  including the nature and circumstances of the offense, weight

5  of the offense (sic), the history and characteristics of the

6  defendant, and the nature and seriousness (inaudible).

7          The nature of the -- I am ultimately going to find

8  that while I think it is a close call, I think there are

9  conditions I can set that will reasonably assure the safety of

10 the community and (inaudible).

11         The nature and circumstance of the offense.  The

12 offense is certainly serious, given its involvement with

13 Fentanyl, as Mr. Jones has certainly underlined.

14         The weight of the evidence I think is much stronger

15 than what Mr. Fleischman has characterized it as.  However, it

16 is still based on a lot of circumstantial evidence.

17         In terms if history and characteristics, the

18 defendant has minimal criminal history.  He does, while he has

19 family ties, and while he does have family ties to Cape Verde,

20 he also has ties to the United States and has been here, as

21 Mr. Fleischman said, since he was 11 years old.  I do note

22 that while there is a detainer against him, according to the

23 Pretrial Services report, he has at least sought to remain

24 here through the DACA program, and that suggests to me that

25 although Immigration may not ultimately give him the choice,

1    he does want to remain.

2             The nature and seriousness of the danger that he

3    poses has to do with his continued activity if he were to

4    continue the activity that's in the indictment.  I think there

5    is a substantial risk there, because he was apparently able to

6    conduct all of the alleged activity from his home and through

7    the dark net, which is difficult to monitor.  At the same

8    time, the lack of criminal history involved suggests to me

9    there's not substantial evidence here that he is not going to

10   be deterred by the significant conditions of bond under which

11   he will be subject.

12            Because of that, I don't think I can determine that

13   there's no conditions, even with a presumption, there are no

14   conditions that I can set that would reasonably assure that he

15   won't continue the alleged conduct while on bond.

16            So based on that, I am going to impose the following

17   bond for Mr. Teixeira-Spencer.  Mr. Teixeira, I want you to

18   listen very closely, because if you violate any of these

19   conditions of your bond there's severe consequences.  One, you

20   could be obviously placed back in custody.  Number two, the

21   bond could be revoked (inaudible) be serious financial

22   consequences both for you and the family members who are going

23   to have to cosign on this bond for you.

24            I'm going to set two bonds.  First, I'm going to set

25   a $150,000 personal surety bond.  It has to be cosigned by the

1   defendant's cousin, Lucio Teixeira, and the aunt.

2          Mr. Fleischman, can you give the aunt's name again,

3   please?

4          MR. FLEISCHMAN:  Yes, Your Honor.

5          The aunt is -- I'll spell it.  I'll say it first and

6   then spell it.  Laurinda Teixeira.  Laurinda is spelled

7   L-a-u-r-i-n-d-a, and Teixeira is (inaudible) in the

8   indictment, T-e-i-x-e-i-r-a.

9          THE COURT:  That's Laurinda Teixeira.

10          I'm also going to impose a $100,000 10 percent bond

11   with a Nebbia condition that also must be cosigned by the

12   defendant's cousin and his aunt.

13          I'm also going to impose the following standard and

14   special conditions:

15          First and foremost, Mr. Teixeira must appear before

16   this Court or the court in the District of Columbia as

17   directed, whether that's remotely or in person.  Mr. Teixeira,

18   make sure that you abide by that condition.  Violating that

19   not only brings the consequences I've already told you about,

20   but you could also be possibly separately prosecuted for

21   failure to appear.  Do you understand that?

22          THE DEFENDANT:  Yes, sir.  Yes, Your Honor.

23          THE COURT:  Your travel is restricted to the

24   District of Rhode Island and the District of Columbia, and

25   travel to the District of Columbia is only for the purpose of

1    court appearances.

2          You must reside at the residence of your cousin and

3    aunt, and you may not change that residence without approval

4    of probation or the Court.

5          You must cooperate with law enforcement in the

6    collection of DNA.

7          While on bond, you must not violate any federal,

8    state or local law.  If you come in contact with law

9    enforcement, you must report that contact within 72 hours.

10          You are to surrender all passports and travel

11    documents if you have any.  While on bond, you are not to

12    obtain any travel documents.

