AO 442 (Rev. 11/11) Arrest Warrant

# UNITED STATES DISTRICT COURT
for the
District of Columbia

| | |
|---|---|
| United States of America | ) |
| v. | ) Case: 1:21-cr-00145 |
| OLATUNJI DAWODU | ) Assigned to: Judge John D. Bates |
| | ) Assign Date: 2/22/2021 |
| | ) Description: INDICTMENT (B) |
| | ) |
| *Defendant* | |

## ARREST WARRANT

To:      Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay
*(name of person to be arrested)*      OLATUNJI DAWODU                                                                                        ,
who is accused of an offense or violation based on the following document filed with the court:

☑ Indictment          ☐ Superseding Indictment          ☐ Information          ☐ Superseding Information          ☐ Complaint
☐ Probation Violation Petition          ☐ Supervised Release Violation Petition          ☐ Violation Notice          ☐ Order of the Court

This offense is briefly described as follows:

21 U.S.C. § 846 - Conspiracy to Distribute 400 grams or More of a Mixture and Substance Containing a Detectable Amount of Fentanyl.

2021.02.22
16:25:56 -05'00'

Date:      02/22/2021                                                          _____
                                                                                                    *Issuing officer's signature*

City and state:      WASHINGTON, DC                              ZIA M. FARUQUI, U.S. Magistrate Judge
                                                                                                    *Printed name and title*

| Return |
|---|
| This warrant was received on *(date)* 02/22/2021 , and the person was arrested on *(date)* 02/23/2021 at *(city and state)* WEST PARK, FLORIDA . |
| Date:      02/23/2021                                                          _____ <br> *Arresting officer's signature* <br> SEAN HAMBLET, SPECIAL AGENT <br> *Printed name and title* |

U.S. District Bankruptcy Courts
for the District of Columbia
A TRUE COPY
ANGELA D. CAESAR, Clerk
By _____
Deputy Clerk

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Holding a Criminal Term

Grand Jury Sworn in January 28, 2021

FILED BY_____D.C.

FEB 2 4 2021

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. LAUD.

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. |
| | : | |
| v. | : | GRAND JURY ORIGINAL |
| | : | OUR CASE:21-6100-JMS |
| LUIS MIGUEL TEIXEIRA-SPENCER, | : | VIOLATION: |
| and OLATUNJI DAWODU, ✔ | : | 21 U.S.C. § 846 |
| | : | (Conspiracy to Distribute 400 grams or More |
| Defendants. | : | of a Mixture and Substance Containing a |
| | : | Detectable Amount of Fentanyl) |
| | : | |
| | : | FORFEITURE: |
| | : | 21 U.S.C. § 853 |

**INDICTMENT**

Case: 1:21-cr-00145
Assigned to: Judge John D. Bates
Assign Date: 2/22/2021
Description: INDICTMENT (B)

The Grand Jury charges that:

At times material to this Indictment:

## DEFINITION OF TERMS

1.      Bitcoin ("BTC") was one type of virtual currency that was circulated over the Internet. Generally, BTC was sent and received using a BTC "address," which was like a bank account number and was represented by a case-sensitive string of numbers and letters. Little to no personally identifiable information about the sender or recipient was transmitted in a BTC transaction itself.

2.      Darknet markets were commercial websites located within the Tor network's hidden services that could only be accessed using Tor. To access the Tor network, a user had to install freely-available Tor software. Within the Tor network, entire websites were set up as "hidden services." A user could only reach these "hidden services" if the user was using the Tor software and operating in the Tor network.

3. Darknet markets functioned primarily as black markets, selling or brokering transactions involving drugs, weapons, stolen credit card details, and other illicit goods. BTC was the most common method of payment for products or services within darknet markets.

4. AlphaBay Market, Dream Market, Empire Market, and Wall Street Market, were, at various times, popular darknet markets widely used by individuals in the United States and elsewhere to buy and sell illegal narcotics.

<div align="center">

**COUNT ONE**
**(Drug Distribution Conspiracy)**
21 U.S.C. § 846

</div>

5. Paragraphs 1 through 4 are incorporated herein.

6. Beginning on or about February of 2017, and continuing through on or about February of 2021, within the District of Columbia and elsewhere, the defendants, **LUIS MIGUEL TEIXEIRA-SPENCER** and **OLATUNJI DAWODU**, did knowingly conspire, with others known and unknown to the Grand Jury, to knowingly and intentionally distribute 400 grams or more of a mixture and substance containing a detectable amount of fentanyl, a Schedule II narcotic drug controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(vi).

<div align="center">

OBJECTS OF THE CONSPIRACY

</div>

7. The objects of the conspiracy were, in substance, as follows:

    a.    to traffic narcotics;

    b.    to use cryptocurrency and the darknet to conceal the co-conspirators' illicit activities; and

    c.    to enrich the co-conspirators from the trafficking of narcotics.

<div align="center">2</div>

8. **LUIS MIGUEL TEIXEIRA-SPENCER** sold narcotics, including fentanyl, on numerous darknet markets, including AlphaBay, Dream, Wall Street, and Empire in exchange for BTC.

9. **LUIS MIGUEL TEIXEIRA-SPENCER** utilized the online moniker "johncarter7" on darknet markets, and used variations of the name, including "LBC Johncarter777" on BTC exchanges.

10. For example, between in or about February 2017 until Apil of 2020, **LUIS MIGUEL TEIXEIRA-SPENCER** advertised the sale of pills on AlphaBay, Dream, Wall Street, and Empire using the moniker "johncarter7." The pills were frequently described as "oxycodone M30," but some of the advertisements stated that the pills in fact contained fentanyl. For instance, on Wall Street, johncarter7 advertised for sale "oxycodone M30 best in the market," with a listing describing that "these pills are pressed with just the right amount of fentanyl no hot spots to overdose solid product all the way around I been around for years since alpha bay days those that know me same product as before MONEY BACK GUARANTEE."

11. Johncarter7's darknet sales were conducted as follows:

a. The vendor sites would be set up on different darknet markets and were linked through a common email connected to **LUIS MIGUEL TEIXEIRA-SPENCER**;

b. Customers would place orders for pills through the darknet market and could communicate with johncarter7 using encrypted messaging;

c. **LUIS MIGUEL TEIXEIRA-SPENCER** and **OLATUNJI DAWODU** would obtain packaging and shipping materials;

3

d. **OLATUNJI DAWODU** would place packages for orders that had been placed over the darknet market in blue boxes or post offices operated by the U.S. Postal Service ("USPS");

e. Packages were typically sent using USPS Priority Mail, with postage that had been paid for in bitcoin;

f. The packages were sent from both South Florida, as well as the Rhode Island area, to buyers across the country, including purchasers in the District of Columbia; and

g. Once the shipments were received by the customer, the darknet market would release funds in BTC, which were held in escrow until the transaction was completed, into the johncarter7 account on the darknet market.

12. **LUIS MIGUEL TEIXEIRA-SPENCER** also communicated with customers through messaging services, such as Jabber. Jabber is an instant messaging service that enables real-time communication between users. Using Jabber, **LUIS MIGUEL TEIXEIRA-SPENCER** would arrange direct transactions with customers, wherein he would communicate with buyers directly regarding shipments of drugs; after receiving bitcoin payment from customers, packages would then be shipped to the customers using the U.S. Postal Service. The packages were shipped in a similar manner as the orders that had been placed on the darknet markets.

## OVERT ACTS

13. The defendants and co-conspirators, known and unknown to the Grand Jury, committed, and caused to be committed, the following overt acts, amongst others, in furtherance of the conspiracy.

4

14.     In setting up the johncarter7 vendor sites on Dream, Wall Street, and Empire Markets, an email account connected to **LUIS MIGUEL TEIXEIRA-SPENCER** was embedded within the public key for vendor accounts on each of the three markets.

*Undercover Purchases from Darknet Markets*

15.     During the course of this investigation, a number of undercover purchases of pills were made, to include:

| Date | Market | Pills Ordered | Controlled Substance |
|------|--------|---------------|----------------------|
| 3/19/19 | Dream | 10 | fentanyl and acetyl fentanyl, a fentanyl analog |
| 3/27/19 | Wall Street | 10 | fentanyl and acetyl fentanyl, a fentanyl analog |
| 4/12/19 | Wall Street | 10 | fentanyl |
| 6/12/19 | Empire | 20 | fentanyl and acetyl fentanyl, a fentanyl analog |
| 6/19/19 | Empire | 50 | fentanyl and acetyl fentanyl, a fentanyl analog |

16.     Each of the packages from johncarter7 was shipped via USPS Priority Mail envelopes and packaged in a similar fashion, with labels affixed that displayed return addresses with fictitious names and addresses.

*Direct Purchases from Johncarter7 Using Jabber*

17.     In April 2019, johncarter7 posted a Jabber account username on the Wall Street vendor page for future orders.   By posting the Jabber contact information, johncarter7 allowed customers to make purchases directly from the vendor, rather than having to place orders through the vendor page.

18.     In late April of 2019, undercover officers began communicating with johncarter7 using the Jabber account and arranged multiple purchases of narcotics, including the following:

5

| Date | Pills Ordered | Controlled Substance |
|---|---|---|
| 4/24/19 | 10 | fentanyl and acetyl fentanyl, a fentanyl analog |
| 5/8/19 | 20 | fentanyl and acetyl fentanyl, a fentanyl analog |
| 5/14/19 | 10 | fentanyl and acetyl fentanyl, a fentanyl analog |
| 6/28/19 | 20 | results pending |
| 7/15/19 | 20 | fentanyl and acetyl fentanyl, a fentanyl analog |
| 12/9/19 | 30 | fentanyl and heroin |

19.     Each of the packages purchased by the undercover officer using the Jabber messaging application contained pills that were packaged in a similar fashion to the undercover purchases from johncarter7 on the darknet markets.

*SPENCER's Connection to Proceeds of Johncarter7 Pill Sales*

20.     The proceeds from certain illicit purchases conducted by johncarter7 were withdrawn to a Bitcoin address ending in 4MW9. That Bitcoin address was linked to more than 100 additional Bitcoin addresses; one of those linked addresses was used to deposit Bitcoin to a Coinbase address on or about May 27, 2017. The deposit was used to process a payment to Expedia for a hotel reservation in Fort Lauderdale, Florida. The traveler's name was **LUIS MIGUEL TEIXEIRA-SPENCER**, with a phone number and email connected to **LUIS MIGUEL TEIXEIRA-SPENCER**.

21.     During the undercover purchase on June 28, 2019, johncarter7 provided the undercover officer with a Bitcoin address ending in LmNP to make the payment for the illicit narcotics. During the undercover purchase on December 9, 2019, johncarter7 provided the undercover officer a Bitcoin address ending in DWYF to make the payment for the illicit narcotics. The transactions in June and December of 2019 were ultimately transferred to a Binance account registered with **LUIS MIGUEL TEIXEIRA-SPENCER's** known email address. The Binance

6

account that received the johncarter7 proceeds was accessed more than one hundred times from an IP address in the name of **LUIS MIGUEL TEIXEIRA-SPENCER** at the address where **LUIS MIGUEL TEIXEIRA-SPENCER** was living at the time.

*Johncarter7 Shipments*

22.     On or about July 17, 2019, **OLATUNJI DAWODU** deposited USPS Priority Mail envelopes in a USPS mailbox. The packages contained pressed pills and were addressed to individuals located in Connecticut and Colorado. The intended recipients of the two packages confirmed that the pills had been purchased from johncarter7 on the Empire Market.

23.     On or about August 27, 2019, **OLATUNJI DAWODU** made another deposit of packages at a USPS mailbox. Law enforcement seized one package for further investigation and determined that it contained pills similar in appearance to the pills purchased during the undercover and darknet market purchases described above.

*Use of Storage Facility*

24.     On or about September 17, 2019, **LUIS MIGUEL TEIXEIRA-SPENCER** sent **OLATUNJI DAWODU** a message with the address of a storage unit located in Davie, Florida.

25.     **OLATUNJI DAWODU** and **LUIS MIGUEL TEIXEIRA-SPENCER** frequented the storage facility in Davie, Florida. A camera captured **OLATUNJI DAWODU** and **LUIS MIGUEL TEIXEIRA-SPENCER** appearing to use the facility in furtherance of the conspiracy.

> (**Conspiracy to Distribute 400 grams or More of a Mixture and Substance Containing a Detectable Amount of Fentanyl**, in violation of Title 21, United States Code, Section 846)

7

## FORFEITURE ALLEGATION

1.      Upon conviction of the offense alleged in Count One of this Indictment, the defendants shall forfeit to the United States pursuant to 21 U.S.C. § 853, any property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of the said violations and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of the said violations.  The United States will also seek a forfeiture money judgment against the defendants equal to the value of any property constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of the offense.

2.      If any of the above-described forfeitable property, as a result of any act or omission of the defendant(s):

a.   cannot be located upon the exercise of due diligence;

b.   has been transferred or sold to, or deposited with, a third party;

c.   has been placed beyond the jurisdiction of the court;

d.   has been substantially diminished in value; or

e.   has been commingled with other property which cannot be divided without difficulty;

the defendants shall forfeit to the United States any other property of the defendant, up to the value of the property described above, pursuant to 21 U.S.C. § 853(p).

(**Criminal Forfeiture,** pursuant to Title 21, United States Code, Section 853(a) and (p))

A TRUE BILL:

FOREPERSON.

Attorney of the United States in
and for the District of Columbia.

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| | |
|---|---|
| United States of America<br>v.<br><br>OLATUNJI DAWODU<br><br><br>*Defendant* | )<br>)<br>)<br>)<br>)<br>) |

**Case: 1:21-cr-00145**
**Assigned to: Judge John D. Bates**
**Assign Date: 2/22/2021**
**Description: INDICTMENT (B)**

## ARREST WARRANT

To:     Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay
*(name of person to be arrested)*     OLATUNJI DAWODU
who is accused of an offense or violation based on the following document filed with the court:

☑ Indictment     ☐ Superseding Indictment     ☐ Information     ☐ Superseding Information     ☐ Complaint
☐ Probation Violation Petition     ☐ Supervised Release Violation Petition     ☐ Violation Notice     ☐ Order of the Court

This offense is briefly described as follows:

21 U.S.C. § 846 - Conspiracy to Distribute 400 grams or More of a Mixture and Substance Containing a Detectable Amount of Fentanyl.

2021.02.22
16:25:56 -05'00'

Date:     02/22/2021

*Issuing officer's signature*

City and state:     WASHINGTON, DC

ZIA M. FARUQUI, U.S. Magistrate Judge
*Printed name and title*

| Return |
|---|
| This warrant was received on *(date)* _____, and the person was arrested on *(date)* _____<br>at *(city and state)* |
| Date: _____ |
| *Arresting officer's signature* |
| *Printed name and title* |

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | Case: 1:21-cr-00145 |
| | : | Assigned to: Judge John D. Bates |
| **v.** | : | Assign Date: 2/22/2021 |
| | : | Description: INDICTMENT (B) |
| **LUIS MIGUEL TEIXEIRA-SPENCER,** | : | **VIOLATION:** |
| **and OLATUNJI DAWODU,** | : | **21 U.S.C. § 846** |
| | : | **(Conspiracy to Distribute Controlled** |
| **Defendants.** | : | **Substances)** |
| | : | |

### ORDER

Upon consideration of the motion to seal the indictment, arrest warrants, and other related material, it is this 22nd day of February 2021,

**ORDERED,** that the Government's Motion is hereby **GRANTED** and the indictment, arrest warrants, and other related material be sealed until further order of the Court. Notwithstanding the sealing, the government may disclose these material in furtherance of its law enforcement and prosecution needs and discovery obligations.

2021.02.22
16:27:59 -05'00'

Zia M. Faruqui
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

FILED BY_____D.C.

FEB 2 4 2021

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. LAUD.

UNITED STATES OF AMERICA
   Plaintiff

vs

           Case No:21-6100-STRAUSS

OLATUNJI DAWODU
   Defendant

## O R D E R

  THIS CAUSE is before the Court for the initial appearance of the above-named

defendant(s) on a SEALED INDICTMENT filed in the District of Columbia.

  UPON ORAL motion of the government in open court that the SEALED INDICTMENT

be unsealed as to all the defendants, it is hereby ORDERED AND ADJUDGED that the Sealed

Complaint be unsealed as to all parties in this case.

DONE AND ORDERED at Fort Lauderdale, Florida this 24th day of February, 2021.


          _____
          JARED M. STRAUSS
          UNITED STATES MAGISTRATE JUDGE


cc: All Counsel of Record

# UNITED STATES DISTRICT COURT FOR SOUTHERN DISTRICT OF FLORIDA **COURT ORDER/MINUTES**
## U.S. MAGISTRATE JUDGE JARED M. STRAUSS- FORT LAUDERDALE, FLORIDA (VIA ZOOM)

DEFT: OLATUNJI DAWODU (J)#

CASE NO: 21-6100-STRAUSS

AUSA: (T. JONES DUTY AUSA)

ATTY:

USPO:

VIOL: 21:U.S.C. § 846

PROCEEDING: INITIAL APPEARANCE ON A RULE 5 FROM COLUMBIA DISTRICT

RECOMMENDED BOND:

BOND/PTD HEARING HELD - yes / no

COUNSEL APPOINTED: FPD. D. Wilcox.

BOND SET @:

To be consigned by:

- ❏ All standard conditions
- ❏ Do not encumber property.

*1- Appearing by Video Conf.*

- ❏ Surrender and / or do not obtain passports / travel documents.

*Gov't Moves to Unseal Indict.*

- ❏ Rpt to PTS as directed / or_ x's a week/month by phone; x's a week/month in person.

*Order Signed. Advised of Charges.*

- ❏ Random urine testing by Pretrial Services. Treatment as deemed necessary.

*Sworn/Test for Court Appt.*

- ❏ Maintain or seek full - time employment.

*FPD. D. Wilcox.*

- ❏ No contact with victims / witnesses.
- ❏ No firearms.
- ❏ Electronic Monitoring:

*1- Waived Removal.*

- ❏ Travel extended to:
- ❏ Other:

| NEXT COURT APPEARANCE: | DATE: | TIME: | JUDGE: | PLACE: |
|---|---|---|---|---|

REPORT RE COUNSEL:

(PTD)/BOND HEARING: Wednesday March 3rd at 10 AM Duty Mag.

**ARRAIGN** OR REMOVAL:

**PRELIM/EXAM HRG**

2/23/21    TIME: **11:00 AM**   FTL/TAPE/# JMS-   } 20Mins {   Begin   **DAR:**   12

[] *** RECORDED BY ZOOM 310 JUDGE HUNT'S COURTROOM**
***THE TIME FROM TODAY THROUGH THE RE-SCHEDULED DATE IS EXCLUDED FROM THE DEADLINE FOR TRIAL AS COMPUTED UNDER THE SPEEDY TRIAL ACT *** (YES OR NO) DAR: 13:11:54 - 13:22:22

Recalled: 13:31:10 - 13:34:05

# UNITED STATES DISTRICT COURT
## FOR THE

### SOUTHERN DISTRICT OF FLORIDA

Case No: 21-6100-STRAUSS
Your Case No:1:21-CR-00145

**United States of America**

**vs**                                **WAIVER OF REMOVAL HEARING**

**Olatunji Dawodu**

I , **Olatunji Dawodu** charged in a proceeding on an **Indictment filed in the District of Columbia in violation of 21:U.S.C.§ 846 Conspiracy To Distribute 400 Grams or More of a Mixture and Substance Containing a Detectable Amount of Fentanyl and** having been arrested in the **Southern District of Florida (Fort Lauderdale)** and taken before **United States Magistrate Jared M. Strauss**, for that district, who informed me of the charge and of my right to retain counsel or request the assignment of counsel if I am unable to retain counsel, and to have a removal hearing or execute a waiver thereof, do hereby waive a hearing before the aforementioned Magistrate Judge and consent to the issuance of a Warrant for my Removal to the **District of Columbia** where the aforesaid charge is pending against me.

Monday February 24th, 2021

_____
Signature of defendant

.......................................................
**Jared M. Strauss**
**United States Magistrate Judge (2/24/2021)**

cc: All Counsel

18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.   21-06100-STRAUSS

UNITED STATES OF AMERICA,
                    Plaintiff,

vs.

OLATUNJI DAWODU,
                    Defendant.
_____/

## NOTICE OF ASSIGNMENT

The above captioned case has been assigned to the Assistant Federal Public

Defender specified below.   Please send all notices and inquiries to this attorney at

the address listed.

Respectfully submitted,

MICHAEL CARUSO
FEDERAL PUBLIC DEFENDER

By:   s/D*aryl E. Wilcox*
Daryl E. Wilcox
Assistant Federal Public Defender
Florida Bar No.   838845
One E. Broward Boulevard, Suite 1100
Ft. Lauderdale, FL 33301-1842
(954) 356-7436
Daryl_Wilcox@fd.org, E-mail

## CERTIFICATE OF SERVICE

I HEREBY certify that on February 25, 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By:  s/ *Daryl E. Wilcox*
Daryl E. Wilcox

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.   21-06100-STRAUSS

UNITED STATES OF AMERICA,
                    Plaintiff,

vs.