13          You must report to Pretrial Services as directed.

14          I'm not going to impose an employment restriction,

15    because I am going to place you on house arrest in your

16    cousin's home with location monitoring, and we'll get to that

17    in a moment.

18          You are to avoid all contact with any victims or

19    witnesses in this case except through counsel.  The government

20    will provide a list of those people to your counsel.  You're

21    also to avoid all contact with any known co-defendant or

22    identified co-conspirator except through counsel.  Again, the

23    government will provide a list of those people.

24          While on bond, you must not possess a firearm or any

25    other destructive devices.

1          Neither you nor the other signatories on the bond

2     may pledge or otherwise encumber the property while you're on

3     bond.

4          Do not visit any commercial transportation

5     establishment except as necessary to travel to the District of

6     Columbia for court appearances or to travel to Rhode Island

7     once you are released.

8          You're going to be on home detention at the home of

9     your cousin subject to GPS monitoring unless Pretrial Services

10    tells the Court that such monitoring is not available in the

11    district where you are being sent.  If that's the case, they

12    can notify the Court, make an amendment of the bond.

13         The home detention is subject to (inaudible)

14    exceptions for medical appointments, court appearances or

15    attorney visits.

16         If I didn't make it clear, the 10 percent bond is

17    subject to a Nebbia condition.

18         Mr. Jones, are there any further restrictions on

19    bond that you would like (inaudible)?

20         MR. JONES:  Just to make sure that there's no

21    ability for him to have access to electronics with Internet

22    access.  Based on the nature of these crimes and the link to

23    drugs being able to be distributed and sold online, I think

24    it's important for the safety of the community to prohibit

25    that.

1          THE COURT:  Yeah, I've considered that, that kind of

2    restriction.  I think the problem is that especially in our

3    current environment, with court hearings occurring by Zoom, as

4    well as just about every other kind of meeting, I don't know

5    if I can impose that full kind of restriction with -- and

6    allow him to both appear in court, communicate with his

7    attorney, possibly conduct other legitimate business.

8          I can order that he not access any Tor or dark net

9    services in any way, although (inaudible) I'm not sure how

10   that can actually be monitored.

11         MR. JONES:  With a provision that probation can come

12   check the history in his electronic devices.

13         THE COURT:  Mr. Fleischman, what do you think about

14   that condition?

15         PROBATION OFFICER:  I'm sorry, Your Honor, I did not

16   hear Mr. Jones.

17         MR. FLEISCHMAN:  I couldn't hear, I'm sorry.

18         THE COURT:  (Inaudible) Mr. Jones is suggesting is

19   that probation be allowed to conduct (inaudible) searches of

20   any electronic devices to confirm that he is not accessing any

21   dark web or Tor services.

22         PROBATION OFFICER:  Your Honor, if -- I believe -- I

23   know this is not a sex offense charge, but I know there is

24   something that we have to control whenever those cases are

25   allowed to have Internet access, and I believe it's called

1    remote.com, but I need to make sure that that's something that

2    we can do in these type of offenses.  If I can just make a

3    quick phonecall?

4             THE COURT:  Well, we do need to move on.  So what

5    I'm going to -- let me ask Mr. Fleischman, what is your

6    position on some sort of Internet restriction?

7             MR. FLEISCHMAN:  Judge, I'm familiar with the

8    software probation is mentioning.  I have -- I mean, he needs

9    to be able to access the Internet especially -- I'm not going

10   to -- if I do represent him or continue, I'm not going to be

11   flying to Rhode Island, I mean, at least not on a regular

12   basis.  So he needs access to the Internet.  If that's what it

13   takes, I'm fine with that.  I know it works on the sex offense

14   cases.  I don't have a problem with it.

15            THE COURT:  I'm not going to impose that restriction

16   right now.  If the government, in consultation with pretrial,

17   can come up with a reasonable formulation of that restriction,

18   I'd ask you either submit that to me or to the court in the

19   District of Columbia as a modification of the bond.

20            But we do need to move on, and I don't want to take

21   the time to (inaudible).

22            MR. FLEISCHMAN:  So, Judge, one other question.

23            THE COURT:  Hold on, Mr. Fleischman.  Hold on,

24   please.