OLATUNJI DAWODU,
                    Defendant.
_____/

## DEFENDANT'S INVOCATION OF RIGHTS TO SILENCE AND COUNSEL

The defendant named above does hereby invoke his rights to remain silent and to counsel with respect to any and all questioning or interrogation, regardless of the subject matter, including, but not limited to:   matters that may bear on or relate to arrest, searches and seizures, bail, pretrial release or detention, evidence at trial, guilt or innocence, forfeitures; or that may be relevant to sentencing, enhanced punishments, factors applicable under the U.S. Sentencing Guidelines, restitution, immigration status or consequences resulting from arrest or conviction; appeals or other post-trial proceedings.

The defendant requests that the U.S. Attorney ensure that this invocation of rights is honored, by forwarding a copy of it to all law enforcement agents, government officials, or employees associated with the investigation of any matters relating to the defendant.

1

Any contact with the defendant must be made through the defendant's lawyer, undersigned counsel.

Respectfully submitted,

MICHAEL CARUSO
FEDERAL PUBLIC DEFENDER

By: s/ *Daryl E. Wilcox*
Daryl E. Wilcox
Assistant Federal Public Defender
Florida Bar No. 838845
One E. Broward Boulevard, Suite 1100
Fort Lauderdale, FL 33301-1842
(954) 356-7436
Daryl_Wilcox@FD.org

## CERTIFICATE OF SERVICE

I HEREBY certify that on February 25, 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: s/ *Daryl E. Wilcox*
Daryl E. Wilcox

2

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA                    CASE NO: 21-6100-STRAUSS

    Plaintiff,

v.

OLATUNJI DAWODU,

    Defendant

_____/

## <u>NOTICE OF LIMITED APPEARANCE</u>

TO THE CLERK OF THE ABOVE COURT

      You will please enter my Appearance of Record for the above named

Defendant in this case for the purposes of detention hearing.

BY: ____/s/Patrick J. Curry___

PATRICK J. CURRY, ESQ.

200 Southeast Sixth Street, Suite 602

Fort Lauderdale, FL 33301

(954) 765-2400

Florida Bar No: 299472

Email: pjcnole@aol.com

## CERTIFICATE OF SERVICE

I HEREBY certify that on February 26, 2021, the foregoing document was electronically filed with the Clerk of Court through the CM/ECF system. I also certify that the foregoing document was served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

By:  /s/ Patrick J. Curry __

Patrick J. Curry

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-06100-STRAUSS

UNITED STATES OF AMERICA,
          Plaintiff,

vs.

OLATUNJI DAWODU,
          Defendant.
_____/

## MOTION TO TERMINATE APPOINTMENT

The Office of the Federal Defender through the undersigned Assistant Federal Public Defender, respectfully moves terminate the appointment as counsel for Defendant, Olatunji Dawodu. In support thereof, undersigned counsel states:

1.     Federal law enforcement officers arrested Mr. Dawodu pursuant to an indictment from the District Court for the District of Columbia that charged Mr. Dawodu and a codefendant with conspiracy to distribute heroin, in violation of 21 U.S.C. § 846.

2.     On February 24, 2021, Mr. Dawodu appeared before the Court for the initial appearance on removal proceedings and determination of bond. The Court appointed the Office of the Federal Public Defender to represent Mr. Dawodu in the proceedings to be held in the Southern District of Florida.

3.     The Court scheduled a pretrial detention hearing for March 3, 2021, 2021.

1

4.      On February 25, 2020, Patrick J. Curry, Esq. filed a notice of appearance for purposes of the detention hearing.

WHEREFORE, the undersigned Assistant Federal Public Defender moves to terminate the appointment of the Office of Federal Public Defender as counsel for Olatunji Dawodu.

Respectfully submitted,

MICHAEL CARUSO
FEDERAL PUBLIC DEFENDER

By:    *s/Daryl E. Wilcox*
       Daryl E. Wilcox
       Assistant Federal Public Defender
       Florida Bar No.  838845
       One E. Broward Boulevard, Suite 1100
       Fort Lauderdale, FL 33301-1842
       (954) 356-7436
       Daryl_Wilcox@fd.org

## CERTIFICATE OF SERVICE

I HEREBY certify that on March 1, 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notice of Electronic Filing.

By: *s/Daryl E. Wilcox*
       Daryl E. Wilcox

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  21-06100-STRAUSS

UNITED STATES OF AMERICA,
            Plaintiff,

vs.

OLATUNJI DAWODU,
            Defendant.
_____/

**ORDER**

THIS CAUSE came before the Court upon the Defendant's Motion to Terminate the Appointment of Counsel.  After carefully considering the motion, it is

ORDERED that the Federal Public Defender's Motion to Terminate Appointment as Counsel is hereby GRANTED and the Federal Public Defender is relieved of any further responsibilities in this cause.

DONE AND ORDERED at Fort Lauderdale, Florida this _____ day of March 2021.

_____
HONORABLE JUDGE JARED M. STRAUSS
UNITED STATES MAGISTRATE JUDGE

cc:    Daryl E. Wilcox, AFPD
       Trevor Christopher Jones, AUSA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-06100-STRAUSS

UNITED STATES OF AMERICA,
                    Plaintiff,

vs.

OLATUNJI DAWODU,
                    Defendant.
_____/

**ORDER**

THIS CAUSE came before the Court upon the Defendant's Motion to Terminate the Appointment of Counsel. After carefully considering the motion, it is

ORDERED that the Federal Public Defender's Motion to Terminate Appointment as Counsel is hereby GRANTED and the Federal Public Defender is relieved of any further responsibilities in this cause.

DONE AND ORDERED at Fort Lauderdale, Florida this _____ day of March 2021.

_____
HONORABLE JUDGE JARED M. STRAUSS
UNITED STATES MAGISTRATE JUDGE

cc:     Daryl E. Wilcox, AFPD
        Trevor Christopher Jones, AUSA

1

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA      CASE NO: 21-mj-06100-JMS

    Plaintiff,

v.

OLATUNJI DAWODU,

    Defendant

_____/

## UNOPPOSED MOTION TO CONTINUE DETENTION HEARING

COMES NOW the Defendant, Olatunji Dawodu, by and through his undersigned attorney and moves this Court to continue the detention hearing date currently set in this case and as grounds for such would state the following:

1. The hearing was set for March 10, 2021 at 10:00am.
2. The undersigned was out sick on that date and was unable to attend the detention hearing as set.
3. The Assistant United States Attorney handling this matter, Trevor Jones, has no objection to the request for a reset and the co-defendant attorney, Jack Fleishman was also in agreement.
4. The parties are requesting the hearing be reset on March 24, 2021.
   WHEREFORE, the defense prays this Court will grant this Motion.

I HEREBY CERTIFY that a true and correct copy of the foregoing was emailed to the Office of the United States Attorney trevor.jones@usdoj.gov and Jack Fleishman at jf@ffjustice.com this 10th day of March, 2021.

BY: /s/Patrick J. Curry___

PATRICK J. CURRY, ESQ.

200 Southeast Sixth Street, Suite 602

Fort Lauderdale, FL 33301

(954) 765-2400

Florida Bar No: 299472

Email: pjcnole@aol.com

UNITED STATES OF AMERICA

    Plaintiff,

v.

OLATUNJI DAWODU

    Defendant,

_____/

## NOTICE OF TEMPORARY APPEARANCE

   COMES NOW, Landon Ray, Esquire of Chukwuma, Hildebrandt & Ray, PLLC, and files this **temporary appearance** as counsel of record for the above-named defendant, for proceedings within the Southern District of Florida.

        Respectfully submitted,

        Chukwuma, Hildebrandt & Ray, PLLC
        1135 Kane Concourse, 5th Floor
        Bay Harbor Islands, FL 33154
        786.408.9903
        Landon@chrlawgroup.com

        By: /s/Landon Ray
        Landon Ray, Esq.
        Florida Bar No. 124223
        Attorney for Defendant Olatunji Dawodu

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on March 23, 2021, a true and correct copy of the foregoing was furnished via CM/ECF to all counsel of record.

By:   /s/Landon Ray
Landon Ray, Esq
Attorney for Defendant Olatunji Dawodu

UNITED STATES OF AMERICA

        Plaintiff,

v.

OLATUNJI DAWODU

        Defendant,

_____/

## UNOPPOSED MOTION TO CONTINUE DETENTION HEARING

**COMES NOW**, the Defendant, Olatunji Dawodu, by and through his undersigned counsel, who hereby files this Motion to Continue the upcoming detention hearing currently set for March 24, 2021. The Defendant puts forth the following in support of his motion:

1. The detention hearing was set for March 24, 2021 at 10:00 AM.

2. The undersigned was retained on March 23, 2021 by the defendant to represent him at the detention hearing and filed a Notice of Temporary Appearance this same day. [Cr. Dkt. No. 13].

3. At this time, Defense Counsel needs additional time to prepare for the detention hearing.

4. Defense Counsel hereby states that this motion is in conformity with the requirements of Local Rule 7.6, and this motion is made in good faith and not for the purposes of hinderance or delay.

5. Pursuant to Local Rule 7.1, on March 23, 2021, Defense Counsel discussed the instant motion with Assistant United States Attorney Trevor Jones and the co-defendant's attorney, Jack Fleishman. Mr. Jones and Mr. Fleishman both stated they do not oppose this Motion to Continue.

6. The parties are requesting the detention hearing be reset to March 31, 2021.

   **WHEREFORE**, the defense prays this Court will grant this Motion to Continue.

<div style="margin-left: 50%;">

Respectfully submitted,

Chukwuma, Hildebrandt & Ray, PLLC
1135 Kane Concourse, 5th Floor
Bay Harbor Islands, FL 33154
786.408.9903
Landon@chrlawgroup.com

By: /s/Landon Ray
Landon Ray, Esq.
Florida Bar No. 124223
Attorney for Defendant Olatunji Dawodu

</div>

**CERTIFICATE OF SERVICE**

      **I HEREBY CERTIFY** that on March 23, 2021, a true and correct copy of the foregoing was furnished via CM/ECF to all counsel of record.

          By:   /s/Landon Ray
                    Landon Ray, Esq
                    Attorney for Defendant Olatunji Dawodu

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO: 21-MJ-06100-JMS**

UNITED STATES OF AMERICA

          Plaintiff,

v.

OLATUNJI DAWODU

          Defendant,

_____/

## ORDER

    **THIS CAUSE** having come before the Court on the Defendant's Unopposed Motion to Continue Detention Hearing, and the Court having reviewed said motion, the position of the parties, and being otherwise fully advised in the premises therein, it is:

    **ORDERED and ADJUDGED** that the Unopposed Motion to Continue Detention Hearing is hereby **GRANTED**.

    The Detention Hearing in this cause shall be continued until _____.

    **DONE and ORDERED** in chambers in Broward County, Florida this _____ day of March, 2021.

                            _____

                            HONORABLE PATRICK M. HUNT
                            UNITED STATES MAGISTRATE JUDGE

UNITED STATES OF AMERICA

        Plaintiff,

v.

OLATUNJI DAWODU

        Defendant,

_____/

## **ORDER**

    **THIS CAUSE** having come before the Court on the Defendant's Unopposed Motion to Continue Detention Hearing ECF No. 14, and the Court having reviewed said motion, the position of the parties, and being otherwise fully advised in the premises therein, it is:

    **ORDERED and ADJUDGED** that the Unopposed Motion to Continue Detention Hearing is hereby **GRANTED**.  The undersigned finds good cause for the continuance based on the hiring of new counsel and finds the time between today's date and the reset hearing is excludable under the Speedy Trial Act in the interests of justice.

    The Detention Hearing for both defendants shall be continued until March 31, 2021 at 10:30 am before the Fort Lauderdale Duty Magistrate Judge.

    **DONE and ORDERED** in chambers in Broward County, Florida this 23rd day of March, 2021.

_____

  HONORABLE PATRICK M. HUNT
  UNITED STATES MAGISTRATE JUDGE

# UNITED STATES DISTRICT COURT FOR SOUTHERN DISTRICT OF FLORIDA **COURT ORDER/MINUTES**
## U.S. MAGISTRATE JUDGE JARED M. STRAUSS- FORT LAUDERDALE, FLORIDA (VIA ZOOM)

DEFT: OLATUNJI DAWODU (J)#31377-509

CASE NO: 21-6100-STRAUSS

AUSA: TREVOR JONES/L. CRANE/R. FLETCHER

ATTY: LANDON RAY (PRESENT IN COURTROOM)

USPO:

VIOL: 21:U.S.C. § 846

PROCEEDING: PRETRIAL DETENTION

RECOMMENDED BOND:

BOND/PTD HEARING HELD - yes / no

COUNSEL APPOINTED:

BOND SET @: **$100,000 PSB & $100,000 10% NEBBIA**

To be cosigned by: **DEFENDANT'S GIRLFRIEND**

| | | |
|---|---|---|
| ❑ | All standard conditions | **DEFENDANT HAD WAIVED REMOVAL, SIGNED WAIVER** |
| ☑ | Do not encumber property. | **ON FEBUARY 24 (ECF NO. 4) ** CONSENT TO APPEAR BY** |
| ☑ | Surrender and / or do not obtain passports / travel documents. | **VIDEO (THOUGH SITTING IN THE COURTROOM)** |
| ☑ | Rpt to PTS as directed / or_ x's a week/month by phone; _ x's a week/month in person. | **GOVERNMENT PROCEED BY PROFFER. SWORN/TEST** |
| ☑ | Random urine testing by Pretrial Services. Treatment as deemed necessary. | **FBI AGENT SEAN HAMBLET. CROSS-EXAMINED BY** |
| ❑ | Maintain or seek full - time employment. | **DEFENSE COUNSEL. COURT DENIES GOVERNMENT'S** |
| ☑ | No contact with victims / witnesses. | **REQUEST FOR DETENTION. SETS BONDS OF $100,000 PSB** |
| ☑ | No firearms. | **& $100,000 10% CASH WITH NEBBIA** |
| ☑ | Electronic Monitoring: | **GOVERNMENT REQUEST A STAY FOR THREE DAYS** |
| ☑ | Travel extended to: SD/FL AND DISTRICT OF COLUMBIA. | **COURT GRANTS REQUEST, STAYED PENDING APPEAL** |
| ☑ | Other: PLEASE REFER TO BOND FOR SPEC CONDITIONS. | **** DUE PROCESS PROTECTION ACT ORDER ISSUED (BRADY) *** |

NEXT COURT APPEARANCE:       DATE:       TIME:       JUDGE:       PLACE:

REPORT RE COUNSEL:

**PTD**/BOND HEARING:

**ARRAIGN** OR REMOVAL:

**PRELIM/EXAM HRG**

3/31/21   TIME: 10:00 AM   FTL/TAPE/# JMS-   Begin DAR:

|2 HOURS AND 10 MINUTES| *** RECORDED BY ZOOM 310 JUDGE HUNT'S COURTROOM**
***THE TIME FROM TODAY THROUGH THE RE-SCHEDULED DATE IS EXCLUDED FROM THE DEADLINE FOR TRIAL AS COMPUTED UNDER THE SPEEDY TRIAL ACT *** (YES OR NO) DAR: 10:41:11-12:49:25

39

```
1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF FLORIDA
2
          Case No. 21-6099-MJ-JMS and 21-6100-MJ-JMS
3
    UNITED STATES OF AMERICA,      )
4                                  )
         GOVERNMENT,               )
5                                  )
         -v-                       )
6                                  )
    LUIS MIGUEL TEIXEIRA-SPENCER,  )
7   AND OLATUNJI DAWODU,           )
                                   )
8        DEFENDANTS.               )     Fort Lauderdale, Florida
                                   )     March 31, 2021
9    _____)


10


11      TRANSCRIPT OF VIDEO DETENTION AND REMOVAL HEARING

12          BEFORE THE HONORABLE JARED M. STRAUSS

13               UNITED STATES MAGISTRATE JUDGE

14
    Appearances:
15
    FOR THE GOVERNMENT        Trevor C. Jones, ESQ., AUSA
16                            U.S. Attorney's Office
                              500 East Broward Boulevard
17                            Suite 7th Floor
                              Fort Lauderdale, FL 33394
18   -and-
                              Laura Crane, ESQ., AUSA, and
19                            Rachel Fletcher, ESQ., AUSA
                              555 4th Street Northwest
20                            Washington, DC 20530

21   (Continued on Page 2.)

22   Reporter                 Stephen W. Franklin, RMR, CRR, CPE
     (561)313-8439            Official Court Reporter
23                            500 West Capitol Avenue
                              Little Rock, AR 72201
24                            E-mail:  SFranklinUSDC@aol.com

25       Proceedings recorded by DIGITAL AUDIO RECORDING, and
     transcript prepared utilizing computer-aided transcription.
```

```
1    Appearances (Cont.'d)

2    FOR DEFENDANT SPENCER        Jack A. Fleischman, ESQ.
                                  Fleischman & Fleischman, P.A.
3                                 2161 Palm Beach Lakes Blvd
                                  Suite 403
4                                 West Palm Beach, FL 33409

5    FOR DEFENDANT DAWODU         Landon W. Ray, ESQ.
                                  Chukwuma, Hildebrandt & Ray, PLLC
6                                 1135 Kane Concourse
                                  5th Floor
7                                 Bay Harbor Islands, FL 33154

8                                    *  *  *  *  *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1          (Call to the order of the Court.)

2              THE COURT:  Okay.  May I please have appearances

3   from all the parties starting with the government.

4              MR. JONES:  Good morning, Your Honor.  Assistant

5   United States Attorney Trevor Jones on behalf of the

6   government.

7              THE COURT:  Good morning, Mr. Jones.

8              Who do we have here --

9              Mr. Jones, is anyone appearing from the District of

10  Columbia for the government, as well?

11             MR. JONES:  Yes, Your Honor.  We have AUSA Laura

12  Crane and Rachel Fletcher, who are the attorneys on the -- on

13  the indictments.

14             THE COURT:  Good morning, Ms. Crane.

15             MS. CRANE:  Good morning.

16             THE COURT:  And Ms. Fletcher I don't see you, but

17  good morning to you.

18             Who do we have appearing on behalf of

19  Mr. Teixeira-Spencer?

20             MR. FLEISCHMAN:  Good morning, Your Honor.  Jack

21  Fleischman for Spencer; he's if custody.

22             THE COURT:  Good morning, Mr. Fleischman.

23             Mr. Fleischman, I'm having a hard time hearing you.

24             MR. FLEISCHMAN:  Let me take out my -- can you hear

25  me better?
```

```
 1              THE COURT:  Yes, that's much better.  Thank you,
 2   Mr. Fleischman.
 3              Mr. Teixeira is appearing from the cellblock?
 4              MR. FLEISCHMAN:  He is, Your Honor.
 5              THE COURT:  Mr. Teixeira, can you see and hear me
 6   okay?
 7              THE DEFENDANT:  Yes, Your Honor.
 8              THE COURT:  Okay.  Who do we have on behalf of
 9   Mr. Dawodu?
10              MR. FLEISCHMAN:  Judge, I'm sorry, I need to
11   interrupt (inaudible) Teixeira.  I don't see my client.  I
12   want to make sure he was on.
13              THE COURT:  Hold on a second.
14              So Mr. Wacia (phonetic) Teixeira, I assume you're
15   a -- you're related to the defendant?
16              UNIDENTIFIED SPEAKER:  Yes, Your Honor.
17              THE COURT:  Okay.  If you're going to -- if I could
18   ask you to please turn off your camera and your microphone
19   unless and until you're asked to testify.  We're trying to
20   minimize the number of people that are appearing on the
21   screen.
22              Mr. Luis Teixeira-Spencer, you're appearing from the
23   cellblock, correct?
24              THE DEFENDANT:  Yes, Your Honor.
25              THE COURT:  Mr. Fleischman, can you see him from the
```

cellblock there?

MR. FLEISCHMAN: I do. I see him now, thank you.

THE COURT: Okay. Who do we have on behalf of Mr. Dawodu?

MR. RAY: Good morning, Your Honor. Can you hear me?

THE COURT: Yes.

MR. RAY: This is Landon Ray on behalf of Mr. Olatunji Dawodu. And I am in the courtroom, and Mr. Dawodu is present here in the courtroom with me.

THE COURT: Mr. Dawodu is there in the courtroom?

MR. RAY: Yes, Your Honor.

THE COURT: Okay. We are here for a detention hearing as to Mr. Dawodu and a detention and removal hearing as to Mr. Teixeira-Spencer. First let me -- let me confirm with counsel for each of the defendants with respect to your clients' right to have these hearings in person, and are they consenting to do it by video conference?

First Mr. Fleischman on behalf of Mr. Teixeira-Spencer.

MR. FLEISCHMAN: Yes, Your Honor, he consents.

THE COURT: Thank you.

And Mr. Ray on behalf of Mr. Dawodu?

MR. RAY: Yes, he consents, Your Honor.