25            MR. FLEISCHMAN:  Okay.

```
 1              THE COURT:  Mr. Jones, is there anything else that
 2    you are recommending?
 3              MR. JONES:  Yes, yes, Your Honor.  I would just
 4    request that we get a brief stay on the bond so that the AUSAs
 5    in D.C. can appeal to an Article III.
 6              THE COURT:  I will grant a stay of the (inaudible)
 7    if there is going to be an appeal.  I'll stay the order for
 8    three days pending appeal.
 9              MR. JONES:  Thank you, Your Honor.
10              THE COURT:  Mr. Fleischman --
11              MR. FLEISCHMAN:  Yes, Your Honor.
12              THE COURT:  -- (inaudible).
13              MR. FLEISCHMAN:  I had a question.  Just I wanted to
14    address this ahead of time.  Will he still be allowed contact
15    with Claudia Schilling?  He has not, on my advice, had contact
16    with her since the -- but, I mean, they were living together.
17    They have a full -- fully formed relationship, and I'm
18    requesting that he be allowed to have contact with her.
19              THE COURT:  What's the government's position as to
20    whether she's a witness or potential co-conspirator?
21              MR. JONES:  At this point she's a potential -- based
22    on what I know and what the government knows, it sounds as if
23    she's a potential co-conspirator based on her jail call with
24    the defendant.
25              MR. FLEISCHMAN:  Judge, I would ask that you almost
```

1  treat her as a wife.  I mean, even husband and wife who --

2  and, I mean, we represent a husband and wife, my brother and

3  I, in the past, and they're (inaudible).

4          THE COURT:  (Inaudible) his girlfriend at this time

5  (inaudible).

6          Any other questions, Mr. Fleischman?

7          MR. FLEISCHMAN:  No, Your Honor.  That will be it.

8  Thank you.  Thank the government.

9          THE COURT:  Anything else from probation?

10          PROBATION OFFICER:  Yes, Your Honor.  We would like

11  to respectfully request substance abuse testing based on

12  what's on the Pretrial Services report when he reported during

13  his interview.

14          THE COURT:  I'll recommend -- I'll impose a

15  restriction of substance abuse testing as --

16          PROBATION OFFICER:  Just to remind counsel and the

17  defendant, once he's released, if he's released depending on

18  the appeal, he needs to contact our office.  I'm going to send

19  the phone number to his attorney.  I know this is a DC case,

20  but the bond was issued here, so he needs to come and call us

21  so that we can give him instructions on where to go once he's

22  released for DC.

23          MR. FLEISCHMAN:  Thank you.

24          THE COURT:  As to the removal, Mr. Fleischman, you

25  indicated that he's waiving removal; is that correct?

1          MR. FLEISCHMAN:  That is correct, Your Honor.  We're

2    not contesting removal.

3          THE COURT:  Mr. Teixeira, you do have the right to a

4    hearing where the government would have to establish that you

5    are the person (inaudible) named in the indictment, and you're

6    saying (inaudible) waive that hearing and appear in the

7    District of Columbia as directed; is that correct?

8          THE DEFENDANT:  Yes, yes, Your Honor.

9          THE COURT:  Okay.  I'll accept the waiver of

10   removal, then.

11         Is there anything else we have to address as to

12   Mr. Teixeira-Spencer?

13         MR. FLEISCHMAN:  No.

14         MR. JONES:  Not from the government, Your Honor.

15         THE COURT:  Okay.  Mr. Ray, as to Mr. Dawodu --

16         I'm sorry, everyone, we need to take just a

17   two-minute break before I hear evidence from Dawodu.  Let's

18   stand in recess for two minutes, please.

19     (A recess was taken.)

20         THE COURT:  Okay.  Let's continue with the evidence

21   for Mr. Dawodu.  Mr. Ray, what --

22         UNIDENTIFIED SPEAKER:  Judge, one second.  Mr. Ray

23   just stepped out.  He will right back.  One second, Judge.