THE COURT: Let me also just confirm,

```
 1   Mr. Fleischman, are we still going ahead with the removal
 2   hearing today?
 3              MR. FLEISCHMAN:  We are not contesting removal, we
 4   just want to go ahead with the detention hearing.
 5              THE COURT:  Okay.  I'll address (inaudible) towards
 6   the end, then.
 7              MR. FLEISCHMAN:  Thank you.
 8              THE COURT:  Are we prepared to proceed regarding the
 9   pretrial detention?
10              MR. FLEISCHMAN:  Yes, Your Honor.
11              MR. JONES:  Yes, Your Honor.
12              THE COURT:  One moment, please.
13              Okay.  Mr. Jones, are you going to be presenting for
14   the government, or is one of the AUSAs from D.C. going to be
15   leading your presentation?
16              MR. JONES:  I will be presenting, Your Honor.
17              THE COURT:  Okay.  Please tell me what the basis for
18   detention is for each defendant.
19              MR. JONES:  We're proceeding under 3142(f)(1)(C).
20   The defendants are a danger to the community and a risk of
21   flight.  We believe there should be a presumption in this case
22   after the presentation and the factual proffer.
23              THE COURT:  Okay.  What is the maximum penalty that
24   each of the defendants faces?
25              MR. JONES:  They're placing life imprisonment with a
```

```
 1   10-year minimum mandatory.

 2              THE COURT:  Okay.  And what is the estimated

 3   guideline range?

 4              MR. JONES:  Guidelines are estimated roughly 121 to

 5   151 months.

 6              THE COURT:  And is the government going to proceed

 7   by proffer this morning?

 8              MR. JONES:  Yes, Your Honor.  And we have agent Sean

 9   Hamblet from the FBI with us today.

10              THE COURT:  Okay.  Please proceed with your proffer,

11   Mr. Jones.

12              MR. JONES:  Thank you, Your Honor.

13              The FBI, in partnership with other law enforcement

14   agencies, have investigated a dark net market vendor that

15   operates the moniker, quote, John Carter 7; that's a

16   numeral 7.  Beginning in approximately February of 2017 and

17   continuing through May of 2020, John Carter 7 sold pills

18   pressed with Fentanyl on a number of dark net markets,

19   including AlphaBay, Wall Street, Dream and Empire.  As one

20   dark net market would get shut down, the vendor would migrate

21   to new markets.  The vendor listed the pills as Oxycodone M30,

22   best in the market, but also included descriptions on its site

23   that noted that the pills contained Fentanyl and claimed that

24   the pills are pre -- quote, the pills are pressed with just

25   the right amount of Fentanyl, no hotspots, end quote.
```

No hotspots is an attempt to convey to customers that the pills would pose less of a risk of overdose. In context, according to the DEA's 2019 National Drug Threat Assessment, Fentanyl remains the primary driver behind the ongoing opioid crisis and continues to be the most lethal category of illicit substances that's used in the United States. A potential lethal dose of Fentanyl is any dose greater than 2 milligrams; that is 2-1000ths or 1-500th of a gram.

The mean consistent amount of Fentanyl present in Fentanyl-containing pills is another major contributor to the pills' lethality. In 2018, DEA's Fentanyl Signature Profiling Program examined 148 tablet exhibits representing 180 kilograms in which the average tablet contained 1.5 milligrams of Fentanyl, with a range of .02 to 4.84 milligrams per tablet. (Inaudible) 19 tablets, about 13 percent that contained a lethal dose of Fentanyl; that is, a dose greater than 2 milligrams.

Back to the instant investigation, records from the dark net markets and from servers seized when certain markets were shut down by law enforcement indicate the following volume of pill sales by John Carter 7: More than 40,000 pills were sold on AlphaBay, approximately 8000 pills on Dream, approximately 1700 pills on Wall Street, and more than 18,000 on Empire.

```
 1              John Carter 7 also began communicating --

 2              THE COURT:  Hold on, Mr. Jones.  Hold on.  You said

 3    1700 on~--

 4              MR. JONES:  Wall Street.

 5              THE COURT:  -- on Wall Street and 18,000 on~--

 6              MR. JONES:  Empire.

 7              May I continue?

 8              THE COURT:  Yes, please.

 9              MR. JONES:  John Carter 7 also began communicating

10    with customers directly without using the dark net markets

11    through an encrypted messaging application called Jabber.  In

12    those transactions, John Carter 7 would provide a Bitcoin

13    address for the customer to provide payment and would then

14    send the requested pills to the customer directly.

15              During the course of the investigation, law

16    enforcement identified that Dream, Wall Street and Empire all

17    had the same PGP public key, and embedded within each key was

18    the same e-mail address.  Law enforcement obtained records

19    related to that e-mail address that linked to the defendant,

20    Luis Spencer.  Physically, the e-mail address was the recovery

21    address for an account on LocalBitcoins.com, the

22    cryptocurrency exchange.  The LocalBitcoins.com account name

23    was, quote, John Carter 777, all one word, and those are

24    numerals.

25              Law enforcement contacted a Bitcoin trader who made
```

numerous transactions with John Carter 777, and that Bitcoin
trader identified Spencer's photograph as the individual with
whom he had traded under the moniker John Carter 777.  The
trader could identify Spencer because he met him on multiple
occasions but only knew him by a nickname.

The same Bitcoin trader also traded with Spencer
under another moniker, quote, LBC John Carter 777, all one
word and using numerals, and records for that moniker include
Spencer's name, as well as phone number and e-mail used by
Spencer.  The Bitcoin trader's phone had a saved contact in
the Telegram application with the name LBC John Carter 777
that the Bitcoin trader said was the same individual he
(inaudible) identified as using the moniker John Carter 777;
that is, defendant Spencer.

Additionally, law enforcement traced funds from John
Carter 7 to Spencer.  Specifically, records from Coinbase
revealed proceeds from John Carter 7 were used to process a
payment to Expedia to reserve a hotel room in Fort Lauderdale
from May 27th to May 29th, in 2017.  Records from Expedia
indicate that the reservation was paid for in Bitcoin, was
made in Spencer's name, and include Spencer's phone number and
e-mail address.

Additionally, in June and December 2019, an
undercover officer conducted direct buys of Fentanyl-pressed
pills from John Carter 7 using Jabber.  The undercover made

payments to Bitcoin addresses provided by John Carter 7, and law enforcement was able to trace those payments from the undercover to an account at Finance connected to defendant Spencer, which account was accessed numerous times from an IP address in Spencer's name and from Spencer's residence.

One of Spencer's close contacts is defendant Olatunji Dawodu. During the course of the investigation, law enforcement observed the two men meet on numerous occasions. Law enforcement installed a pole camera that captured Dawodu and Spencer coming and going from a storage unit in Davie, Florida, where they were frequently seen bringing in and taking out boxes.

During surveillance of Dawodu, law enforcement observed Dawodu drop packages on separate occasions. Specifically, on June -- July 17th, 2019, law enforcement observed Dawodu drop packages at a blue USPS mailbox. Law enforcement contacted two of the intended recipients of those packages that contained pills which were consistent with the pills purchased by the undercover from John Carter 7. In interviews with the intended recipients and reviewing their accounts, law enforcement confirmed that the two seized packages had been ordered from John Carter 7 on Empire Market.

Similarly, in August of 2019, law enforcement again observed Dawodu drop packages. They observe -- law enforcement followed up with the intended recipients of one of

those packages, and an individual provided consent to open the package, which again contained pills packaged similarly to the pressed Fentanyl pills seized throughout the investigation.

In addition to the pills connected to John Carter 7, a confidential human source also purchased pills from Dawodu on multiple occasions, including in May of 2020, October of 2020, January 7th, 2021, and January 25th, 2021. The pressed pills purchased by the confidential source were consistent with the pills that were packaged in packages dropped by Dawodu that had been purchased on John Carter 7.

On February 23rd, 2021, law enforcement executed search warrants at both of the defendants' residences. In Dawodu's residence, law enforcement found approximately 1400 grams of pills consistent with pills ordered from John Carter 7, numerous electronic devices and approximately 30 USPS mailing envelopes consistent with those used by John Carter 7. Law enforcement also recovered a handgun in a drawer in the residence. At defendant Spencer's residence, law enforcement found $12,000 in cash and numerous electronic devices.

That same day, law enforcement executed a search warrant at a residence of an associate of Dawodu and Spencer in Providence, Rhode Island, Alex Ogando. Inside that residence, law enforcement recovered approximately $370,000 in cash, more than 1770 grams of light blue pills that field

tested positive for the presence of Fentanyl, and

approximately 30 USPS Priority Mail envelopes containing

363 grams of pills packed for mailing.

Dawodu has also been indicted in the District of

Columbia on another conspiracy to distribute over 400 grams of

Fentanyl for a similar distribution scheme with Mr. Ogando.

THE COURT:  Hold on a second, Mr. Jones.  My

computer crashed and I was out of the meeting there for a

little while.  So the last I heard was regarding the local

Bitcoin -- you were discussing the tie between the Expedia

purchase and the John Carter -- the John Carter Bitcoin

account.

MR. JONES:  Okay.  I'll apologize for everyone else

for having to hear my voice for that long again, but I'll go

back.

Okay.  Back to the Expedia.  Records from Expedia

indicated the reservation in Fort Lauderdale was paid for in

Bitcoin, was made in Spencer's name and included Spencer's

phone number and e-mail address.

Additionally, in June and December 2019, an

undercover officer conducted direct buys of Fentanyl-pressed

pills from John Carter 7 using Jabber.  The undercover made

payments to Bitcoin addresses provided by John Carter 7.  Law

enforcement was able to trace those payments through the

undercover to an account at Finance connected to Spencer,

which account was accessed numerous times from an IP address in Spencer's name and from Spencer's residence.

One of Spencer's close contacts is defendant Olatunji Dawodu. During the course of the investigation, law enforcement observed two men -- the two men meet on numerous occasions. Law enforcement installed a pole camera that captured Dawodu and Spencer coming and going from a storage unit in Davie, Florida, where they were frequently seen bringing in and taking out boxes.

During surveillance of Dawodu, law enforcement observed Dawodu drop packages on two separate occasions. Specifically, on July 17th, 2019, law enforcement observed Dawodu drop packages at a blue USPS mailbox. Law enforcement contacted two of the intended recipients, and both packages contained pills that were consistent with pills purchased by the undercover from John Carter 7. In interviewing the intended recipients and reviewing their accounts, law enforcement confirmed that the two seized packages had been ordered from John Carter 7 on Empire Market.

Similarly, in August of 2019, law enforcement again observed Dawodu drop packages. Law enforcement observed -- followed up with the intended recipients of one of the packages, and that individual provided consent to open the package, which also contained pills packaged similarly to the pressed Fentanyl pills seized throughout this investigation.

```
 1            In addition to the pills connected to John Carter 7,
 2   a confidential human source also purchased pills from Dawodu
 3   on multiple occasions, including in May of 2020, October of
 4   2020, January 7th, 2021, and January 25th, 2021.
 5            THE COURT:  Mr. Jones, did you say were those --
 6   those were in-person purchases from --
 7            MR. JONES:  Yes.
 8            THE COURT:  -- Dawodu?
 9            MR. JONES:  Yes, by a confidential human source.
10            THE COURT:  Okay.
11            MR. JONES:  The pressed pills were purchased by the
12   confidential source and were consistent with the pills that
13   were packages dropped by Dawodu that had been purchased on
14   John Carter 7.
15            On February 23rd, 2021, law enforcement executed
16   search warrants at both defendants' residences.  At Dawodu's
17   residence, law enforcement found and seized approximately
18   1400 grams of pills consistent with the pills ordered through
19   John Carter 7, numerous electronic devices, and approximately
20   30 USPS mailing envelopes consistent with those used by John
21   Carter 7.  Law enforcement also recovered a handgun at the
22   residence.  At Spencer's residence law enforcement found
23   $12,000 in cash, as well as additional electronic devices.
24            The same day, law enforcement executed a search
25   warrant at a residence of an associate of Dawodu and Spencer
```

```
 1    in Providence, Rhode Island, Alex Ogando.  Inside of that
 2    residence law enforcement recovered approximately $370,000 in
 3    cash and more than 1770 grams of light blue pills that field
 4    tested positive for the presence of Fentanyl, and
 5    approximately 30 USPS Priority Mail envelopes containing
 6    363 grams of pills packed for mailing.
 7              Dawodu has also been indicted in the District of
 8    Columbia on another conspiracy to distribute over 400 grams of
 9    Fentanyl for a similar distribution scheme with Mr. Ogando.
10              Following his arrest and while in jail, Spencer
11    called his girlfriend, Ms. Schilling, from jail, and the two
12    were recorded, the following exchange.
13              Mr. Spencer stated:  "I had a backpack on the floor
14    with garage and shit.  They took that?"
15              Ms. Schilling:  "Your black backpack?  No, they took
16    your cameras.
17              "Mr. Spencer:  I mean my black backpack, the other
18    one, the NPN.
19              "Ms. Schilling:  It's right here.  There's laptops
20    here.
21              "Mr. Spencer:  Get rid of it."
22              This concludes the factual proffer.  FBI agent Sean
23    Hamblet's available for cross-examination.
24              THE COURT:  Special agent Spencer (sic), can you
25    turn on your -- can you turn on your video, please?  Actually,
```

```
 1    if you'll just hold on a second.

 2            Everyone who's joining us now for the 11:00 o'clock

 3    calendar, we are still in the middle of a detention hearing

 4    from prior to that calendar.  If you'd all make sure that your

 5    video and microphone is off if you're not participating in the

 6    10:00 o'clock hearing.  We will proceed with the 11:00 o'clock

 7    calendar as soon as we're done with this hearing.

 8            Special agent Hamblet, can you please turn on your

 9    microphone.

10            Special agent Hamblet, please raise your right hand.

11            Sean Hamblet, Government's witness, sworn.

12            THE COURT:  You can put your hand down.

13            Did you hear the factual proffer read by AUSA Jones?

14            THE WITNESS:  I did.

15            THE COURT:  Okay.  And do you have any corrections

16    to that proffer?

17            THE WITNESS:  Your Honor, there was a question I

18    believe about whether or not the deals that were executed with

19    the confidential human source were conducted in person, and

20    I'd like to clarify something on that if I may.

21            THE COURT:  Please do.

22            THE WITNESS:  Your Honor, may I refer to any notes?

23            THE COURT:  Yes, go ahead.

24            While he's doing that, again, if any of the

25    attorneys or parties or witnesses who are here for the
```

```
 1   11:00 o'clock hearing who are not participating in the
 2   10:00 o'clock hearing, please turn off your videos and
 3   microphones so that we can have as clear a stream as possible
 4   for this 10:00 o'clock hearing.  Thank you.
 5            THE WITNESS:  Your Honor, the only clarifying point
 6   I'd like to make is that the communications with -- between
 7   Mr. Dawodu and the CHS, some of those communications happened
 8   electronically and resulted in in-person -- in in-person
 9   meetings.
10            That's the only clarifying point that I'd like to
11   make, Your Honor.
12            THE COURT:  Thank you very much, special agent.
13   Other than that correction, do you adopt the factual proffer
14   as your direct testimony?
15            THE WITNESS:  I do.
16            THE COURT:  Okay.  Can you -- Mr. Fleischman on
17   behalf of Mr. Spencer, why don't you start with
18   cross-examination, please.  Yes, thank you, Your Honor.
19                      Cross-Examination
20   BY MR. FLEISCHMAN:
21   Q    And special agent Hamblet, you'll let me know if you
22   cannot hear me, and I'll repeat the question.
23   A    Will do.
24   Q    Can you hear me okay, or . . .
25   A    I can.
```

57

| | |
|---|---|
| 1 | Q    Okay.  Thank you.  I'll begin. |
| 2 | I want to ask you first about the search of homes |
| 3 | and other places that took place here.  It's correct that no |
| 4 | drugs were found in Mr. Spencer's home; is that correct? |
| 5 | A    That's correct. |
| 6 | Q    And is it correct that no firearms were found in |
| 7 | Mr. Spencer's home? |
| 8 | A    It is correct. |
| 9 | Q    And is it correct that Mr. Spencer, I'm assuming, was |
| 10 | surveilled during the course of this (inaudible). |
| 11 | A    I'm sorry, sir, you broke up on me. |
| 12 | Q    Sure.  Was Mr. Spencer part of your surveillance during |
| 13 | the course of the investigation prior to his arrest? |
| 14 | A    Mr. Spencer was the subject of physical surveillance. |
| 15 | Q    And at any time was he seen possessing or moving any form |
| 16 | of weapon? |
| 17 | A    Did you say moving any form of weapon, sir? |
| 18 | Q    Yes; or possessing a weapon. |
| 19 | A    No. |
| 20 | Q    And was Mr. Spencer ever seen holding, physically |
| 21 | holding, what you believed to be any form of drugs? |
| 22 | A    He was seen holding envelopes we believe contained drugs, |
| 23 | but not actual -- I didn't see actual drugs in his hand. |
| 24 | Q    Okay.  And the envelopes that he was seen holding were |
| 25 | never seized; is that correct? |

```
1    A    I believe that's correct, yes.

2    Q    Okay.  You could not say that anything illegal is

3    contained within those envelopes; is that correct?

4    A    That's correct.

5    Q    Now, the co-defendant, Mr. Dawodu, you used the term the

6    packages were dropped.  I'm assuming you mean that they were

7    mailed at a postal center?

8    A    I'm sorry, sir.  You broke up on me a little bit there.

9    Q    I'll move the mic a little.

10        The -- now, you had testified that Mr. Dawodu -- it

11   was part of the proffer -- Dawodu was seen dropping packages.

12   Does that refer to dropping packages at a postal center?

13   A    Or USPS mailbox.

14   Q    Okay.  At no time was Mr. Spencer with him (inaudible)?

15   A    I'm sorry, I'm hearing either background noise or I've

16   had a hard time hearing you.  Can you please repeat?

17   Q    Yes.  At no time was Mr. Spencer seen with Mr. Dawodu

18   when he was at a postal center or United States Post Office;

19   is that correct?

20   A    Not that I'm aware of, sir.

21   Q    And the packages that were intercepted, those came from,

22   you believe, Mr. Dawodu; is that correct?

23   A    The packages that we intercepted and later determined to

24   contain pills?

25   Q    Yes; you believe those were dropped by Dawodu?
```

```
1    A     That's correct.
2    Q     Is it correct that there's no physical evidence in this
3    case that links Mr. Spencer to any of the drugs that were
4    actually collected and placed into evidence in this case; is
5    that correct?
6    A     Meaning physical evidence that we collected during the
7    course of the search warrant and --
8    Q     Yes.  There's no physical evidence that links him to any
9    of the drugs that you physically collected, whether it be
10   search warrant or packages that were -- were intercepted; is
11   that correct?
12   A     Correct.
13   Q     Okay.  And none of the -- none of the -- I'm using the
14   term "suspects," but none of the purchasers of these drugs
15   that you interviewed have identified Spencer as the person
16   that they purchased drugs from; is that correct?
17   A     Not directly, that's correct.
18   Q     Okay.  And the confidential informant, the human source
19   that was used to target and make contact with Mr. Dawodu, that
20   informant had no contact with Mr. Spencer; is that correct?
21   A     Not that I'm aware of, sir.
22   Q     And was the confidential informant being paid, or working
23   off a charge when he was working this case?
24   A     I don't know the answer to that, sir.
25   Q     Was it a confidential informant that was used by the FBI
```

```
 1  or a local agency?

 2  A    I can say that it was used by the FBI.  The extent of

 3  that person's work with other agencies I'm not aware of.

 4  Q    Okay.  Did you vet the CI to have some confidence that

 5  the CI was reliable?

 6  A    I didn't -- so this confidential human source was not my

 7  human source, so I'm not sure of the extent of the vetting

 8  that was done on this source.

 9  Q    Do you know if the human source ever brought up the name

10  of Mr. Spencer?

11  A    I don't believe so, but I'm not sure.

12  Q    Okay.  As of today, have you recovered any narcotics that

13  came from Mr. Spencer directly?  And let me correct that; that

14  you can say came from Mr. Spencer directly.  Have you

15  recovered any physical narcotics that you can say came from or

16  were delivered by Mr. Spencer directly?

17  A    Not that we can say with certainty.

18  Q    Was a search warrant executed or maybe a consensual

19  search done on the storage unit that you -- was referred in

20  the proffer?

21  A    Not that I'm aware of.

22  Q    And I'm correct that there was nothing in Mr. Dawodu's

23  home that connected Spencer to Mr. Dawodu, is that correct,

24  that you located during the search?

25  A    The review of electronics that we've collected at the
```