24         THE COURT:  Mr. Ray.

25         MR. RAY:  Yes.  I apologize, Your Honor.

1          We were asking for essentially similar conditions to

2    release as Mr. Spencer.  I have on Zoom here Ms. Rochelle

3    Rose.  She is Mr. Dawodu's best friend, has been for over 16

4    years.  She's an oncology pharmacy technician at the

5    University of Miami hospital.  She owns a house.  It's located

6    at 11225 Northeast 12th Avenue, that's in Miami, 33161.  She

7    has a house with a bedroom that she is willing to open up her

8    house and have Mr. Dawodu stay with her.  It's her and her two

9    children.

10         Like I said, this has been his best friend for

11   almost 16 years.  They've -- since he moved here to the United

12   States 16 years ago.  She is willing to take him in.  She's

13   willing to, you know, support him in any way.  She said that

14   she's willing to do anything to help ensure that he does not

15   violate any of the conditions of his release.

16         You know, she has her two children there, that they

17   refer to him as his (sic) uncle.  He's been in their life, you

18   know, almost the children's entire life.  They're age 10 and

19   age 18.

20         Furthermore, I also have Ms. Jamilla Boule

21   (phonetic), who is Mr. Dawodu's girlfriend.  She currently

22   lives in Atlanta; however, if Mr. Dawodu is granted release

23   and is able to live with Ms. Rochelle Rose, his girlfriend,

24   Ms. Boule, is going to do everything in her power to move down

25   here to South Florida to be close to him.  She has also said

1   that she wants to do anything in her power to help Mr. Dawodu,

2   and that's including if he has to appear in the District of

3   Columbia for any appearings, she would be traveling with him.

4   She would be ensuring that he would show up to any court

5   appearance that he needs to be at.

6          Furthermore, both Ms. Rochelle Rose and Jamilla

7   Boule would be willing to cosign on any bond.  And, again,

8   just to reiterate, we would be asking for, you know, similar

9   conditions with the personal surety bond, the home detention

10  with the GPS monitor, and any other conditions that Your Honor

11  would think would be appropriate for his release.

12         THE COURT:  Mr. Ray, what -- is there any monetary

13  collateral that Ms. Rose and Ms. Boule is willing to deposit

14  in the court as to secure a -- secure the monetary bond?

15         MR. RAY:  I do need to discuss that more in detail

16  with them, but, Your Honor, if we -- I'm sure that between the

17  two of them, that they could come up with somewhere around

18  $10,000.

19         THE COURT:  Anything further from you, Mr. Ray?

20         MR. RAY:  Nothing for that, Your Honor.

21         THE COURT:  In terms of evidence or proffer.

22         MR. RAY:  Just argument, Your Honor.

23         THE COURT:  Mr. Jones, your argument, please.

24         MR. JONES:  Argument, Your Honor?

25         THE COURT:  Yes.

1          MR. RAY:  Yes.  Consistent with the arguments

2     against Mr. Spencer, I reiterate that the burden here, there

3     is probable cause to find him guilty, or that he committed the

4     crimes as alleged, and that there is a rebuttable presumption

5     that there's no set of conditions that can assure his

6     appearance and the safety of the community.

7          Again, we're dealing with Fentanyl.  I want to be --

8     I just want to stress that the ability for these gentlemen to

9     sell this drug that can cause overdoses and kill individuals

10    in an opioid crisis is serious.

11         In addition, specific to Mr. Dawodu, he's got

12    substantial ties to Nigeria, including his parents and

13    siblings who live there.  This contributes to his risk of

14    flight.  He would be able to restart life or connect with his

15    family and live there for -- to avoid his 10-year minimum

16    sentence.  He is not married; he has no children.  He does

17    have a substance abuse issue, consistent marijuana usage.

18    He's got a -- we don't have a significant criminal history,

19    but there is a charge for prior possession of marijuana.

20         But in general, Your Honor, I think the danger to

21    the community is a big push here, and to the extent this Court

22    is inclined to grant a bond, we would also request a stay for

23    this defendant, as well, for an appeal.

24         THE COURT:  Okay.  Thank you, Mr. Jones.

25         Mr. Ray, your argument.

1          MR. RAY:  Thank you, Your Honor.

2          I do want to point out on his Pretrial Service

3   report it does state on page 4 that he does have a prior

4   charge in Butts County, Georgia.  According to Mr. Dawodu,

5   that case was dismissed.  I personally reached out to the

6   district attorney's office in Butts County.  They had no

7   record of any case being filed under his name or the citation

8   number provided.  So at this time I would ask Your Honor to

9   take notice of that, and that would essentially mean he has no

10  criminal history at all.