| 1 | home is ongoing, so nothing that I'm aware of right now that |
| 2 | directly connects the two.  But as I said, the search of |
| 3 | electronics is ongoing. |
| 4 | Q   Okay.  Now, Mr. Spencer's home was searched; is that |
| 5 | correct? |
| 6 | A   Yes. |
| 7 | Q   Okay.  And there was reference made in the proffer to a |
| 8 | phonecall while he was in custody to his girlfriend, where he |
| 9 | speaks of, quote, getting rid of or removing sounds like maybe |
| 10 | computers or some form of electronics. |
| 11 |      Were you present for the search of the home?  Let me |
| 12 | ask you that first. |
| 13 | A   I was not, not the search of -- when the search warrants |
| 14 | were executed, I was at Mr. Dawodu's home. |
| 15 | Q   And am I correct that what Mr. Spencer was referencing on |
| 16 | the phone was actually left at the house by the agents after |
| 17 | the search? |
| 18 | A   I can make that assumption.  All I know is from the call |
| 19 | it sounded like there was a bag found by Ms. Schilling that |
| 20 | contained electronics.  So I don't know what was left behind |
| 21 | by the agents, but I can make that assumption based on what |
| 22 | was found by Ms. Schilling. |
| 23 | Q   So it's not like the agents didn't know about those |
| 24 | electronic devices when they left; is that correct? |
| 25 | A   I'm not sure if they knew of them.  Again, it's |

| 1 | speculation on my part, but I believe they may have overlooked |
| 2 | them. |
| 3 | Q    Do you know how long they searched the home? |
| 4 | A    I do not. |
| 5 | Q    Okay.  Have you heard the call? |
| 6 | A    I have. |
| 7 | Q    Okay.  And there's no indication that these were hidden |
| 8 | somehow in the house; is that correct?  In other words, before |
| 9 | they were sitting wherever they were sitting, there's no |
| 10 | indication they had been hidden by anyone prior to or during |
| 11 | the search; is that correct? |
| 12 | A    I didn't hear anything like that in the call. |
| 13 | Q    Okay.  And this is a search where the subjects weren't |
| 14 | called ahead of time and said, hey, we're coming to your house |
| 15 | to search, and I'm assuming that this was a executed search |
| 16 | warrant, is that correct, without prior notice? |
| 17 | A    That is correct. |
| 18 | Q    Okay.  Now, agent, do you have -- well, am I correct that |
| 19 | there is no direct evidence that Spencer is John Carter? |
| 20 | Would you agree with me on that or not? |
| 21 | A    Help me understand what you mean by "direct".  I think we |
| 22 | have several things pointing to that. |
| 23 | Q    Okay.  Let me start off with:  Did you find in any |
| 24 | searches that you have done up to now, or through informants |
| 25 | or other collection of evidence, that Spencer is the person |

```
 1   that set up the John Carter name and/or accounts?  Do you have
 2   any evidence of that?
 3   A    Not that he set them up.
 4   Q    Are multiple people able to access and use the John
 5   Carter account?
 6   A    Yes, I would assume that anybody who has the password to
 7   access the vendor account would be able to access it.
 8   Q    And do you know where this vendor account was originally
 9   set up?
10   A    You mean where the person was physically sitting when
11   they set the account up, or whether the --
12   Q    Yes.  Can you --
13   A    -- where the server was sitting?
14   Q    Well, let me start with that.  Well, have you been able
15   to ascertain or have you been able to figure out where the
16   person was sitting, let's start with that, when that John
17   Carter vendor account was set up?
18   A    No, no.
19   Q    Okay.  And what about the server?  Where is the server,
20   the same for the server?
21   A    Well, we don't know, but -- well, I suppose we need to
22   specify.  The John Carter -- the John Carter vendor accounts
23   operated on multiple markets, so there may -- we're likely
24   talking about multiple servers.  So in I believe two
25   instances, the markets were taken down by law enforcement, and
```

| | |
|---|---|
| 1 | in -- I believe, and I can confirm if I can refer to my |
| 2 | affidavit, that the other two markets just went down. |
| 3 | But to answer your question where those servers may |
| 4 | have been physically located would likely be known to us from |
| 5 | the vendor accounts that were taken down by law enforcement. |
| 6 | The other two we would not know. |
| 7 | Q   Okay.  But you cannot rule out, though, that multiple |
| 8 | people, if they had the code to enter, could have accessed and |
| 9 | used John Carter; is that correct? |
| 10 | A   That's correct. |
| 11 | Q   And you would agree that the fact that curren -- that |
| 12 | Bitcoin went into what you're alleging are wallets or accounts |
| 13 | that were kept by Spencer does not mean that he was involved |
| 14 | in the distribution or selling of drugs; is that correct? |
| 15 | A   Could you ask the question again, please, sir? |
| 16 | Q   Would you agree that the fact that Bitcoin, or portions |
| 17 | of coin, were directed and actually went into wallets or |
| 18 | accounts that you believe belong to Spencer, that that doesn't |
| 19 | mean that he was selling or distributing drugs; is that |
| 20 | correct? |
| 21 | A   I believe if you look at the totality of the |
| 22 | circumstances, it does indicate that he was involved in the |
| 23 | distribution of narcotics using the dark web. |
| 24 | Q   Well, you do not have evidence that the monies that went |
| 25 | into his wallet -- or I'm using a generic term, account -- but |

```
 1  came directly from the sale of drugs; is that correct?

 2  A    One more time, sir?

 3  Q    Sure.  You don't have any actual direct evidence that

 4  monies that went into his wallet or accounts came from the

 5  sale of drugs.

 6  A    May I refer to my affidavit?

 7  Q    Yes, definitely.

 8  A    (Perusing document.)

 9        So in the case of AlphaBay as an example, we can say

10  that a portion of the proceeds of the sale of illicit

11  narcotics went to virtual currency accounts that were

12  associated with Spencer.

13  Q    Okay.  You don't know how many other people had access to

14  those accounts; is that correct?

15  A    That is correct.

16  Q    And do you know if Spencer traded currencies, Bitcoin or

17  other digital currency?

18  A    I know that he traded using LocalBitcoins, for example,

19  yes.

20  Q    And you didn't -- were you able to subpoena any of the

21  records from any of the accounts that pulled his wallet to see

22  the number of transactions he engaged in and when?

23  A    Are you referring specifically to -- I -- can you restate

24  the question, please?

25  Q    Sure.  Let me, just as an example, was there an account
```

| 1 | at Coinbase? |
| 2 | A    Yes. |
| 3 | Q    Okay.  So let me, just as an example, in Coinbase were |
| 4 | you able to subpoena those records and determine the volume of |
| 5 | turnover or trades that he did in digital currency? |
| 6 | A    I personally did not review those records.  We had |
| 7 | another person on my team review those records. |
| 8 | Q    Okay.  Are you familiar with those records? |
| 9 | A    Not to the extent of the volume that you're asking about. |
| 10 | Q    Were you able to locate dates that match up with what |
| 11 | you're alleging were drug transactions in any of those, you |
| 12 | know, digital records? |
| 13 | A    I'm not familiar enough with the records, sir, to be able |
| 14 | to answer the question. |
| 15 | Q    Do you know how many people had access to that Coinbase |
| 16 | account, for example, other than Spencer? |
| 17 | A    I do not. |
| 18 | Q    Okay.  I want to move on now to Spencer's arrest.  Were |
| 19 | you present for Spencer's arrest? |
| 20 | A    I was present -- I was not the present -- excuse me.  I |
| 21 | was not present at his home when he was arrested, which was |
| 22 | the day the search warrant was executed.  I was present when |
| 23 | we transferred him from the jail to the U.S. Marshals. |
| 24 | Q    Did you speak with Mr. Spencer? |
| 25 | A    No.  And, uh -- |

| | |
|---|---|
| 1 | Q (Inaudible.) |
| 2 | A May I clarify? |
| 3 | Q Sure. |
| 4 | A I don't recall speaking with him. If I said anything, it |
| 5 | might have just been maybe a greeting or something of that |
| 6 | nature. |
| 7 | Q Mr. Spencer has made no admissions that he was involved |
| 8 | in any form of illicit drug trade; is that correct? |
| 9 | A Not that I'm aware of. |
| 10 | Q And his passport and other documents were seized from him |
| 11 | at the time of his arrest; is that correct? |
| 12 | A I'm aware that his passport was seized. I'm not sure |
| 13 | what other documents may have been taken with -- relating to |
| 14 | that. |
| 15 | Q And Mr. Spencer didn't resist arrest or provide any type |
| 16 | of threats of force or violence at the time of his arrest; is |
| 17 | that correct? |
| 18 | A That's correct, not that I'm aware of. |
| 19 | Q And you're aware that Mr. Spencer does have a business, |
| 20 | is that correct? A music business? Are you aware of that, or |
| 21 | . . . |
| 22 | A I understand he might be involved in music. I'm not sure |
| 23 | what extent -- to what extent he runs a business associated |
| 24 | with that. |
| 25 | MR. FLEISCHMAN: Okay. Thank you, special agent |

```
 1  Hamblet.

 2              Your Honor, I have nothing further at this time.

 3              THE COURT:  Okay.  Mr. Ray, your cross-examination.

 4              MR. RAY:  Thank you, Your Honor.

 5                       Cross-Examination

 6  BY MR. RAY:

 7  Q    Good morning, special agent Hamblet.  Can you hear me?

 8  A    Good morning.  Yes, sir.

 9  Q    Sir, during this investigation, Mr. Dawodu was the

10  subject of your investigation; is that correct?

11  A    That's correct.

12  Q    During your entire investigation, did you ever see

13  Mr. Dawodu complete a Bitcoin transaction?

14  A    Not that I can recall.

15  Q    So during --

16  A    I should clarify -- go ahead, I'm sorry.

17  Q    During your investigation, did you observe, was there any

18  evidence that Mr. Dawodu made payments using any type of

19  cryptocurrency?

20  A    May I have a moment to refer to my affidavit?

21  Q    Yes.

22  A    (Perusing document.)

23              Could you please restate the question?

24  Q    Yeah.  During your investigation, did you ever observe,

25  or is there any evidence that Mr. Dawodu made any type of
```

| 1 | payment using any type of cryptocurrency? |
| 2 | A    Not that I'm aware of. |
| 3 | Q    And during your investigation, was there -- did you |
| 4 | observe or was there any evidence that Mr. Dawodu accepted any |
| 5 | type of cryptocurrency payment? |
| 6 | A    Not that I'm aware of.  I should clarify.  I just want to |
| 7 | state for the record that there may be some instance of that, |
| 8 | but not that I can recall at the moment. |
| 9 | Q    And at no point in your investigation did you observe or |
| 10 | see evidence that Mr. Dawodu accessed the dark web? |
| 11 | A    Again, may I refer to my affidavit? |
| 12 | Q    Yes. |
| 13 | A    (Perusing document.) |
| 14 |        So regarding evidence that Mr. Dawodu accessed the |
| 15 | dark web, I'm not aware of any indications with certainty that |
| 16 | he accessed the dark web, but we do see through the Internet |
| 17 | service provider at his residence at least in some cases his |
| 18 | resident -- the residential IP address associated with his |
| 19 | residence did access IP addresses that are associated with Tor |
| 20 | relays.  So while I can't say with certainty that he accessed |
| 21 | the dark web, I couldn't rule it out either. |
| 22 | Q    And so at any time during your investigation, did you |
| 23 | have -- discover any evidence that Mr. Dawodu accessed the |
| 24 | online markets through the dark net? |
| 25 | A    Not direct evidence at this time; however, I should point |

```
 1   out that the review of electronics that were seized from his

 2   residence is ongoing.

 3   Q    So did the name John Carter or any other of the online

 4   monikers that were revealed during your investigation that

 5   were on the dark net markets, were any of those linked

 6   directly to Mr. Dawodu?

 7   A    May I refer to my affidavit once more?

 8   Q    Yes.

 9   A    (Perusing document.)

10        Not directly.

11   Q    Now, you stated that there were proceeds from -- for the

12   narcotic transactions, some of the proceeds were withdrawn to

13   a Bitcoin address ending in 4MW9; is that correct?

14   A    One moment, please.

15        Did you say 4MW9?

16   Q    Correct.

17   A    Yes, that's correct.

18   Q    And, now, that address, 4MW9, that was linked to the

19   Coinbase account that was used to pay for a hotel in Fort

20   Lauderdale; is that correct?

21   A    That's correct.

22   Q    And that hotel room that was booked using that Coinbase

23   account, that was booked under the -- under Spencer's name; is

24   that correct?

25   A    Yes, that was booked under Mr. Luis Spencer's name.
```

```
 1   Q    And the phone number that was on that reservation was

 2   also connected to Spencer, correct?

 3   A    That's correct.

 4   Q    And the e-mail address that was under that reservation

 5   was also connected to Spencer; is that correct?

 6   A    That's correct.

 7   Q    You stated that you observed meetings between Mr. Dawodu

 8   and Mr. Spencer at a storage unit; is that correct?

 9   A    That's correct.

10   Q    And you observed them taking in and out boxes?

11   A    That's correct.

12        I should clarify, I wasn't physical present during

13   that.  We had a camera installed, and so multiple people saw

14   that video, which was recorded.

15   Q    But you're not certain as to what was inside of the

16   boxes?

17   A    That's correct.

18   Q    So you can't say that there was anything illegal inside

19   of the boxes?

20   A    That's correct.

21   Q    Now, you stated that you observed Mr. Dawodu make two

22   drops, which you're saying that you observed him make two

23   drops, and drops meaning dropping packages off at the U.S.

24   Postal Service?

25   A    He was observed by people that are involved in law
```

```
1    enforcement, not by me personally.

2    Q    But there was two times that he was observed?

3    A    Give me just one moment, please.

4    Q    No problem.

5    A    That's correct.  There were at least two times that he

6    was observed.

7    Q    One was on July 17th?

8    A    That's correct.

9    Q    And one was on August -- or July of 2017, I'm sorry.

10   A    I'm sorry, one more time.  I show a date of July 17th,

11   2019.

12   Q    Yeah, I apologize.  July 17, 2019.

13            And then there was also another time in August of

14   2019; is that correct?

15   A    That's correct.

16   Q    You also stated that Mr. Dawodu has another pending case;

17   is that correct?

18   A    There are separate charges; for us it's the same case.

19   Q    But it stems from the same alleged operation; is that

20   correct?

21   A    We believe two separate vendor accounts are related, so

22   it's relating to a different vendor account.

23   Q    But part of the investigation is connected, both

24   co-defendants of Mr. Dawodu, they've connected them together?

25   A    Say that one more time, please.
```

```
 1   Q    So it's Alex Ogadu (phonetic) is the other co-defendant

 2   in his --

 3   A    That's correct.

 4   Q    -- other case?  And you have evidence connecting

 5   Mr. Ogadu (phonetic) and Mr. Spencer; is that correct?

 6   A    Yeah, I can't speak directly to the evidence we have, but

 7   we believe this is operating all as part of the same

 8   conspiracy.

 9   Q    And earlier you stated that you were not the one who

10   personally vetted the confidential informant; that's correct?

11   A    That's correct.

12   Q    So you're not sure of the relationship between the

13   confidential informant and Mr. Dawodu?

14   A    The extent of my knowledge of their relationship is from

15   reviewing records memorializing drug transactions.

16   Q    Okay.  So you're not aware if the confidential informant

17   had a personal grudge against Mr. Dawodu?

18   A    I'm not aware of that, that's correct.

19   Q    And you're not aware if they had any type of falling out

20   as prior friends?

21   A    That's correct, I'm not aware of that.

22   Q    So Mr. Dawodu, he was not the main subject of your

23   investigation; is that correct?

24   A    I'm not sure how to answer that.  You know, the -- our

25   investigation focuses on two, uh, separate monikers operating
```

| 1 | on multiple dark net marketplaces, and we believe Mr. Dawodu |
| 2 | is involved in that business. |
| 3 | Q   And you said you believe, but is there any evidence that |
| 4 | directly ties Mr. Dawodu to one of those online monikers? |
| 5 | A   I suppose that's correct not directly, but indirectly. |
| 6 | Q   Okay.  You were present on the day the search warrant was |
| 7 | executed on Mr. Dawodu's apartment; is that correct? |
| 8 | A   I was present the day that -- I was present.  I wasn't in |
| 9 | his home during the entire process of searching his home, and |
| 10 | I can expand on that a little bit if you'd like me to. |
| 11 | Q   Well, my question is:  At any point in time, did |
| 12 | Mr. Dawodu resist being taken into custody? |
| 13 | A   He did not. |
| 14 | Q   And at any time did he display and signs of violence? |
| 15 | A   He did not. |
| 16 | Q   And during that search, there was a .9 millimeter firearm |
| 17 | recovered; is that correct? |
| 18 | A   That is correct. |
| 19 | Q   And are you aware that that .9 millimeter was registered |
| 20 | to Mr. Dawodu? |
| 21 | A   I believe that is correct. |
| 22 | Q   And so as far as you know, that he lawfully owned that |
| 23 | firearm; is that correct? |
| 24 | A   As far as I know. |
| 25 | Q   So during your investigation, you were not able to |

```
1   ascertain if other people occupied the residence at

2   Mr. Dawodu's place; is that correct?

3   A    Well, we -- that's not correct, and I can expand on that

4   if you'd like.

5   Q    Yes, please.

6   A    So when we executed the search warrant, we discovered

7   that the home was subdivided into three efficiency units, and

8   we were not aware of that leading up to the warrant.  And when

9   we were -- so the main building of the residence was divided

10  into, like I said, three units.  Mr. Dawodu occupied the

11  center unit, and we encountered other people within his

12  efficiency unit when we arrived.

13  Q    And you don't know who those other people are; is that

14  correct?

15  A    We -- we did gather there identities when the search

16  warrant was being executed.

17  Q    But you were not aware of any relationship, if any at

18  all, between Mr. Dawodu and the other residents of that

19  efficiency apartment?

20  A    As I said, when we executed the warrant we thought it was

21  one residence.  It wasn't until we arrived at the residence we

22  realized it was divided into three.  So, and we were also

23  aware of some of the other individuals present at the

24  residence when the search warrant was executed; however, we

25  didn't know the extent of their -- the relationship of those
```

| 1 | other people to Mr. Dawodu. |
| 2 | Q    Now, during your investigation, so the investigation had |
| 3 | started back in 2017; is that correct? |
| 4 | A    I believe so, yes. |
| 5 | Q    But Mr. Dawodu is not mentioned in your report until |
| 6 | 2019; that's correct? |
| 7 | A    You know, if we can . . . may I step back to your |
| 8 | previous question? |
| 9 | When the -- the date that our case opened, I'm not |
| 10 | sure of the date that the case opened.  What I -- what I was |
| 11 | recalling when I answered the last question was the date of |
| 12 | the AlphaBay server.  So I'm not sure the exact date that our |
| 13 | case was initiated. |
| 14 | Q    But in your report, you date back to transactions and |
| 15 | incidents that go back to 2017; is that correct? |
| 16 | A    In the affidavit, sir? |
| 17 | Q    Yes. |
| 18 | A    So we make reference in the affidavit, or I make |
| 19 | reference, rather, in the affidavit, of John Carter 7 |
| 20 | operating as a vendor on AlphaBay since 2017, but then our |
| 21 | undercover purchases that are referenced in the affidavit |
| 22 | don't begin until 2019. |
| 23 | Q    And again, Mr. Dawodu was not mentioned in your affidavit |
| 24 | or in the indictment until 2019; is that correct? |
| 25 | A    I believe that's correct, yes. |

```
 1           THE COURT:  Mr. Ray, I don't want to cut you short,
 2    but we are going to need to move along with the hearing --
 3           MR. RAY:  Yeah.
 4           THE COURT:  -- rapidly.  If there are specific
 5    points you want to make, I'd suggest you direct yourself
 6    towards them.
 7           MR. RAY:  Yes, Your Honor.  I only have a couple
 8    more questions.
 9    BY MR. RAY:
10    Q    So there were multiple purchases made by undercovers in
11    this investigation, correct?
12    A    That's correct.
13    Q    And it looks like in 2000' -- from March to June of 2019,
14    there were five undercover purchases?
15    A    There were at least five, that's correct.
16    Q    And then from April to December 2019, there was at least
17    six?
18    A    That's correct.
19           MR. RAY:  Nothing further, Your Honor.
20           THE COURT:  Okay.  Thank you.
21           Any redirect, Mr. Jones?
22           MR. JONES:  Yes, Your Honor.
23                      Redirect Examination
24    BY MR. JONES:
25    Q    Agent Hamblet, (inaudible) conceding to the relationship
```