11         MR. JONES:  One more thing, Your Honor.  I

12  apologize, but there's also information provided in the

13  Pretrial Services report by this defendant that he exports

14  cars, buys and then exports them, and that can go to his

15  ability to develop business relationships with people in

16  different countries, potentially Nigeria.  With those business

17  connections he could also flee.

18         So I just wanted to make sure that we highlight

19  his -- his claimed . . .

20         THE COURT:  Okay.  Thank you, Mr. Jones.

21         Anything further, Mr. Ray?

22         MR. RAY:  Yes, Your Honor.

23         As the government pointed out, there is a rebuttable

24  presumption.  One, looking at if he is a flight risk, even

25  though that Mr. Dawodu was born in Nigeria, he's lived in

1   America for 16 years.  He's been an American citizen for

2   almost a decade.  More importantly, he identifies as an

3   American, and he's proud to be an American citizen.

4          Furthermore, as the evidence was presented here in

5   this hearing today, you know, it appears that this was an

6   elaborate, you know, sophisticated drug operation; however,

7   Mr. Dawodu's role is minimal compared to the other

8   participants.  There's no evidence that he ever conducted any

9   Bitcoin transactions, there's no evidence that he ever owned

10  or has owned any type of cryptocurrency, there's no direct

11  evidence that he's ever accessed the dark web, and there's no

12  evidence suggesting that he, you know, possesses the knowledge

13  or understanding of the entire scope or structure of this

14  operation.  You know, according to the allegations, he's, you

15  know, not much more than just a courier in this operation.

16         And additionally, there's no evidence that

17  Mr. Dawodu has the financial capacity to flee the

18  jurisdiction.  You know, he lived in a small efficiency where

19  he paid a thousand dollars of rent in a month.  The only

20  assets that he owns is his car, he has one piece of jewelry,

21  and he has less than $2000 in his bank account.

22         Furthermore, you know, he has a strong support

23  system here.  Ms. Rochelle Rose has been his friend for 16

24  years.  As I said, she has -- she's an oncology pharmacy

25  technician.  She's willing to open her home to Mr. Dawodu.

1  She's willing to do anything that she can, including be a

2  cosigner on the bond, and she's there to provide not just a

3  home, but also support for him as if she were a family member.

4          And additionally, his girlfriend, Ms. Boule, as I

5  stated earlier, she is attempting to move down to South

6  Florida upon his release.  She's also, you know, is going to

7  be with him at every appearance, whether it's here in southern

8  Florida or it's in the District of Columbia.

9          Also, he does have a sister who lives in the D.C.

10  area.  She lives in Maryland, just right outside of D.C.

11  She's a teacher in D.C., and she has also stated that if he

12  needs to be in D.C. at any time for any appearance, that him

13  and his girlfriend, Ms. Boule, are welcome to stay with her.

14          Furthermore, Mr. Dawodu, he has a college degree.

15  He worked at CVS for over six years as a supervisor, and he --

16  he -- additionally, he's -- I turned in his passport to the

17  federal probation office last week, so he does not have any

18  passport that would enable him to leave the country.

19          And, you know, as to him being a danger to the

20  community, the government points out that he's a danger to the

21  community solely because this is Fentanyl.  I do just want to

22  point out that if the government really thought that this was

23  such a danger, they witnessed over 11, or conducted over 11

24  undercover buys over a six-month period, knowing that Fentanyl

25  was involved, and if it was that big of a danger, I would

1    think that they would have stopped this operation from the

2    beginning.  So, you know, as far as he's a danger, the

3    government can't have it both ways.  The same action that they

4    observed multiple times is the same action they're trying to

5    say right now poses a danger to the community.

6           But he has no -- he has no criminal history, he has

7    no history of violence, he has no history of use of weapon,

8    and there are no allegations that he's a dangerous person.  In

9    fact, he's the opposite.  If you would ask anybody around,

10   they say that he's a loving boyfriend, a brother, son and

11   friend.