78

```
1    between defendant Dawodu and defendant Spencer, are you
2    familiar with any -- the connections or the amount of times
3    that they had met during your investigations?
4    A    I can't tell you the exact number, but we are aware that
5    they -- they were observed during physical surveillance
6    meeting on numerous occasions.
7    Q    Have they ever -- has Mr. Dawodu ever gone to
8    Mr. Spencer's residence?
9    A    I can't tell you with certainty.  I believe we have seen
10   Mr. Spencer go to Mr. Dawodu's residence.
11   Q    Okay.  Would it help you refresh your recollection if you
12   took a look at your affidavit?
13   A    Yes.
14   Q    If I can direct you to paragraph 26.
15   A    (Perusing document.)
16          Yes, that's correct.  Mr. Dawodu was observed on
17   multiple instance at Mr. Spencer's residence.
18          THE COURT:  Mr. Jones, when you refer to the
19   affidavit, are you referring to the complaint affidavit?
20          THE WITNESS:  The search warrant affidavit, sir.
21          THE COURT:  Okay.  Thank you.
22   BY MR. JONES:
23   Q    And are there phone records between Dawodu and Spencer
24   communicating?
25   A    Yes.
```

```
 1   Q    And how many times approximately had they communicated
 2   between June 2019 and November 2020?
 3   A    May I refer to the affidavit?
 4   Q    Of course.
 5   A    (Perusing document.)
 6            Could you say the dates one more time, please?
 7   Q    Between June 2019 and November 2020, approximately how
 8   many times have they communicated based on toll records?
 9   A    I apologize.  I'm trying to find that spot in my
10   affidavit.
11   Q    Twenty -- it's paragraph 26, I can direct your attention.
12   A    That's correct.
13   Q    I asked you approximately how many times.
14   A    Oh, I'm sorry.  Law enforcement observed approximately
15   1496 calls between Spencer and Dawodu between June 17th of
16   2019 and November 15th of 2020.
17   Q    Does that overlap with the investigation regarding these
18   Fentanyl-pressed pills?
19   A    It does.
20   Q    Do you recall obtaining iCloud data from Mr. -- defendant
21   Dawodu's iCloud account?
22   A    Yes.
23   Q    Do you recall whether they ever exchanged Bitcoin wallet
24   addresses between defendant Spencer and defendant Dawodu?
25   A    Let me -- just one moment, please.
```

```
 1   Q    Would it help your recollection if I referred you to a --
 2   or showed you a Cellebrite?
 3   A    Yes.
 4   Q    (Inaudible.)
 5            MR. JONES:  Your Honor, if I may share my screen
 6   real quick?
 7            THE COURT:  Sure.
 8   BY MR. JONES:
 9   Q    Can you see my screen, the extraction report?
10   A    Yes, sir.
11   Q    Do you recognize what this is?
12   A    I do.
13   Q    What is it?
14   A    It's an extraction report from an iCloud backup.
15   Q    Do you recognize the phone numbers associated with this
16   backup?
17   A    I do.
18            THE COURT:  Let me just interrupt.
19            Mr. Jones, the rules -- the typical rules of
20   evidence don't apply here.  Do you want to proffer what you're
21   trying to get from the extraction report and we can see if
22   special agent Hamblet agrees with that or not?
23            MR. JONES:  Yes, Your Honor.
24            I could just proffer that on or around August 26,
25   2019, defendant Spencer and defendant Dawodu exchanged a
```

```
 1    Bitcoin wallet address that I'm showing on the screen right

 2    now.

 3            THE COURT:  Special agent, is that your recollection

 4    from the iCloud data?

 5            THE WITNESS:  Are you asking me, Your Honor?

 6            THE COURT:  Yes.

 7            THE WITNESS:  Yes, yes, Your Honor.

 8    BY MR. JONES:

 9    Q    Thank you.

10            And referencing the original cross-examination from

11    Mr. Fleischman, during -- are you familiar with the undercover

12    purchases on June 28th, 2019 and December 9th, 2019, as

13    reflected in paragraphs 21 and 22 of the affidavit?

14    A    I am.

15    Q    And those -- weren't those -- weren't those transactions

16    directly tied back to a Bitcoin address associated with

17    defendant Spencer, and specifically his e-mail account

18    associated with the address, Mr. Spencer's address?

19    A    That's correct.

20            MR. JONES:  No further questions, Your Honor.

21            THE COURT:  Thank you, special agent Hamblet.

22            Is there any further -- oh, actually, wait, before

23    you step down, I don't know if this is something the special

24    agent can address and maybe the defendant will be able to

25    address.  Is there any -- is there an immigration detainer
```

```
1    against -- formally lodged against Mr. Spencer?

2                THE WITNESS:  Is that for me, Your Honor?

3                THE COURT:  If you know.

4                THE WITNESS:  I believe there -- as of a couple of

5    weeks ago, there was an immigration detainer for Mr. Spencer,

6    which we provided to the U.S. Attorney's Office, and I believe

7    that was forwarded to his attorney.

8                THE COURT:  Okay.  Thank you.

9                Okay.  You may step down, special agent Hamblet.

10               Mr. Jones, any further evidence that the government

11   wants to present?

12               MR. JONES:  No further evidence, Your Honor.  Just

13   argument.

14               THE COURT:  Okay.  Mr. Fleischman, is there any

15   evidence to present from Mr. Teixeira-Spencer, or -- I'll hear

16   argument from you --

17               MR. FLEISCHMAN:  I do have --

18               THE COURT:  Is there any evidence to present?

19               MR. FLEISCHMAN:  I wanted to proffer first our --

20   and I have the witness available regarding our bond proposal.

21               THE COURT:  Please, yes.

22               MR. FLEISCHMAN:  So, and we've met him initially.

23   He was on Zoom.  He's still on.  I'm not sure if I'm

24   pronouncing this right, Laucio (phonetic) Teixeira is the

25   defendant's cousin.  They reside in Rhode Island.  He owns a
```

```
1   home together with his mom, the address of which is 55

2   Edgeworth Avenue, Providence, Rhode Island, 02904.  The

3   defendant's aunt, this witness' mother, is Laurinda Teixeira.

4   Laucio is a sales rep for Kitu Super Coffee.  He's lived in

5   Rhode Island for 29 years.  The mom, the defendant's aunt, is

6   currently temporarily unemployed, working for a banquette

7   company because of COVID, but she intends to go back as soon

8   as that's completed.  The home they own is worth approximately

9   350,000.  The mortgage is down to 125,000.

10          Our proposal is that the defendant would live with

11  them in Rhode Island.  We would -- and Laucio would --

12  Teixeira would sign on a personal surety or, you know, the --

13  what's left as far as the equity in the home.  And we would

14  also propose either house arrest or electronic monitor,

15  depending on what's available in Rhode Island.  And the family

16  also has savings of between 13 and 15,000 that they would be

17  willing to post as a personal surety, as a corporate surety

18  bond on behalf of the defendant in this case.

19          So, again, just to summarize, Your Honor, we would

20  be requesting a personal surety secured by the residence in

21  Rhode Island, signed by both Laucio Teixeira and his mother,

22  Laurinda Teixeira, the aunt, and first cousin of Mr. Spencer.

23  Additionally, they would be willing to post a corporate

24  surety.  The maximum funds they have to do that is 15,000,

25  which come from both of them having worked full-time.
```

```
1            THE COURT:  Mr. Fleischman, what was your

2    understanding of Mr. Teixeira-Spencer's immigration status and

3    whether there's an immigration detainer lodged that would put

4    him in immigration custody if he were released?

5            MR. FLEISCHMAN:  There is an immigration detainer,

6    but he has hired an immigration attorney, but it's something

7    that even if you awarded bail at this point or some form of

8    pretrial release, they cannot just rush out and take care of

9    that.  The immigration issue would have to be addressed first.

10   But, so that's the status.  And as of now, there is an

11   immigration detainer.  They hired an immigration attorney.

12           And I don't know if you're ready for me to argue or

13   not, if you want the government to go first, but I did want to

14   address his background, the Pretrial Services report, and the

15   documents I filed from Rhode Island as defense exhibits would

16   show that he pled to a misdemeanor there.

17           THE COURT:  Okay.

18           MR. FLEISCHMAN:  If you want me to go, I can do that

19   now, or if you want the government to go.

20           THE COURT:  Well, what I'm going to do, what I'm

21   going to do, Mr. Ray, what I'm going to do is hear argument

22   from the government and Mr. Fleischman regarding

23   Mr. Teixeira-Spencer, and then we will -- I'll hear from you

24   as to any evidence you want to present as to Mr. Dawodu and

25   move to argument for him.  Okay?
```

```
 1              MR. RAY:  Thank you, Your Honor.

 2              MR. FLEISCHMAN:  And also if the government wanted

 3    to question Laucio Teixeira, he is present on Zoom.

 4              THE COURT:  Mr. Jones, would you like to

 5    cross-examine Mr. Teixeira?

 6              MR. JONES:  No, Your Honor.

 7              THE COURT:  Okay.  So let me hear argument from

 8    Mr. Jones.

 9              MR. JONES:  Thank you, Your Honor.

10              As previously referenced, we believe there's

11    probable cause at this point to determine that Mr. Spencer and

12    Mr. Dawodu both committed the offense as charged in the

13    indictment, at which point the -- there's a rebuttable

14    presumption that there's no reasonable conditions that can

15    assure their appearances and maintain the safety of the

16    community.

17              In this instance, we are dealing with a extreme

18    amount of Fentanyl, which, as referenced previously in the

19    factual proffer, is a very dangerous drug that causes a lot of

20    death in our country with the opioid crisis, and these --

21    Mr. Spencer and Mr. Dawodu have been distributing these

22    Fentanyl-laced pills that can cause this danger.

23              In addition to the underlying problems with the --

24    their ability to distribute this from home or from anywhere,

25    this is two gentlemen, or I can reference Mr. Spencer now, but
```

obviously very capable of hiding his ability to sell drugs,
work on the dark net and use Bitcoin to fund his life.  So we
are in a situation where if any -- even if they were released
at home, we cannot monitor their ability to continue to
function and sell drugs, as they seem very good at doing.

The charge that he's facing is obviously
substantial.  There's a 10-year minimum sentence, and his
guidelines are upwards of 15, or 150 months.  But we also have
to take into account that he has no legal status in the United
States, has ties to Cape Verde and could flee and fund his
flight with his illicit proceeds that we may not have our
hands on at this point.  He had $12,000 in cash in his home
when the residence was searched, and this is consistent with
behavior of someone that can hide, stash money and be able to
flee at the drop of a hat.

In addition, we have evidence from his jail calls
that he's not afraid to obstruct justice.  He directed his
live-in girlfriend to destroy evidence, and I think that's
indicative of Mr. Spencer's character, which is something this
Court should consider in the factors.

In addition, we know that he's used marijuana
consistently, which is another factor for this Court to
consider, his substance abuse.

And that is all I have to present for Mr. Spencer.

THE COURT:  Mr. Fleischman, your argument.

```
 1          MR. FLEISCHMAN:  Judge, let me start off with, if I
 2   could, before I get to our view of the facts, the Pretrial
 3   Services report.  I want to note, Your Honor, that he
 4   literally, other than the misdemeanor in Rhode Island, he has
 5   no criminal history whatsoever.  But although he does have a
 6   detainer currently, he is -- there's no evidence -- and he
 7   denied this to, as well, to Pretrial Services, that he's left
 8   the United States.  I mean, he's literally grown up here.
 9   He's totally assimilated into the U.S.  He has no connection
10   nor does he want to go back to Cape Verde.  There's no
11   evidence he's ever left the U.S., period.  They have his
12   passport; it would be impossible for him to leave this
13   country.  All his ties are here.  His family lives in Rhode
14   Island and South Florida.

15          There's no evidence that he's a risk of danger to
16   the community.  There's no prior acts of violence.  No
17   firearms were found on him or in his home.  He was never seen
18   with any form of weapon during surveillance that took place in
19   this case.  So I would say that danger to the community, zero.
20   And risk of flight I would say, you know, obviously in any
21   criminal case there's a risk of flight, but I would say that
22   that is almost zero on the part of Mr. Spencer.

23          Addressing the -- addressing the facts of this case,
24   it's our position that for Mr. Spencer there's barely probable
25   cause, barely.  And I want to emphasize the fact that one of
```

```
 1   the strongest points that the government has is that it
 2   appears that currency, digital currency from the sale of
 3   drugs -- and this in the light most favorable to the
 4   government -- may have gone into wallets, or I'm using that
 5   term broadly, that the defendant had access to.  This is the
 6   problem with their theory of the case and claiming to have
 7   probable cause for this is that multiple people have access to
 8   those accounts, and they cannot say who accessed the accounts,
 9   they can't say who the money was to be sent into the account
10   for, if, in the light most favorable to the government, you
11   know, it was actually drug money that was sent to those
12   accounts, and there's no evidence that Spencer knew that money
13   for drugs were going into those wallets, period.
14          So the fact that he later rented a hotel room with
15   Bitcoin, so what?  That doesn't prove that he was using drug
16   proceeds.  And they know that he trades Bitcoin and other
17   digital currency, which could account for a large amount of
18   transactions.
19          They did surveillance.  They never saw him with
20   drugs, they never saw him with weapons, they never saw him
21   mail at a postal center or a United States Post Office any
22   form of drugs.  No CI had contact with him.  They did a search
23   of his home, found no drugs.  They never searched the storage
24   unit.  There's no evidence that that was used for anything
25   illicit.
```

```
 1              There's pole -- apparently their surveillance of him
 2   with the co-defendant.  So what?  I mean, there's no evidence
 3   that at that time they're engaged in any type of illegal
 4   activity, period.
 5              So it's complete conjecture on the government's
 6   part.  There's barely probable cause in this case to even
 7   charge and arrest him for this.  And the fact that he told the
 8   girlfriend, again, in the light most favorable to the State
 9   (sic), to get rid of the computers, the computers were there
10   during the search and the police left them.  That was their
11   decision to leave them.  Also, they're not even evidence at
12   this point.
13              And they did a search of the home, found only U.S.
14   currency.  There's no evidence the currency is linked to
15   drugs.  He has a music business which the agent is somewhat
16   aware of.
17              So I would say at this point, Your Honor, first of
18   all, we shouldn't have to rebut the presumption, but if you
19   find that the government's evidence rises to that --
20              THE COURT:  Mr. Fleischman, the grand jury's
21   returned an indictment here finding probable cause.  Why
22   shouldn't you have to rebut the presumption?
23              MR. FLEISCHMAN:  Okay.  Well, let's -- I agree,
24   there is an indictment in this case.  I would say
25   overwhelmingly we have rebutted the presumption.
```

```
 1              So we're asking the Court to at this point -- he
 2   can't -- obviously at this point he can't get out, but I'm
 3   asking the Court to, you know, put together a bond package
 4   where a personal surety with the home in Rhode Island where he
 5   would reside would be, you know, posted as collateral, and
 6   then if the Court felt it necessary, although I don't see why
 7   it would be necessary on top of that, an additional corporate
 8   surety bond or even some form of 10 percent bond with the
 9   clerk, with electronic monitor of him in Rhode Island and the
10   ability to travel to South Florida and, you know, Rhode Island
11   and obviously Washington, D.C., if he's out of custody.
12              But that's our position, Your Honor.
13              THE COURT:  A couple questions.
14              First of all, as to your bond conditions, why would
15   he need to travel to South Florida --
16              MR. FLEISCHMAN:  Because he still has --
17              THE COURT:  -- (inaudible) Rhode Island, is going to
18   be living in Rhode Island, and the court proceedings are in
19   D.C., for what reason would he have to travel back to South
20   Florida?
21              MR. FLEISCHMAN:  Because he still has family here.
22   And although obviously he's not going to live with his
23   girlfriend, I mean, there's no indication that they're on bad
24   terms.  It's our -- just because of everything that went on
25   with the phonecall and the, you know, that situation, we felt
```

```
1    it better to propose that he live with, you know, the family
2    in Rhode Island, so . . .
3              THE COURT:  Who is the family in South Florida?
4              MR. FLEISCHMAN:  Well, he has Claudia Schilling, who
5    is his, you know, live-in partner.  And then he has other
6    family members in the South Florida area.  But he -- if you
7    restricted him only to Rhode Island, so, you know, he could
8    certainly live with that.
9              THE COURT:  Let me ask this:  With the immigration
10   detainer, you said that he has no intent to go back to Cape
11   Verde or otherwise leave the United States.  How am I supposed
12   to deal with that?  Immigration may not actually give him that
13   choice.
14             MR. FLEISCHMAN:  Well, he intends to fight, you
15   know, deportation.  He's hired an immigration attorney.  He
16   has zero interest in going back to a country in that area, in
17   Cape Verde.  But he's been in the United States since he's 11
18   years old.  So, I mean, absent this case, I'm not even sure
19   that DACA could be ruled out.  I don't know, I don't do
20   immigration work, but he's been here since he's 11 years old.
21   He's completely assimilated to this country.  So he does not
22   intend to just say, okay, deport me, because he does not want
23   to -- for all intents and purposes, other than not having U.S.
24   citizenship, he's here, so . . .
25             THE COURT:  Let me -- Mr. Jones, is there anything
```

1    you want to respond to?

2            MR. JONES:  Just that he has family in Cape Verde.

3    His mother is there.  There's somewhere for him to go and make

4    a start, and when you're facing a minimum of 10 years in

5    prison, anyone can change their plans to have their

6    immigration attorney to stop fighting also.

7            THE COURT:  As to Mr. Spencer, the Court must

8    determine whether the government's met is burden of proving

9    that no condition or combination of conditions reasonably

10   assure the defendant's appearance as required, and the safety

11   of the community.

12           As to appearance in court, the government's burden

13   is by a preponderance of evidence, that's more likely than

14   not.  As to danger, it's by clear and convincing evidence.

15   That means evidence sufficient to create an abiding conviction

16   that future danger is highly probable.  The Court has to first

17   assess the extent of any risk, whether any condition, or

18   combination of conditions, would mitigate that risk.

19           There is an indictment in this case establishing

20   probable cause that the defendant committed the charged

21   offenses, and that does create a rebuttable statutory

22   presumption that no condition or combination of conditions

23   could reasonably assure the defendant's appearance as

24   required, and the safety of the community.

25           Regardless of the presumption, the government

1   retains its burden of proving that there's no condition or
2   combination of conditions I can set.

3           There are a number of factors I must consider,
4   including the nature and circumstances of the offense, weight
5   of the offense (sic), the history and characteristics of the
6   defendant, and the nature and seriousness (inaudible).

7           The nature of the -- I am ultimately going to find
8   that while I think it is a close call, I think there are
9   conditions I can set that will reasonably assure the safety of
10  the community and (inaudible).

11          The nature and circumstance of the offense.  The
12  offense is certainly serious, given its involvement with
13  Fentanyl, as Mr. Jones has certainly underlined.

14          The weight of the evidence I think is much stronger
15  than what Mr. Fleischman has characterized it as.  However, it
16  is still based on a lot of circumstantial evidence.

17          In terms if history and characteristics, the
18  defendant has minimal criminal history.  He does, while he has
19  family ties, and while he does have family ties to Cape Verde,
20  he also has ties to the United States and has been here, as
21  Mr. Fleischman said, since he was 11 years old.  I do note
22  that while there is a detainer against him, according to the
23  Pretrial Services report, he has at least sought to remain
24  here through the DACA program, and that suggests to me that
25  although Immigration may not ultimately give him the choice,

1   he does want to remain.

2          The nature and seriousness of the danger that he

3   poses has to do with his continued activity if he were to

4   continue the activity that's in the indictment.  I think there

5   is a substantial risk there, because he was apparently able to

6   conduct all of the alleged activity from his home and through

7   the dark net, which is difficult to monitor.  At the same

8   time, the lack of criminal history involved suggests to me

9   there's not substantial evidence here that he is not going to

10  be deterred by the significant conditions of bond under which

11  he will be subject.

12          Because of that, I don't think I can determine that

13  there's no conditions, even with a presumption, there are no

14  conditions that I can set that would reasonably assure that he

15  won't continue the alleged conduct while on bond.

16          So based on that, I am going to impose the following

17  bond for Mr. Teixeira-Spencer.  Mr. Teixeira, I want you to

18  listen very closely, because if you violate any of these

19  conditions of your bond there's severe consequences.  One, you

20  could be obviously placed back in custody.  Number two, the

21  bond could be revoked (inaudible) be serious financial

22  consequences both for you and the family members who are going

23  to have to cosign on this bond for you.