12          And at this time, Your Honor, for those reasons we

13   would respectfully ask Your Honor to deny the motion, the

14   government's motion for detention, and I believe that there's

15   a combination of conditions that we discussed earlier that

16   will reasonably assure his appearance and safety of the

17   community.

18          THE COURT:  Thank you.

19          Again, I must determine whether the government's met

20   its burden of proving that no condition or combination of

21   conditions can reasonably assure the defendant's appearance

22   (inaudible) community.  As to appearance, it's the

23   government's burden by a presumption of evidence.  As to

24   danger, it's by clear and convincing evidence.  (Inaudible)

25   the presumption in this case established by the indictment

1    finding probable cause that the defendant committed the

2    charged offense, there is a rebuttable presumption, and the

3    government retains the burden of proof.

4           I've considered the factors in 3142 (inaudible), as

5    with the previous defendant.  I think there are a combination

6    of conditions that I can set, despite the presumption and

7    despite the evidence, that will reasonably assure the

8    defendant's appearance (inaudible).

9           The nature of the offense is quite serious because

10   it does involve Fentanyl and is essentially more serious for

11   Mr. Dawodu as opposed to Mr. Spencer, given the more direct

12   evidence of his handling the Fentanyl pills (inaudible).  So

13   it is a -- certainly it is a serious offense.  The nature and

14   circumstances do involve danger.  I find the weight of the

15   evidence is fairly strong, at least (inaudible) portions of

16   (inaudible) Mr. Dawodu (inaudible).  That said, he has little

17   to no criminal history depending on how this Georgia citation

18   is actually (inaudible).  Even if he was convicted of

19   possession of marijuana, it's a relatively minor offense in

20   the grand scheme of things.

21          While he has ties to Nigeria, he also does have ties

22   to the United States.  He's been here for quite a long time.

23   He is a naturalized citizen and has been so for many years,

24   for about a decade now.  Given his lack of criminal history, I

25   think while there is a danger posed given the nature of the

offense, again, the lack of criminal history suggests that --
or there's no evidence that he would not be deterred by
conditions of bond.  He also does have strong enough ties to
the United States.  While there is the risk of flight to
another country, the conditions that I impose can reasonably
mitigate those risks to ensure the defendant's (inaudible) at
trial.

So based on that finding, I am going to impose a
combination of (inaudible).  I'm going to again impose a
$100,000 personal surety bond, a $100,000 10 percent bond.
Both of those bonds must be cosigned by Rochelle Rose and
Jamilla Boule.  There is a Nebbia condition on the 10 percent
bond.

Mr. Dawodu, listen carefully, because I'm going to
read you the standard and special conditions of your bond.  If
you violate any of these conditions, not only will you end up
back in custody, but you will bring severe financial
consequences on Ms. Rose and Ms. Boule, who are both vouching
for you.

First and foremost, you shall appear before this
Court or the District of Columbia court as directed, whether
remotely or in person as directed.  I would note that if you
fail to abide by that condition, you could also be charged
with a separate crime of failure to appear.

Your travel is restricted to the Southern District

1  of Florida and the District of Columbia, but only the District

2  of Columbia for the purpose of court appearances.  You must

3  reside at Ms. Rose's address on 12th Avenue, in Miami, and you

4  will not change that address without prior notice to probation

5  and the Court.

6          You must cooperate with law enforcement in the

7  collection of DNA.

8          While on bond, you must not violate any federal,

9  state or local raw.  If you come in contact with law

10 enforcement, you must contact probation within 72 hours.

11         While on bond, you are going to be (inaudible).  You

12 must surrender any passports that you have.  You may not

13 obtain any passport or other travel documents while on bond.

14         You are to report to Pretrial Services as directed.

15         (Inaudible) the substance abuse counseling as

16 determined by probation, the cost borne by you.  While on

17 bond, you are to abstain from the use of any narcotic drug or

18 controlled substance.

19         You are to avoid all contact with any victims or

20 witnesses in the crimes charged except through counsel.

21 You're also to avoid contact with any co-defendants or

22 co-conspirators except through counsel.

23         While on bond, you must not possess any firearm or

24 destructive device.