24          I'm going to set two bonds.  First, I'm going to set

25  a $150,000 personal surety bond.  It has to be cosigned by the

```
 1   defendant's cousin, Lucio Teixeira, and the aunt.
 2              Mr. Fleischman, can you give the aunt's name again,
 3   please?
 4              MR. FLEISCHMAN:  Yes, Your Honor.
 5              The aunt is -- I'll spell it.  I'll say it first and
 6   then spell it.  Laurinda Teixeira.  Laurinda is spelled
 7   L-a-u-r-i-n-d-a, and Teixeira is (inaudible) in the
 8   indictment, T-e-i-x-e-i-r-a.
 9              THE COURT:  That's Laurinda Teixeira.
10              I'm also going to impose a $100,000 10 percent bond
11   with a Nebbia condition that also must be cosigned by the
12   defendant's cousin and his aunt.
13              I'm also going to impose the following standard and
14   special conditions:
15              First and foremost, Mr. Teixeira must appear before
16   this Court or the court in the District of Columbia as
17   directed, whether that's remotely or in person.  Mr. Teixeira,
18   make sure that you abide by that condition.  Violating that
19   not only brings the consequences I've already told you about,
20   but you could also be possibly separately prosecuted for
21   failure to appear.  Do you understand that?
22              THE DEFENDANT:  Yes, sir.  Yes, Your Honor.
23              THE COURT:  Your travel is restricted to the
24   District of Rhode Island and the District of Columbia, and
25   travel to the District of Columbia is only for the purpose of
```

```
 1   court appearances.

 2              You must reside at the residence of your cousin and

 3   aunt, and you may not change that residence without approval

 4   of probation or the Court.

 5              You must cooperate with law enforcement in the

 6   collection of DNA.

 7              While on bond, you must not violate any federal,

 8   state or local law.  If you come in contact with law

 9   enforcement, you must report that contact within 72 hours.

10              You are to surrender all passports and travel

11   documents if you have any.  While on bond, you are not to

12   obtain any travel documents.

13              You must report to Pretrial Services as directed.

14              I'm not going to impose an employment restriction,

15   because I am going to place you on house arrest in your

16   cousin's home with location monitoring, and we'll get to that

17   in a moment.

18              You are to avoid all contact with any victims or

19   witnesses in this case except through counsel.  The government

20   will provide a list of those people to your counsel.  You're

21   also to avoid all contact with any known co-defendant or

22   identified co-conspirator except through counsel.  Again, the

23   government will provide a list of those people.

24              While on bond, you must not possess a firearm or any

25   other destructive devices.
```

```
 1              Neither you nor the other signatories on the bond
 2   may pledge or otherwise encumber the property while you're on
 3   bond.
 4              Do not visit any commercial transportation
 5   establishment except as necessary to travel to the District of
 6   Columbia for court appearances or to travel to Rhode Island
 7   once you are released.
 8              You're going to be on home detention at the home of
 9   your cousin subject to GPS monitoring unless Pretrial Services
10   tells the Court that such monitoring is not available in the
11   district where you are being sent.  If that's the case, they
12   can notify the Court, make an amendment of the bond.
13              The home detention is subject to (inaudible)
14   exceptions for medical appointments, court appearances or
15   attorney visits.
16              If I didn't make it clear, the 10 percent bond is
17   subject to a Nebbia condition.
18              Mr. Jones, are there any further restrictions on
19   bond that you would like (inaudible)?
20              MR. JONES:  Just to make sure that there's no
21   ability for him to have access to electronics with Internet
22   access.  Based on the nature of these crimes and the link to
23   drugs being able to be distributed and sold online, I think
24   it's important for the safety of the community to prohibit
25   that.
```

```
 1              THE COURT:  Yeah, I've considered that, that kind of
 2   restriction.  I think the problem is that especially in our
 3   current environment, with court hearings occurring by Zoom, as
 4   well as just about every other kind of meeting, I don't know
 5   if I can impose that full kind of restriction with -- and
 6   allow him to both appear in court, communicate with his
 7   attorney, possibly conduct other legitimate business.
 8              I can order that he not access any Tor or dark net
 9   services in any way, although (inaudible) I'm not sure how
10   that can actually be monitored.
11              MR. JONES:  With a provision that probation can come
12   check the history in his electronic devices.
13              THE COURT:  Mr. Fleischman, what do you think about
14   that condition?
15              PROBATION OFFICER:  I'm sorry, Your Honor, I did not
16   hear Mr. Jones.
17              MR. FLEISCHMAN:  I couldn't hear, I'm sorry.
18              THE COURT:  (Inaudible) Mr. Jones is suggesting is
19   that probation be allowed to conduct (inaudible) searches of
20   any electronic devices to confirm that he is not accessing any
21   dark web or Tor services.
22              PROBATION OFFICER:  Your Honor, if -- I believe -- I
23   know this is not a sex offense charge, but I know there is
24   something that we have to control whenever those cases are
25   allowed to have Internet access, and I believe it's called
```

```
 1   remote.com, but I need to make sure that that's something that
 2   we can do in these type of offenses.  If I can just make a
 3   quick phonecall?
 4             THE COURT:  Well, we do need to move on.  So what
 5   I'm going to -- let me ask Mr. Fleischman, what is your
 6   position on some sort of Internet restriction?
 7             MR. FLEISCHMAN:  Judge, I'm familiar with the
 8   software probation is mentioning.  I have -- I mean, he needs
 9   to be able to access the Internet especially -- I'm not going
10   to -- if I do represent him or continue, I'm not going to be
11   flying to Rhode Island, I mean, at least not on a regular
12   basis.  So he needs access to the Internet.  If that's what it
13   takes, I'm fine with that.  I know it works on the sex offense
14   cases.  I don't have a problem with it.
15             THE COURT:  I'm not going to impose that restriction
16   right now.  If the government, in consultation with pretrial,
17   can come up with a reasonable formulation of that restriction,
18   I'd ask you either submit that to me or to the court in the
19   District of Columbia as a modification of the bond.
20             But we do need to move on, and I don't want to take
21   the time to (inaudible).
22             MR. FLEISCHMAN:  So, Judge, one other question.
23             THE COURT:  Hold on, Mr. Fleischman.  Hold on,
24   please.
25             MR. FLEISCHMAN:  Okay.
```

```
 1            THE COURT:  Mr. Jones, is there anything else that

 2   you are recommending?

 3            MR. JONES:  Yes, yes, Your Honor.  I would just

 4   request that we get a brief stay on the bond so that the AUSAs

 5   in D.C. can appeal to an Article III.

 6            THE COURT:  I will grant a stay of the (inaudible)

 7   if there is going to be an appeal.  I'll stay the order for

 8   three days pending appeal.

 9            MR. JONES:  Thank you, Your Honor.

10            THE COURT:  Mr. Fleischman --

11            MR. FLEISCHMAN:  Yes, Your Honor.

12            THE COURT:  -- (inaudible).

13            MR. FLEISCHMAN:  I had a question.  Just I wanted to

14   address this ahead of time.  Will he still be allowed contact

15   with Claudia Schilling?  He has not, on my advice, had contact

16   with her since the -- but, I mean, they were living together.

17   They have a full -- fully formed relationship, and I'm

18   requesting that he be allowed to have contact with her.

19            THE COURT:  What's the government's position as to

20   whether she's a witness or potential co-conspirator?

21            MR. JONES:  At this point she's a potential -- based

22   on what I know and what the government knows, it sounds as if

23   she's a potential co-conspirator based on her jail call with

24   the defendant.

25            MR. FLEISCHMAN:  Judge, I would ask that you almost
```

```
 1    treat her as a wife.  I mean, even husband and wife who --
 2    and, I mean, we represent a husband and wife, my brother and
 3    I, in the past, and they're (inaudible).
 4              THE COURT:  (Inaudible) his girlfriend at this time
 5    (inaudible).
 6              Any other questions, Mr. Fleischman?
 7              MR. FLEISCHMAN:  No, Your Honor.  That will be it.
 8    Thank you.  Thank the government.
 9              THE COURT:  Anything else from probation?
10              PROBATION OFFICER:  Yes, Your Honor.  We would like
11    to respectfully request substance abuse testing based on
12    what's on the Pretrial Services report when he reported during
13    his interview.
14              THE COURT:  I'll recommend -- I'll impose a
15    restriction of substance abuse testing as --
16              PROBATION OFFICER:  Just to remind counsel and the
17    defendant, once he's released, if he's released depending on
18    the appeal, he needs to contact our office.  I'm going to send
19    the phone number to his attorney.  I know this is a DC case,
20    but the bond was issued here, so he needs to come and call us
21    so that we can give him instructions on where to go once he's
22    released for DC.
23              MR. FLEISCHMAN:  Thank you.
24              THE COURT:  As to the removal, Mr. Fleischman, you
25    indicated that he's waiving removal; is that correct?
```

```
 1          MR. FLEISCHMAN:  That is correct, Your Honor.  We're

 2   not contesting removal.

 3          THE COURT:  Mr. Teixeira, you do have the right to a

 4   hearing where the government would have to establish that you

 5   are the person (inaudible) named in the indictment, and you're

 6   saying (inaudible) waive that hearing and appear in the

 7   District of Columbia as directed; is that correct?

 8          THE DEFENDANT:  Yes, yes, Your Honor.

 9          THE COURT:  Okay.  I'll accept the waiver of

10   removal, then.

11          Is there anything else we have to address as to

12   Mr. Teixeira-Spencer?

13          MR. FLEISCHMAN:  No.

14          MR. JONES:  Not from the government, Your Honor.

15          THE COURT:  Okay.  Mr. Ray, as to Mr. Dawodu --

16          I'm sorry, everyone, we need to take just a

17   two-minute break before I hear evidence from Dawodu.  Let's

18   stand in recess for two minutes, please.

19      (A recess was taken.)

20          THE COURT:  Okay.  Let's continue with the evidence

21   for Mr. Dawodu.  Mr. Ray, what --

22          UNIDENTIFIED SPEAKER:  Judge, one second.  Mr. Ray

23   just stepped out.  He will right back.  One second, Judge.

24          THE COURT:  Mr. Ray.

25          MR. RAY:  Yes.  I apologize, Your Honor.
```

1  We were asking for essentially similar conditions to
2  release as Mr. Spencer.  I have on Zoom here Ms. Rochelle
3  Rose.  She is Mr. Dawodu's best friend, has been for over 16
4  years.  She's an oncology pharmacy technician at the
5  University of Miami hospital.  She owns a house.  It's located
6  at 11225 Northeast 12th Avenue, that's in Miami, 33161.  She
7  has a house with a bedroom that she is willing to open up her
8  house and have Mr. Dawodu stay with her.  It's her and her two
9  children.

10  Like I said, this has been his best friend for
11  almost 16 years.  They've -- since he moved here to the United
12  States 16 years ago.  She is willing to take him in.  She's
13  willing to, you know, support him in any way.  She said that
14  she's willing to do anything to help ensure that he does not
15  violate any of the conditions of his release.

16  You know, she has her two children there, that they
17  refer to him as his (sic) uncle.  He's been in their life, you
18  know, almost the children's entire life.  They're age 10 and
19  age 18.

20  Furthermore, I also have Ms. Jamilla Boule
21  (phonetic), who is Mr. Dawodu's girlfriend.  She currently
22  lives in Atlanta; however, if Mr. Dawodu is granted release
23  and is able to live with Ms. Rochelle Rose, his girlfriend,
24  Ms. Boule, is going to do everything in her power to move down
25  here to South Florida to be close to him.  She has also said

| | |
|---|---|
| 1 | that she wants to do anything in her power to help Mr. Dawodu, |
| 2 | and that's including if he has to appear in the District of |
| 3 | Columbia for any appearings, she would be traveling with him. |
| 4 | She would be ensuring that he would show up to any court |
| 5 | appearance that he needs to be at. |
| 6 | Furthermore, both Ms. Rochelle Rose and Jamilla |
| 7 | Boule would be willing to cosign on any bond.  And, again, |
| 8 | just to reiterate, we would be asking for, you know, similar |
| 9 | conditions with the personal surety bond, the home detention |
| 10 | with the GPS monitor, and any other conditions that Your Honor |
| 11 | would think would be appropriate for his release. |
| 12 | THE COURT:  Mr. Ray, what -- is there any monetary |
| 13 | collateral that Ms. Rose and Ms. Boule is willing to deposit |
| 14 | in the court as to secure a -- secure the monetary bond? |
| 15 | MR. RAY:  I do need to discuss that more in detail |
| 16 | with them, but, Your Honor, if we -- I'm sure that between the |
| 17 | two of them, that they could come up with somewhere around |
| 18 | $10,000. |
| 19 | THE COURT:  Anything further from you, Mr. Ray? |
| 20 | MR. RAY:  Nothing for that, Your Honor. |
| 21 | THE COURT:  In terms of evidence or proffer. |
| 22 | MR. RAY:  Just argument, Your Honor. |
| 23 | THE COURT:  Mr. Jones, your argument, please. |
| 24 | MR. JONES:  Argument, Your Honor? |
| 25 | THE COURT:  Yes. |

MR. RAY:  Yes.  Consistent with the arguments
against Mr. Spencer, I reiterate that the burden here, there
is probable cause to find him guilty, or that he committed the
crimes as alleged, and that there is a rebuttable presumption
that there's no set of conditions that can assure his
appearance and the safety of the community.

                    Again, we're dealing with Fentanyl.  I want to be --
I just want to stress that the ability for these gentlemen to
sell this drug that can cause overdoses and kill individuals
in an opioid crisis is serious.

                    In addition, specific to Mr. Dawodu, he's got
substantial ties to Nigeria, including his parents and
siblings who live there.  This contributes to his risk of
flight.  He would be able to restart life or connect with his
family and live there for -- to avoid his 10-year minimum
sentence.  He is not married; he has no children.  He does
have a substance abuse issue, consistent marijuana usage.
He's got a -- we don't have a significant criminal history,
but there is a charge for prior possession of marijuana.

                    But in general, Your Honor, I think the danger to
the community is a big push here, and to the extent this Court
is inclined to grant a bond, we would also request a stay for
this defendant, as well, for an appeal.

                    THE COURT:  Okay.  Thank you, Mr. Jones.

                    Mr. Ray, your argument.

```
1            MR. RAY:  Thank you, Your Honor.

2            I do want to point out on his Pretrial Service

3   report it does state on page 4 that he does have a prior

4   charge in Butts County, Georgia.  According to Mr. Dawodu,

5   that case was dismissed.  I personally reached out to the

6   district attorney's office in Butts County.  They had no

7   record of any case being filed under his name or the citation

8   number provided.  So at this time I would ask Your Honor to

9   take notice of that, and that would essentially mean he has no

10  criminal history at all.

11           MR. JONES:  One more thing, Your Honor.  I

12  apologize, but there's also information provided in the

13  Pretrial Services report by this defendant that he exports

14  cars, buys and then exports them, and that can go to his

15  ability to develop business relationships with people in

16  different countries, potentially Nigeria.  With those business

17  connections he could also flee.

18           So I just wanted to make sure that we highlight

19  his -- his claimed . . .

20           THE COURT:  Okay.  Thank you, Mr. Jones.

21           Anything further, Mr. Ray?

22           MR. RAY:  Yes, Your Honor.

23           As the government pointed out, there is a rebuttable

24  presumption.  One, looking at if he is a flight risk, even

25  though that Mr. Dawodu was born in Nigeria, he's lived in
```

America for 16 years.  He's been an American citizen for

almost a decade.  More importantly, he identifies as an

American, and he's proud to be an American citizen.

Furthermore, as the evidence was presented here in

this hearing today, you know, it appears that this was an

elaborate, you know, sophisticated drug operation; however,

Mr. Dawodu's role is minimal compared to the other

participants.  There's no evidence that he ever conducted any

Bitcoin transactions, there's no evidence that he ever owned

or has owned any type of cryptocurrency, there's no direct

evidence that he's ever accessed the dark web, and there's no

evidence suggesting that he, you know, possesses the knowledge

or understanding of the entire scope or structure of this

operation.  You know, according to the allegations, he's, you

know, not much more than just a courier in this operation.

And additionally, there's no evidence that

Mr. Dawodu has the financial capacity to flee the

jurisdiction.  You know, he lived in a small efficiency where

he paid a thousand dollars of rent in a month.  The only

assets that he owns is his car, he has one piece of jewelry,

and he has less than $2000 in his bank account.

Furthermore, you know, he has a strong support

system here.  Ms. Rochelle Rose has been his friend for 16

years.  As I said, she has -- she's an oncology pharmacy

technician.  She's willing to open her home to Mr. Dawodu.

1    She's willing to do anything that she can, including be a
2    cosigner on the bond, and she's there to provide not just a
3    home, but also support for him as if she were a family member.

4          And additionally, his girlfriend, Ms. Boule, as I
5    stated earlier, she is attempting to move down to South
6    Florida upon his release.  She's also, you know, is going to
7    be with him at every appearance, whether it's here in southern
8    Florida or it's in the District of Columbia.

9          Also, he does have a sister who lives in the D.C.
10   area.  She lives in Maryland, just right outside of D.C.
11   She's a teacher in D.C., and she has also stated that if he
12   needs to be in D.C. at any time for any appearance, that him
13   and his girlfriend, Ms. Boule, are welcome to stay with her.

14         Furthermore, Mr. Dawodu, he has a college degree.
15   He worked at CVS for over six years as a supervisor, and he --
16   he -- additionally, he's -- I turned in his passport to the
17   federal probation office last week, so he does not have any
18   passport that would enable him to leave the country.

19         And, you know, as to him being a danger to the
20   community, the government points out that he's a danger to the
21   community solely because this is Fentanyl.  I do just want to
22   point out that if the government really thought that this was
23   such a danger, they witnessed over 11, or conducted over 11
24   undercover buys over a six-month period, knowing that Fentanyl
25   was involved, and if it was that big of a danger, I would

1   think that they would have stopped this operation from the
 2   beginning.  So, you know, as far as he's a danger, the
 3   government can't have it both ways.  The same action that they
 4   observed multiple times is the same action they're trying to
 5   say right now poses a danger to the community.

 6          But he has no -- he has no criminal history, he has
 7   no history of violence, he has no history of use of weapon,
 8   and there are no allegations that he's a dangerous person.  In
 9   fact, he's the opposite.  If you would ask anybody around,
10   they say that he's a loving boyfriend, a brother, son and
11   friend.

12          And at this time, Your Honor, for those reasons we
13   would respectfully ask Your Honor to deny the motion, the
14   government's motion for detention, and I believe that there's
15   a combination of conditions that we discussed earlier that
16   will reasonably assure his appearance and safety of the
17   community.

18          THE COURT:  Thank you.

19          Again, I must determine whether the government's met
20   its burden of proving that no condition or combination of
21   conditions can reasonably assure the defendant's appearance
22   (inaudible) community.  As to appearance, it's the
23   government's burden by a presumption of evidence.  As to
24   danger, it's by clear and convincing evidence.  (Inaudible)
25   the presumption in this case established by the indictment

1  finding probable cause that the defendant committed the
2  charged offense, there is a rebuttable presumption, and the
3  government retains the burden of proof.

4        I've considered the factors in 3142 (inaudible), as
5  with the previous defendant.  I think there are a combination
6  of conditions that I can set, despite the presumption and
7  despite the evidence, that will reasonably assure the
8  defendant's appearance (inaudible).

9        The nature of the offense is quite serious because
10 it does involve Fentanyl and is essentially more serious for
11 Mr. Dawodu as opposed to Mr. Spencer, given the more direct
12 evidence of his handling the Fentanyl pills (inaudible).  So
13 it is a -- certainly it is a serious offense.  The nature and
14 circumstances do involve danger.  I find the weight of the
15 evidence is fairly strong, at least (inaudible) portions of
16 (inaudible) Mr. Dawodu (inaudible).  That said, he has little
17 to no criminal history depending on how this Georgia citation
18 is actually (inaudible).  Even if he was convicted of
19 possession of marijuana, it's a relatively minor offense in
20 the grand scheme of things.

21       While he has ties to Nigeria, he also does have ties
22 to the United States.  He's been here for quite a long time.
23 He is a naturalized citizen and has been so for many years,
24 for about a decade now.  Given his lack of criminal history, I
25 think while there is a danger posed given the nature of the

offense, again, the lack of criminal history suggests that --

or there's no evidence that he would not be deterred by

conditions of bond.  He also does have strong enough ties to

the United States.  While there is the risk of flight to

another country, the conditions that I impose can reasonably

mitigate those risks to ensure the defendant's (inaudible) at

trial.

So based on that finding, I am going to impose a

combination of (inaudible).  I'm going to again impose a

$100,000 personal surety bond, a $100,000 10 percent bond.

Both of those bonds must be cosigned by Rochelle Rose and

Jamilla Boule.  There is a Nebbia condition on the 10 percent

bond.

Mr. Dawodu, listen carefully, because I'm going to

read you the standard and special conditions of your bond.  If

you violate any of these conditions, not only will you end up

back in custody, but you will bring severe financial

consequences on Ms. Rose and Ms. Boule, who are both vouching

for you.

First and foremost, you shall appear before this

Court or the District of Columbia court as directed, whether

remotely or in person as directed.  I would note that if you

fail to abide by that condition, you could also be charged

with a separate crime of failure to appear.

Your travel is restricted to the Southern District

1  of Florida and the District of Columbia, but only the District

2  of Columbia for the purpose of court appearances.  You must

3  reside at Ms. Rose's address on 12th Avenue, in Miami, and you

4  will not change that address without prior notice to probation

5  and the Court.

6          You must cooperate with law enforcement in the

7  collection of DNA.

8          While on bond, you must not violate any federal,

9  state or local raw.  If you come in contact with law

10  enforcement, you must contact probation within 72 hours.

11          While on bond, you are going to be (inaudible).  You

12  must surrender any passports that you have.  You may not

13  obtain any passport or other travel documents while on bond.

14          You are to report to Pretrial Services as directed.

15          (Inaudible) the substance abuse counseling as

16  determined by probation, the cost borne by you.  While on

17  bond, you are to abstain from the use of any narcotic drug or

18  controlled substance.

19          You are to avoid all contact with any victims or

20  witnesses in the crimes charged except through counsel.

21  You're also to avoid contact with any co-defendants or

22  co-conspirators except through counsel.

23          While on bond, you must not possess any firearm or

24  destructive device.

25          Neither you nor the women who will be cosigning on

the bond may pledge, mortgage or otherwise encumber any real property while you are on bond.