25         Neither you nor the women who will be cosigning on

1    the bond may pledge, mortgage or otherwise encumber any real

2    property while you are on bond.

3            You must not visit any commercial transportation

4    establishments except as necessary to travel to the District

5    of Columbia.

6            You're going to be placed on house arrest subject to

7    GPS monitoring with the following exception:  You may leave

8    the home for medical reasons and court appearances or for

9    attorney visits.

10            Mr. Jones, are there any other conditions that you'd

11    like to recommend as to the bond?

12            MR. JONES:  No, Your Honor.

13            THE COURT:  Ms. Vasquez, anything else you want to

14    recommend or have me clarify?

15            PROBATION OFFICER:  No, Your Honor.  I just need the

16    actual address of where he's going to be residing.

17            THE COURT:  Mr. Ray, correct me if I'm wrong.  I

18    believe it's 11225 Northeast 12th Avenue, in Miami?

19            MR. RAY:  That is correct, Your Honor.

20            THE COURT:  Is that correct, Mr. Ray?

21            MR. RAY:  Yes, thank you.

22            THE COURT:  And Ms. --

23            PROBATION OFFICER:  Your Honor, I apologize.  I only

24    got 11225 12th Avenue.  I'm having such a hard time hearing

25    you, Your Honor.

1          THE COURT:  It's in Miami.

2          MR. RAY:  And that's Northeast 12th Avenue.

3          PROBATION OFFICER:  Northeast, okay.

4          THE COURT:  The cost of GPS monitoring will be borne

5   by you if Pretrial determines that you are in a position to

6   afford it.

7          Anything else, Mr. Ray?

8          MR. RAY:  Nothing else, Your Honor.

9          THE COURT:  Mr. Jones, I will grant the government's

10  motion to stay my release order pending the three days to

11  allow the government an opportunity to appeal that order in

12  the District of Columbia.

13         MR. JONES:  Thank you, Your Honor.

14         THE COURT:  I do recognize that we have

15  Mr. Fleischman here, we have Mr. Ray here.  I'm not sure if we

16  need do this for a removal case; however, let me (inaudible)

17  the (inaudible) protection act (inaudible) has not been read

18  in this case.

19         Let me advise counsel for all parties here that I

20  need to remind everyone of the government's disclosure

21  obligations under Brady versus Maryland.  The government has a

22  constitutional duty to disclose any evidence that goes toward

23  the (inaudible) of the defendant's guilt that would reduce the

24  defendant's potential sentence or evidence showing the

25  credibility of a witness.  The defendant is entitled to this

1   information without a request.  I hereby order the government

2   to comply with these obligations.  Failure to timely comply

3   with Brady obligations could result in serious consequences,

4   including sanctions against the government, suppression of

5   evidence, adverse jury instructions, (inaudible) charges,

6   contempt, or reversal of conviction, as well as professional

7   consequences for any individual found to have unlawfully

8   withheld them.

9           All right.  Is there anything else we need to

10  address as to either Mr. Spencer or Mr. Dawodu?

11          MR. FLEISCHMAN:  No, Your Honor.

12          MR. JONES:  No, Your Honor.

13          MR. RAY:  No, Your Honor.

14          THE COURT:  Thank you all for your appearances

15  today.

16          VOICES:  Thank you, Your Honor.

17      (Proceedings concluded.)

18                    *  *  *  *  *

19

20

21

22

23

24

25

```
 1                          * * * * *

 2                          I N D E X

 3   Testimony of Sean Hamblet

 4              Cross by Mr. Fleischman           18

 5              Cross by Mr. Ray                  30

 6              Redirect by Mr. Jones            39

 7                          * * * * *

 8                       E X H I B I T S

 9   (None.)

10                          * * * * *

11                        CERTIFICATE

12       I, Stephen W. Franklin, Registered Merit Reporter, and

13   Certified Realtime Reporter, certify that the foregoing is a

14   correct transcript, to the best of my ability, from the

15   DIGITAL AUDIO RECORDING of proceedings in the above-entitled

16   matter.

17       Dated this 6th day of APRIL, 2021.

18

19       /s/Stephen W. Franklin
         _____
20       Stephen W. Franklin, RMR, CRR

21

22

23

24

25
```