You must not visit any commercial transportation establishments except as necessary to travel to the District of Columbia.

You're going to be placed on house arrest subject to GPS monitoring with the following exception: You may leave the home for medical reasons and court appearances or for attorney visits.

Mr. Jones, are there any other conditions that you'd like to recommend as to the bond?

MR. JONES: No, Your Honor.

THE COURT: Ms. Vasquez, anything else you want to recommend or have me clarify?

PROBATION OFFICER: No, Your Honor. I just need the actual address of where he's going to be residing.

THE COURT: Mr. Ray, correct me if I'm wrong. I believe it's 11225 Northeast 12th Avenue, in Miami?

MR. RAY: That is correct, Your Honor.

THE COURT: Is that correct, Mr. Ray?

MR. RAY: Yes, thank you.

THE COURT: And Ms. --

PROBATION OFFICER: Your Honor, I apologize. I only got 11225 12th Avenue. I'm having such a hard time hearing you, Your Honor.

```
 1              THE COURT:  It's in Miami.

 2              MR. RAY:  And that's Northeast 12th Avenue.

 3              PROBATION OFFICER:  Northeast, okay.

 4              THE COURT:  The cost of GPS monitoring will be borne

 5    by you if Pretrial determines that you are in a position to

 6    afford it.

 7              Anything else, Mr. Ray?

 8              MR. RAY:  Nothing else, Your Honor.

 9              THE COURT:  Mr. Jones, I will grant the government's

10    motion to stay my release order pending the three days to

11    allow the government an opportunity to appeal that order in

12    the District of Columbia.

13              MR. JONES:  Thank you, Your Honor.

14              THE COURT:  I do recognize that we have

15    Mr. Fleischman here, we have Mr. Ray here.  I'm not sure if we

16    need do this for a removal case; however, let me (inaudible)

17    the (inaudible) protection act (inaudible) has not been read

18    in this case.

19              Let me advise counsel for all parties here that I

20    need to remind everyone of the government's disclosure

21    obligations under Brady versus Maryland.  The government has a

22    constitutional duty to disclose any evidence that goes toward

23    the (inaudible) of the defendant's guilt that would reduce the

24    defendant's potential sentence or evidence showing the

25    credibility of a witness.  The defendant is entitled to this
```

```
 1    information without a request.  I hereby order the government
 2    to comply with these obligations.  Failure to timely comply
 3    with Brady obligations could result in serious consequences,
 4    including sanctions against the government, suppression of
 5    evidence, adverse jury instructions, (inaudible) charges,
 6    contempt, or reversal of conviction, as well as professional
 7    consequences for any individual found to have unlawfully
 8    withheld them.
 9              All right.  Is there anything else we need to
10    address as to either Mr. Spencer or Mr. Dawodu?
11              MR. FLEISCHMAN:  No, Your Honor.
12              MR. JONES:  No, Your Honor.
13              MR. RAY:  No, Your Honor.
14              THE COURT:  Thank you all for your appearances
15    today.
16              VOICES:  Thank you, Your Honor.
17         (Proceedings concluded.)
18                         * * * * *
19
20
21
22
23
24
25
```

```
 1                        * * * * *

 2                        I N D E X

 3   Testimony of Sean Hamblet
```

```
 4           Cross by Mr. Fleischman            18

 5           Cross by Mr. Ray                   30

 6           Redirect by Mr. Jones             39
```

```
 7                        * * * * *

 8                      E X H I B I T S

 9   (None.)

10                        * * * * *

11                       CERTIFICATE

12       I, Stephen W. Franklin, Registered Merit Reporter, and

13   Certified Realtime Reporter, certify that the foregoing is a

14   correct transcript, to the best of my ability, from the

15   DIGITAL AUDIO RECORDING of proceedings in the above-entitled

16   matter.

17       Dated this 6th day of APRIL, 2021.

18

19       /s/Stephen W. Franklin
         _____
20       Stephen W. Franklin, RMR, CRR

21

22

23

24

25
```

# UNITED STATES DISTRICT COURT

| SOUTHERN | District of | FLORIDA |
|---|---|---|

| UNITED STATES OF AMERICA<br>vs.<br>OLATUNJI DAWODU | **COMMITMENT TO ANOTHER<br>DISTRICT** |
|---|---|
| | 21-6100-STRAUSS |

| DOCKET NUMBER | | MAGISTRATE JUDGE CASE NUMBER | |
|---|---|---|---|
| District of Arrest | District of Offense | District of Arrest | District of Offense |
| DISTRICT OF COLUMBIA | 21-CR-00145 | SOUTHERN DISTRICT OF FLORIDA | 21-6100-STRAUSS |

**CHARGES AGAINST THE DEFENDANT ARE BASED UPON AN**

X Indictment  ☐ Information  ☐ Complaint  ☐ PETITION

charging a violation of 21      **U.S.C. § 846**

**DISTRICT OF OFFENSE:**

DISTRICT OF COLUMBIA

**CONSPIRACY TO POSSESS WITH INTENT TO DISTRIBUTE FENTANYL**

**CURRENT BOND STATUS:**

☐ Bail fixed at          and conditions were not met
☐ Government moved for detention and defendant detained after hearing in District of Arrest
☐ Government moved for detention and defendant detained pending detention hearing in District of Offense
☒ Other (specify)   Government's Motion for Emergency Review and Appeal GRANTED order attached ****

**Representation:** ☒ Retained Own Counsel    Federal Defender Organization   ☐ CJA Attorney   ☐ None

**Interpreter Required?** ☐ No    Yes   Language: ENGLISH

**SOUTHERN DISTRICT OF FLORIDA**

TO: THE UNITED STATES MARSHAL
     You are hereby commanded to take custody of the above named defendant and to transport that defendant with a certified copy of this commitment forthwith to the district of offense as specified above and there deliver the defendant to the United States Marshal for that District or to some other officer authorized to receive the defendant.

| 4/19/2021 | |
|---|---|
| Date | United States Judge or Magistrate Judge |

| **RETURN** |
|---|

This commitment was received and executed as follows:

| DATE COMMITMENT ORDER RECEIVED | PLACE OF COMMITMENT | DATE DEFENDANT COMMITTED |
|---|---|---|
| | | |

| DATE | UNITED STATES MARSHAL | (BY) DEPUTY MARSHAL |
|---|---|---|
| | | |

UNITED STATES OF AMERICA,

v.

LUIS MIGUEL TEXEIRA-SPENCER,
and OLATUNJI DAWODU, ✔✔

Defendants.

Crim. No. 21-145 (JDB)

## MEMORANDUM OPINION

Defendants Luis Miguel Teixeira-Spencer and Olatunji Dawodu are charged via indictment with one count of conspiracy to distribute 400 grams or more of a mixture and substance containing a detectable amount of fentanyl. The charges stem from defendants' involvement in a narcotics trafficking conspiracy which used darknet websites[1] to distribute pills pressed with fentanyl by mail. Following their arrests and a joint detention hearing, a magistrate judge on the United States District Court for the Southern District of Florida ordered both defendants released pending trial and stayed the release order pending appeal. The government now asks this Court to review the magistrate judge's decision and order defendants detained pending trial. For the reasons stated below, the Court concludes that no condition or combination of conditions of release will reasonably assure defendants' appearance and the safety of the community if the defendants are released pending trial, and hence will order them detained.

### Background

On February 22, 2021, a grand jury returned an indictment charging defendants Spencer

---

[1] Darknet markets are commercial websites that are set up as "hidden services" and can only be accessed using the Tor network, which requires installing Tor software. Darknet markets function primarily as black markets for illicit goods and bitcoin is the most common payment method. See Indictment [ECF No. 1] ¶¶ 2–3.

1

and Dawodu with one count of conspiracy to distribute 400 grams or more of a mixture and substance containing a detectable amount of fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A)(vi). See Indictment.[2] These charges arise from defendants' participation in a narcotics trafficking conspiracy which involved using darknet websites to distribute pills pressed with fentanyl via the U.S. Postal Service ("USPS"). Id. ¶¶ 8–12. The government's proffer in support of pretrial detention is described below.

The Federal Bureau of Investigation ("FBI") and other law enforcement agencies conducted a criminal investigation of a darknet market vendor that operates the moniker "johncarter7." See Gov't's Mem. at 1.[3] From around February 2017 until May 2020, johncarter7 sold pills pressed with fentanyl on several darknet markets, including AlphaBay, Wall Street, Dream, and Empire. Id. As certain darknet sites were shut down, the vendor turned to new markets. Id. at 1–2. Records indicate that johncarter7 sold more than 67,700 pills across the four darknet markets and more through the encrypted messaging application Jabber, receiving payment in bitcoin. Id. at 2.

While investigating johncarter7, law enforcement found that three of the vendor's darknet sites used the same encryption key and embedded within each key was the same email address. Id. That email address was the recovery address for an account on a bitcoin exchange

---

[2] Additionally, on March 1, 2021, a grand jury returned an indictment in Case No. 21-CR-163 charging Dawodu and a third individual, Alex Ogando, with one count of conspiracy to distribute 400 grams or more of a mixture and substance containing a detectable amount of fentanyl. See Indictment [ECF No. 3], United States v. Dawodu, 21-CR-163 (D.D.C.). That indictment arose from a related investigation of fentanyl pills sold on the darknet site PolarSprings. See Gov't's Mem. for Pretrial Detention ("Gov't's Mem.") [ECF No. 7] at 1 n.2. Following a detention hearing on April 8, 2021, Magistrate Judge Harvey ordered Ogando detained pending trial. See Min. Entry (Apr. 8, 2021), United States v. Ogando, 21-CR-163 (D.D.C.).

[3] The Court will cite the government's written proffer, but notes that all of these facts are consistent with the oral proffer given during the detention hearing in the Southern District of Florida. See Tr. of Video Detention & Removal Hr'g Before the Hon. Jared M. Strauss, U. S. Magistrate Judge ("Mag. Hr'g Tr.") [ECF No. 8-1] at 7–16. These facts are also reflected in the "manner and means" and "overt acts" section of the indictment. See Indictment ¶¶ 8–25.

2

(Localbitcoins.com) with the username "johncarter777." Id. at 3. An individual who traded cash for bitcoin with johncarter777 in-person several times identified Spencer's photograph as depicting the person he met with. Id. That same individual traded bitcoin with Spencer under another handle, and records for that handle include Spencer's name, phone number, and email address. Id. Further, records from another bitcoin exchange (Coinbase) show that bitcoin proceeds from johncarter7 were used on Expedia to pay for a May 2017 hotel stay in Fort Lauderdale, Florida, which was reserved under Spencer's name, phone number, and email address. Id. Moreover, in June and December 2019, an undercover officer bought pills directly from johncarter7 using Jabber, submitting payments to provided bitcoin addresses. Id. at 3–4. Law enforcement traced those payments to an account on a bitcoin exchange (Binance) connected to Spencer and accessed from an IP address in his name and at his residence. Id. at 4.

Law enforcement identified one of Spencer's close contacts as Olatunji Dawodu. Id. Records show nearly 1,500 calls between them from June 17, 2019 to November 15, 2020. Id. Through a pole camera, law enforcement captured Spencer and Dawodu bringing in and taking out boxes from a storage unit in Davie, Florida. Id. Law enforcement also observed them together at Spencer's residence and found messages from Spencer on Dawodu's iCloud account that contained bitcoin wallet addresses. Id. In July and August 2019, law enforcement twice observed Dawodu drop packages containing pills at USPS boxes. Id. After contacting the intended recipients, law enforcement confirmed that the packages were ordered from johncarter7 on Empire and contained fentanyl pills similar to those purchased undercover from johncarter7. Id. at 4–5. Additionally, a confidential human source purchased pills directly from Dawodu several times— including in May and October 2020 and January 2021—that were consistent with the pills in the packages Dawodu dropped at USPS boxes. Id. at 5.

3

On February 23, 2021, following the Indictment, law enforcement executed search warrants at both defendants' residences in Fort Lauderdale. Id. From Dawodu's residence, law enforcement recovered electronic devices, approximately 1,400 grams of pills containing suspected fentanyl, and around thirty USPS mailing envelopes. Id. The pills and packaging were consistent with those from the johncarter7 undercover purchases and the packages law enforcement observed Dawodu drop at USPS boxes. Id. at 7. From Spencer's residence, law enforcement recovered more than $12,000, digital devices, and ledgers. Id.[4]

On that same day, defendants were arrested in the Southern District of Florida. See Arrest (Feb. 23, 2021), United States v. Spencer, 21-MJ-6099 (S.D. Fla.); Arrest (Feb. 23, 2021), United States v. Dawodu, 21-MJ-6100 (S.D. Fla.). During a recorded jail call shortly after his arrest, Spencer directed his girlfriend to "get rid of" laptops that the FBI missed during their search of his residence. Gov't's Mem. at 8. On February 24, 2021, defendants appeared before Magistrate Judge Jared M. Strauss in the Southern District of Florida and were temporarily detained at the government's request. See Min. Entry (Feb. 24, 2021), Spencer, 21-MJ-6099 (S.D. Fla.); Min. Entry (Feb. 24, 2021), Dawodu, 21-MJ-6100 (S.D. Fla.).

After several continuances, Judge Strauss held a detention hearing on March 31, 2021. See Mag. Hr'g Tr. The government provided an oral proffer and testimony by an FBI agent involved in the investigation. Id. Judge Strauss ordered both defendants released pending trial, finding that certain conditions of release could reasonably assure the defendants' appearance and the safety of the community. Id. at 56, 72–73. Specifically, Judge Strauss ordered both defendants released on

---

[4] That same day, law enforcement also executed a search warrant at the Providence, Rhode Island residence of Alex Ogando, Dawodu's co-conspirator in Case No. 21-CR-163 who the government has described as a "known associate" of both Dawodu and Spencer. Gov't's Mem. at 7. From Ogando's residence, law enforcement recovered more than 1,770 grams of pills containing fentanyl, about $370,000, a money counter, electronic devices, and about thirty USPS Priority Mail envelopes with filled pill orders. Id. at 7–8.

4

bond into home detention on GPS monitoring, with Spencer to reside with a cousin and aunt in Providence, Rhode Island and Dawodu with a friend in Miami. Id. at 56–58, 73–75. At the government's request, Magistrate Judge Strauss stayed the release order pending appeal. See id. at 62, 76. Later that day, the government moved for revocation of the release order. See Mot. for Emergency Review & Appeal of Release Order ("Gov't's Mot.") [ECF No. 6]. All parties submitted memoranda on the motion, and the Court conducted a hearing on April 16. The government's motion is now ripe for decision.

## Legal Standard

When a defendant is ordered released by a magistrate judge, the government may file "a motion for revocation of the order or amendment of the conditions of release" with "a court having original jurisdiction over the offense." 18 U.S.C. § 3145(a)(1). Although the D.C. Circuit has not ruled on the matter, every circuit to consider the issue has found that a magistrate judge's release or detention order is subject to de novo review. See United States v. Hunt, 240 F. Supp. 3d 128, 132 (D.D.C. 2017) (identifying cases from the Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits that support this proposition). This Court has adopted this view, see United States v. Louallen, 2019 WL 1003531, at *1 (D.D.C. Feb. 27, 2019) (Bates, J.), and the government agrees that this is the appropriate standard, see Gov't's Mot. at 4. See also United States v. Chrestman, -- F. Supp. 3d --, 2021 WL 765662, at *5–6 (D.D.C. Feb. 26, 2021) (Howell, C.J.) (explaining why "both the [Bail Reform Act] and the Federal Magistrates Act support the conclusion, reached by every circuit to have considered question, that a district court reviews a magistrate judge's pretrial release or detention order de novo").

Under the Bail Reform Act ("BRA"), 18 U.S.C. §§ 3141–3156, "Congress limited pretrial detention of persons who are presumed innocent to a subset of defendants charged with crimes

that are 'the most serious' compared to other federal offenses." United States v. Singleton, 182 F.3d 7, 13 (D.C. Cir. 1999) (quoting United States v. Salerno, 481 U.S. 739, 747 (1987)). Hence, a detention hearing must be held only if a case involves certain enumerated categories of offenses, 18 U.S.C. § 3142(f)(1)(A)–(E), or if the defendant poses a serious risk of flight or of trying to obstruct justice or threaten, injure, or intimidate a witness or juror, id. § 3142(f)(2)(A)–(B). A subset of the types of offenses requiring a detention hearing triggers a rebuttable presumption "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed" that subset of offenses. 18 U.S.C. § 3142(e)(3).

If a defendant is eligible for a detention hearing, the BRA provides that the court "shall" order pretrial detention if it "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." Id. § 3142(e)(1). "In common parlance, the relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to the community.'" United States v. Vasquez-Benitez, 919 F.3d 546, 550 (D.C. Cir. 2019). Pretrial detention must be supported by clear and convincing evidence when the justification involves the safety of the community, and a preponderance of the evidence when the justification involves the risk of flight. United States v. Simpkins, 826 F.2d 94, 96 (D.C. Cir. 1987). To justify detention on the basis of dangerousness, the government must establish by clear and convincing evidence that the defendant poses a continued "articulable threat to an individual or the community" that cannot be sufficiently mitigated by release conditions. United States v. Munchel, 2021 WL 1149196, at *4 (D.C. Cir. Mar. 26, 2021) (quoting Salerno, 481 U.S. at 751).

To decide whether pretrial detention is warranted, the court must "take into account the available information concerning" four statutory factors: (1) "the nature and circumstances of the

6

offense charged," (2) "the weight of the evidence against the person," (3) "the history and characteristics of the person," and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(1)–(4).

## Analysis

To start, defendants are eligible for pretrial detention under 18 U.S.C. § 3142(f)(1)(C), which authorizes pretrial detention in cases that involve "an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act." Defendants do not dispute that the Controlled Substances Act offense charged here meets these criteria. See 21 U.S.C. § 841(b)(1)(A)(vi).

Moreover, because the charged offense here is "an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act," it triggers a rebuttable presumption that no conditions will reasonably assure the defendant's appearance and protect the community if the Court finds there is probable cause to believe the defendant committed the offense. 18 U.S.C. § 3142(e)(3)(A). The indictment alone establishes probable cause and triggers the presumption. See, e.g., United States v. Smith, 79 F.3d 1208, 1210 (D.C. Cir. 1996) ("The indictment alone would have been enough to raise the rebuttable presumption that no condition would reasonably assure the safety of the community"). The government may also support that presumption by proffer, id., and all parties agreed during this Court's detention hearing that the presumption applies.

The Court concludes that defendants have not presented sufficient evidence to rebut the presumption. Moreover, after considering the presumption and the § 3142(g) factors discussed below, the Court concludes that detention is warranted.

7

### A.    Nature and Circumstances of the Offense

The Court first considers "the nature and circumstances of the offense charged." 18 U.S.C. § 3142(g)(1). Here, the offense is extremely serious. A grand jury has found probable cause to believe that defendants were involved in a sophisticated conspiracy to distribute more than 400 grams of a mixture and substance containing fentanyl—which carries a ten-year mandatory minimum and a maximum sentence of life imprisonment. See 21 U.S.C. § 841(b)(1)(A)(vi). As noted above, Congress enacted a statutory presumption in favor of pretrial detention for those charged with serious drug trafficking offenses—demonstrating that Congress recognized the risks posed by such defendants. Furthermore, the quantity of fentanyl distributed by johncarter7 greatly exceeds that required for the mandatory minimum; the quantity recovered from Dawodu's residence alone is more than three times the qualifying amount. See Gov't Mem. at 12. Fentanyl distribution poses a grave danger to the community, especially in recent months. See, e.g., Abby Goodnough, Overdose Deaths Have Surged During the Pandemic, C.D.C. Data Shows, N.Y. Times (Apr. 14, 2021), https://www.nytimes.com/2021/04/14/health/overdose-deaths-fentanyl-opiods-coronaviurs-pandemic.html (noting that fentanyl is the primary driver for a twenty-nine percent rise in overdose deaths from October 2019 through September 2020 compared with the previous twelve-month period).

Because defendants are subject to a lengthy period of incarceration if convinced, they have an incentive to flee. The circumstances of this offense suggest they might have the means to do so. Defendants have access to virtual currency and are familiar with darknet markets that sell not only drugs but also false identification and weapons. Indeed, during the search of Dawodu's residence, law enforcement recovered a false Illinois driver's license with the name "Jason Richmond." See Suppl. To Gov't Mem. for Pretrial Det. ("Gov't Suppl. Mem.") [ECF No. 11]

at 1–2.[5] And despite Dawodu's claim that there is no direct evidence of him using cryptocurrency, there is evidence on Dawodu's iCloud of Spencer sending him bitcoin wallet addresses. See Mag. Hr'g Tr. at 41:20–43:19.

While Spencer admits that "the offense was serious given its involvement with Fentanyl," see Spencer's Mem. at 2, Dawodu claims that his role in the alleged conspiracy was "minimal," see Dawodu's Mem. at 2. But the facts disprove Dawodu's assertion: more than 1,400 grams of pills (approximately 12,590 pills) were found in his bedroom and law enforcement observed him both drop packages for johncarter7 and ship pills directly to customers, including a confidential human source. See Gov't's Suppl. Mem. at 2–3.

Hence, the Court finds that the nature and circumstances of the charged offense weigh heavily in favor of detention for both Spencer and Dawodu.

## B. The Weight of the Evidence

The weight of the evidence that Dawodu and Spencer were involved in the alleged conspiracy is fairly strong. To be sure, the nature of this conspiracy renders prosecution quite difficult. Because the alleged conspiracy involved sophisticated co-conspirators operating on the darknet with virtual currency and encryption tools to evade detection by law enforcement, it is hard to attribute the criminal activities to individuals. But here, as detailed in the background section above, the government has presented ample evidence.

With respect to Dawodu, the government observed him drop packages containing fentanyl pills at USPS boxes whose intended recipient confirmed the pills were purchased from johncarter7. A confidential source purchased fentanyl pills directly from Dawodu, and approximately 1,400

---

[5] At the detention hearing, Dawodu's attorney stated that he did not believe the picture on the fake driver's license depicted Dawodu. Regardless of whether it does, Dawodu's possession of any counterfeit identification card suggests he has access to fake identification.

grams of pills containing suspected fentanyl and 30 USPS mailing envelopes were found in his residence. Additionally, the government has extensive records of his communications and meetings with Spencer, including their exchange of bitcoin wallet addresses.

As for Spencer, the government linked his email address, photograph, and a hotel reservation made in his name to johncarter7. Law enforcement also traced an undercover purchase of fentanyl from johncarter7 to a bitcoin exchange account connected to Spencer and accessed from an IP address in Spencer's name and at his residence. Further, the search of his residence uncovered a large amount of cash and ledgers. Spencer attempts to cast doubt on the evidence against him by arguing that "[w]hile there were bitcoin transactions linked back to Spencer's bitcoin account and email, the government was not able to say whether a review of the bitcoin transactions matched up with actual dates that drug transactions took place" or "how many people other than Spencer had access to that same bitcoin (Coinbase) account." See Spencer's Mem. at 4 (internal citation omitted). He also argues that no purchasers or informants identified him as a seller, no narcotics were found in his house, and he was never seen with Dawodu during mail drops. Id. The government persuasively rebutted these points in its supplemental memorandum and during the detention hearing. Although Spencer apparently relied on others to mail the narcotics, he played an integral role in the conspiracy. See Gov't's Suppl. Mem. at 4–5. In addition to the evidence already discussed, Spencer purchased bitcoin to pay for orders of at least 610 grams of furanylfentanyl on the darknet site Alphabay in 2016 and searches observed in his email address reflect searches for fentanyl analogues close in time to several of these purchases. Id. at 4. Spencer's IP address records also reveal that he accessed the darknet and encrypted messaging platforms: he connected to the Tor network, which is how darknet markets are accessed, and connected to the Jabber server during the time when johncarter7 was directing customers to

contact the vendor directly via Jabber. Id. at 5. And although Spencer did not sell drugs in-person, he did trade bitcoin for cash in person with a trader who found him using the johncarter777 moniker. Id. Finally, while Spencer was not observed dropping packages with Dawodu, they were observed together carrying packages to and from a storage unit and were in frequent contact. Id.

In sum, this factor weighs in favor of detention, although it "is the least important." See United States v. Gebro, 948 F.2d 1118, 1121–22 (9th Cir. 1991).

## C. History and Characteristics of the Defendant

Both defendants' history and characteristics are mixed but tilt in favor of detention. As part of this factor, the Court considers defendants' "character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings." 18 U.S.C. § 3142(g)(3)(A).

Neither defendant has a significant criminal history. In 2017, Spencer pled guilty to one misdemeanor for obtaining money under false pretenses in Rhode Island. See Ex. 1, Spencer's Mem. at 3–4. While the pretrial service report states that Dawodu has a charge in Butts County, Georgia for marijuana possession, the district attorney's office told Dawodu's counsel that no case was ever filed under his name or the citation number provided, and prosecution never commenced. See Dawodu's Mem. at 2; Mag. Hr'g Tr. at 68:2–10. Notably, however, the indictment here charges defendants with a years-long conspiracy that was able to evade detection by law enforcement by using electronic tools designed specifically to conceal illegal activity.

Both defendants have significant ties to both the United States and foreign countries. While Spencer is from Cape Verde and has no legal status in the United States, he has been here since he was eleven years old. Spencer's Mem. at 3. He has a girlfriend in South Florida, and a cousin and

11

aunt in Rhode Island whom he would reside with if released. Id.; Mag. Hr'g Tr. at 49:13–14. But his mother is in Cape Verde, Mag. Hr'g Tr. at 54:2–3, and he has an immigration detainer currently in place. See Ex. 1, Gov't's Mem. [ECF No. 7-1]. While Spencer has sought to remain here through the DACA program, and says he will fight deportation, he may not be given the choice. See Mag. Hr'g Tr. at 55:21–56:1. Spencer argues that his immigration detainer actually "takes away any risk of flight because Spencer first must obtain a ruling [from] DHS, at a minimum, which grants him an immigration bond prior to even being able to be released in the instant case on bail." Spencer's Mem. at 3. This argument is unavailing because if this Court orders Spencer released and he then receives an immigration bond, he could still flee to avoid prosecution in this case. Moreover, Spencer's call to his girlfriend after his arrest, in which he directed her to get rid of laptops the FBI inadvertently left behind, suggests that he is willing to obstruct justice.

Dawodu was born in Nigeria but came to the United States in 2005 and has been a naturalized citizen since 2011. See Dawodu's Mem. at 2. He has close friends in South Florida, including a friend he would reside with if released, a girlfriend in Atlanta, and a sister in Maryland. Id. at 2–3. But he has substantial ties to Nigeria, too, including his parents and siblings who live there. See Mag. Hr'g Tr. at 67:11–16. He also buys and exports cars, suggesting possible business relationships with people abroad. Id. at 68:11–17. Dawodu claims that he is not a flight risk because he voluntarily surrendered his passports to a probation officer on March 29, 2021 and because he does not have the financial resources to flee. Id. at 3. Yet agents discovered his fake driver's license, which suggests an attempt to evade law enforcement and raises the possibility he could flee using false identification. See Gov't's Suppl. Mem. at 1–2. And because Dawodu has exchanged bitcoin wallet addresses with Spencer, he might very well have access to virtual currency.

12

Hence, while both defendants have limited criminal histories and the Court believes they wish to remain in the United States, their flight risk cannot be dismissed given their foreign ties, possible access to the darknet and cryptocurrency, history of evading law enforcement, and incentive to flee. The Court therefore concludes that both defendants' history and characteristics counsel against release.

### D.    Nature and Seriousness of the Danger

The final factor that the Court must consider is "the nature and seriousness of the danger to any person or the community that would be posed by the [defendant's] release." 18 U.S.C. § 3142(g)(4). "Consideration of this factor encompasses much of the analysis set forth above, but it is broader in scope," as it requires "an 'open-ended assessment of the "seriousness" of the risk to public safety.'" United States v. Cua, Crim. A. No. 21-108 (RDM), 2021 WL 918255, at *5 (D.D.C. Mar. 10, 2021) (quoting United States v. Taylor, 289 F. Supp. 3d 55, 70 (D.D.C. 2018)).

As set forth above, defendants' role in a large-scale fentanyl distribution conspiracy showed an obvious disregard for the safety of others. Fentanyl is extraordinarily dangerous and this operation distributed a massive amount. Congress recognized the high risk of recidivism for those involved in serious drug offenses by creating a statutory presumption in favor of detention, and defendants have not presented any compelling evidence to rebut that presumption here. Defendants argue that they have no history of violence. See Dawodu's Mem. at 2; Spencer's Mem. at 4. Even if true, that does nothing to allay the dangers stemming from fentanyl distribution.

This Court respectfully disagrees with Magistrate Judge Strauss's conclusion that there is a combination of conditions that can be imposed to reasonably assure the safety of the community. See Mag. Hr'g Tr. at 56, 72. As Judge Strauss acknowledged, Spencer poses a "substantial risk" of continuing his criminal activity on home detention "because he was apparently able to conduct

all of the alleged activity from his home and through the dark net, which is difficult to monitor." Id. at 56:2–7. And while Dawodu's activity involved leaving the home to travel to USPS drop boxes, he could become involved with a different part of the conspiracy or direct others to drop packages for him. The Court disagrees with Judge Strauss's view that "the lack of criminal history involved suggests . . . there's not substantial evidence here that [defendants are] not going to be deterred by the significant conditions of bond." Id. at 56:7–11. Fentanyl sales are lucrative and defendants' use of cryptocurrency, the darknet, and encrypted applications over a lengthy period of time demonstrate their ability to operate the conspiracy without detection out of their homes. No combination of conditions could effectively mitigate that danger. Even if pretrial services can monitor internet use to some extent, it has no meaningful way to prevent defendants from using sophisticated tools to evade detection. For example, as the government suggested during the detention hearing, defendants could access the darknet or virtual currency using devices owned by others in their households. Indeed, Judge Strauss did not impose any internet restrictions at all precisely because he was "not sure" how defendants' access to darknet services could "actually be monitored." Id. at 60:1–10.

Because there is a significant risk that defendants will continue their criminal activity on home detention, they pose a continued "articulable threat to an individual or the community" that cannot be sufficiently mitigated by release conditions. See Munchel, 2021 WL 1149196, at *4 (quoting Salerno, 481 U.S. at 751). Therefore, in addition to finding by a preponderance of evidence that there is a risk of flight, the Court finds by clear and convincing evidence that both defendants pose a substantial prospective threat to the community.

### Conclusion

For the reasons explained above, the Court finds that all four statutory factors weigh in

14

favor of pretrial detention.  Therefore, the Court will grant the government's motion for emergency

review and appeal of release order, and order defendants detained pending trial.  A separate order

has been issued on this date.

                                                                          /s/
                                                                 JOHN D. BATES
                                                            United States District Judge

Dated:  April 19, 2021

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| |
|---|
| UNITED STATES OF AMERICA, |
| v. |
| OLATUNJI DAWODU, |
| Defendant. |

**Crim. No. 21-145-2 (JDB)**

## ORDER

Upon consideration of [6] the government's Motion for Emergency Review and Appeal of Release Order, the evidence proffered and arguments presented in connection with the government's motion, including at the detention hearing held on April 16, 2021, the entire record herein, the factors enumerated in 18 U.S.C. § 3142(g), and for the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that [6] the government's Motion for Emergency Review and Appeal of Release Order is **GRANTED**; it is further

**ORDERED** that defendant Olatunji Dawodu shall be detained pending trial; it is further

**ORDERED** that defendant be committed to the custody of the Attorney General for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal; it is further

**ORDERED** that defendant be afforded reasonable opportunity for private consultation with counsel; and it is further

**ORDERED** that the person in charge of the corrections facility in which defendant is confined shall deliver the defendant to the United States Marshals Service which shall transport defendant forthwith to the District of Columbia for further proceedings in this matter.

1

134

**SO ORDERED.**

_____/s/_____
JOHN D. BATES
United States District Judge

Dated: April 19, 2021

# U.S. District Court
## Southern District of Florida (Ft Lauderdale)
## CRIMINAL DOCKET FOR CASE #: <ins>0:21−mj−06100−JMS</ins>−1

Case title: USA v. Dawodu

Date Filed: 02/24/2021

Date Terminated: 04/19/2021

Assigned to: Magistrate Judge
Jared M. Strauss

## **Defendant (1)**

**Olatunji Dawodu**
31377−509
*YOB 1984 English*
*TERMINATED: 04/19/2021*

represented by **Noticing FPD−FTL**
(954) 356−7436
Email: ftl_ecf@fd.org
*TERMINATED: 02/25/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender Appointment*

**Daryl Elliott Wilcox**
Federal Public Defender's Office
One East Broward Boulevard
Suite 1100
Fort Lauderdale, FL 33301−1842
954−356−7436
Fax: 954−356−7556
Email: Daryl_Wilcox@fd.org
*TERMINATED: 03/03/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender Appointment*

**Landon William Ray**
Chukwuma, Hildebrandt & Ray, PLLC
1135 Kane Concourse
5th Floor
Bay Harbor Islands
Bay Harbor Islands, FL 33154
786−408−9903
Email: landon@chrlawgroup.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Temporary*

**Patrick Joseph Curry**
200 SE 6th Street
Fort Lauderdale, FL 33301

954–765–2400
Fax: 765–1487
Email: PJCNOLE@AOL.COM
*ATTORNEY TO BE NOTICED*
*Designation: Temporary*

**Pending Counts**                      **Disposition**

None

**Highest Offense Level
(Opening)**

None

**Terminated Counts**                  **Disposition**

None

**Highest Offense Level
(Terminated)**

None

**Complaints**                          **Disposition**

21:U.S.C.§846 CONSPIRACY
TO DISTRIBUTE 400 GRAMS
OR MORE OF A MIXTURE
AND SUBSTANCE
CONTAINING A
DETECTABLE AMOUNT OF
FENTANYL

---

**Plaintiff**

**USA**                    represented by   **Trevor Christopher Jones**
                                            DOJ–USAO
                                            500 E. Broward Blvd.
                                            Ste 7th Floor
                                            Ft. Lauderdale, FL 33394
                                            786–564–9109
                                            Email: trevor.jones@usdoj.gov
                                            *LEAD ATTORNEY*
                                            *ATTORNEY TO BE NOTICED*
                                            *Designation: Retained*

| Date Filed | # | Page | Docket Text |
| --- | --- | --- | --- |
| 02/23/2021 | | | Arrest of Olatunji Dawodu (at) (Entered: 02/24/2021) |

| 02/24/2021 | 1 | Magistrate Removal of Indictment from DISTRICT OF COLUMBIA Case number in the other District 1:21–CR–00145 as to Olatunji Dawodu (1). (at) (Entered: 02/24/2021) |
|---|---|---|
| 02/24/2021 | 2 | Order to Unseal as to Olatunji Dawodu re 1 Magistrate Removal In. (Signed by Magistrate Judge Jared M. Strauss on 2/24/2021). (at) (Entered: 02/24/2021) |
| 02/24/2021 | | Set Hearing as to Olatunji Dawodu: Initial Appearance – Rule 5(c)(3)/40 set for 2/24/2021 AT 11:00 AM in Fort Lauderdale Division before FTL Duty Magistrate. (at) (Entered: 02/24/2021) |
| 02/24/2021 | 3 | Minute Order for proceedings held before Magistrate Judge Jared M. Strauss: Initial Appearance in Rule 5(c)(3)/Rule 40 Proceedings as to Olatunji Dawodu held on 2/24/2021. Gov't moves to unseal Indictment. Order signed. Advised of charges. Waived Removal. Detention Hearing set for 3/3/2021 AT 10:00 AM in Fort Lauderdale Division before FTL Duty Magistrate. Attorney added: Noticing FPD–FTL for Olatunji Dawodu (Digital 13:11:54–13:22:22 RECALLED 13:31:10–13:34:05) (Signed by Magistrate Judge Jared M. Strauss on 2/24/2021). (at) (Entered: 02/24/2021) |
| 02/24/2021 | 4 | WAIVER OF REMOVAL by Olatunji Dawodu (at) (Entered: 02/24/2021) |
| 02/25/2021 | 5 | Notice of Assignment of Assistant Federal Public Defender as to Olatunji Dawodu. Attorney Daryl Elliott Wilcox added. Attorney Noticing FPD–FTL terminated.. Attorney Daryl Elliott Wilcox added to party Olatunji Dawodu(pty:dft). (Wilcox, Daryl) (Entered: 02/25/2021) |
| 02/25/2021 | 6 | Invocation of Right to Silence and Counsel by Olatunji Dawodu (Wilcox, Daryl) (Entered: 02/25/2021) |
| 02/26/2021 | 7 | NOTICE OF TEMPORARY ATTORNEY APPEARANCE: Patrick Joseph Curry appearing for Olatunji Dawodu (Curry, Patrick) (Entered: 02/26/2021) |
| 03/01/2021 | 8 | Defendant's MOTION for Termination of Appointment of FPD Daryl E. WIlcox by Olatunji Dawodu. (Attachments: # 1 Text of Proposed Order)(Wilcox, Daryl) (Entered: 03/01/2021) |
| 03/02/2021 | 9 | PAPERLESS NOTICE OF HEARING as to Olatunji Dawodu*** RESET DUE TO QUARANTINE*** Detention Hearing set for 3/10/2021 10:00 AM in Fort Lauderdale Division before FTL Duty Magistrate. Defendant has already waived removal. (dd) (Entered: 03/02/2021) |
| 03/03/2021 | 10 | PAPERLESS ORDER granting 8 Motion for Termination of Appointment of FPD. Daryl Elliott Wilcox terminated from case. as to Olatunji Dawodu (1). Signed by Magistrate Judge Jared M. Strauss on 3/3/2021. (JMS) (Entered: 03/03/2021) |
| 03/10/2021 | 11 | MOTION to Continue by Olatunji Dawodu. Responses due by 3/24/2021 (Curry, Patrick) (Entered: 03/10/2021) |
| 03/11/2021 | 12 | PAPERLESS ORDER granting 11 Motion to Continue as to Olatunji Dawodu (1). The Pretrial Detention hearing will be reset by separate order. The undersigned finds good cause for the continuance based on counsel's illness and also finds the time between today's date and the reset hearing is excludable under the Speedy Trial Act in the interests of justice. Signed by Magistrate Judge Patrick M. Hunt on 3/11/2021. (PMH) (Entered: 03/11/2021) |

| 03/11/2021 | | | Hearing as to Olatunji Dawodu: Detention Hearing reset for 3/24/2021 10:30 AM in Fort Lauderdale Division before FTL Duty Magistrate. (tw) (Entered: 03/11/2021) |
|---|---|---|---|
| 03/23/2021 | 13 | | NOTICE OF TEMPORARY ATTORNEY APPEARANCE: Landon William Ray appearing for Olatunji Dawodu *for proceedings within the Southern District of Florida* (Ray, Landon) (Entered: 03/23/2021) |
| 03/23/2021 | 14 | | Defendant's MOTION to Continue *Detention Hearing* by Olatunji Dawodu. Responses due by 4/6/2021 (Attachments: # 1 Text of Proposed Order Proposed Order)(Ray, Landon) (Entered: 03/23/2021) |
| 03/23/2021 | 15 | | ORDER granting 14 Motion to Continue as to Olatunji Dawodu (1). Re: 14 Defendant's MOTION to Continue *Detention Hearing*. Signed by Magistrate Judge Patrick M. Hunt on 3/23/2021. *See attached document for full details.* (PMH) (Entered: 03/23/2021) |
| 03/23/2021 | | | Set/Reset Deadlines/Hearings as per DE 15 as to Olatunji Dawodu: Detention Hearing reset for 3/31/2021 at 10:30 AM in Fort Lauderdale Division before FTL Duty Magistrate. (lk) (Entered: 03/24/2021) |
| 03/26/2021 | | | Reset Hearing as to Olatunji Dawodu: **TIME CHANGE ONLY** Detention Hearing RESET for 3/31/2021 10:00 AM in Fort Lauderdale Division before FTL Duty Magistrate. (at) (Entered: 03/26/2021) |
| 03/31/2021 | 16 | | Minute Order for proceedings held before Magistrate Judge Jared M. Strauss: Detention Hearing as to Olatunji Dawodu held on 3/31/2021. Witness FBI Agent Sean Hamblet testified. Bond recommendation/set: Olatunji Dawodu (1) $100,000 PSB & $100,000 10% WITH NEBBIA. Government request a stay for three days. Court grants request, stayed pending Appeal. (Digital 10:41:11–12:49:25)<br><br>It is ORDERED AND ADJUDGED that pursuant to the Due Process Protections Act, the Court confirms the obligation of the United States to produce all exculpatory and impeachment evidence to the defendant pursuant to Brady v. Maryland, 373 U.S. 83 (1963) and its progeny, and orders it to do so. Failing to do so in a timely manner may result in consequences, including, but not limited to, exclusion of evidence, adverse jury instructions, dismissal of charges, contempt proceedings, or sanctions by the Court. Signed by Magistrate Judge Jared M. Strauss on 3/31/2021. (at) (Entered: 03/31/2021) |
| 04/06/2021 | 17 | | TRANSCRIPT of Video Detention and Removal Hearing as to Olatunji Dawodu held on 3/31/21 before Magistrate Judge Jared M. Strauss, 1–78 pages, Court Reporter: Stephen Franklin, 305–523–5635. Transcript may be viewed at the court public terminal or purchased by contacting the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 4/27/2021. Redacted Transcript Deadline set for 5/7/2021. Release of Transcript Restriction set for 7/6/2021. (hh) (Entered: 04/07/2021) |
| 04/19/2021 | 18 | | COMMITMENT TO ANOTHER DISTRICT as to Olatunji Dawodu. Defendant committed to District of District of Columbia.. Closing Case for Defendant. (Signed by Magistrate Judge Jared M. Strauss on 4/19/2021). *(See attached document for full details).* (at) (Entered: 04/19/2021) |